**STERLING MILLWRIGHTS, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 367–88C.**

United States Claims Court.

April 29, 1992.

Douglas L. Patin, Kilcullen, Wilson and Kilcullen, Chartered, Washington, D.C., with whom was Marc S. Zweben, Kilcullen, Wilson and Kilcullen, Chartered, for plaintiff.

Russell B. Kinner, Atty., Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, and David M. Cohen, for defendant.

## OPINION

MOODY R. TIDWELL, III, Judge:

On July 15, 1983, the United States Department of the Army, acting through the Watervliet Arsenal, in Watervliet, New York, issued the first step in a two-step bidding process for the construction of a chrome-plating facility for the inner surfaces of 120–millimeter M256 cannon barrels mounted on the M1A1 tank. Only plaintiff, Sterling Millwrights, Inc. (Sterling), and a competitor survived the rigorous technical threshold of Step One, Request for Technical Proposals. The contract to be awarded following Step Two was a fixed-price contract let in accordance with the competitive sealed-bid procedures. Sterling was selected as the low responsive, responsible bidder and was awarded the contract on June 9, 1987, four years after initiation of the procurement. The project was doomed to failure from the start. On August 12, 1988, the Arsenal terminated the contract for default for failure to timely complete. The case is before the court on issues of liability following seven weeks of trial. As the following discussion will demonstrate, the case is extremely complex, both factually and legally.

## PLAINTIFF'S CLAIMS

The chrome-plating facility consists of approximately twenty steel tanks or vats that contain chrome in liquid form. As cannon barrels are dipped into the liquid chrome, electric current is run through the bore to electroplate the chrome to the inside of the barrel. The reason for plating the bore is to reduce friction to increase the velocity of the projectile and extend the life of the barrel.

The contract was a firm fixed-price supply contract with a DX–C2 priority rating.[1] The contract price was $8,310,000 and was to be completed by June 8, 1988, one year from the date of award. The contract completion date was highly ambitious and both sides agreed that the period for performance was greatly compressed.

██ There was disagreement as to whether the contract was a construction contract or supply contract. The document signed by Harold Caton, Sterling's owner, was a supply contract, although performance of the contract, and virtually all of the substantive testimony surrounding it, clothed the project in the indicia of a construction contract. For example, the contract required Sterling to build a large facility that included such construction activities as performing demolition, pouring a concrete foundation, erecting structural steel, installing heating and ventilation systems, and installing extensive electrical and control systems. Both the reprocurement of the instant project and the Arsenal's eight-millimeter chrome-plating facility built in the 1970's were let under construction, and not supply, contracts. The Arsenal's Engineering and Housing Director-ate referred to the chrome-plating facility as a construction project. The C–2 classification assigned to the project under the Defense Priorities and Allocation System signified a construction project. The contract required the preparation and updating of a Program Evaluation and Review Technique (PERT) chart, and the project used Critical Path Method (CPM) analysis, both of which traditionally are intended for use on construction projects.[2] In spite of the obvious nature of the construction activities involved, Mr. John Valloze, the Chief of the Arsenal's Purchasing and Contracting Division, the senior contracting officer on the project, testified that the contract was a supply contract because Sterling was to provide "one chrome plating facility, complete."[3] It defied common sense to contract for the construction of the chrome-plating facility under a supply contract; nonetheless, the government did, and Mr. Caton signed the contract. It is basic contract law that prior or contemporaneous parol evidence will not be permitted to change the meaning of a writing which the parties intended to be the integrated expression of their agreement, unless the parties agree to modify the contract appropri-

1. The Defense Priorities and Allocations System (DPAS) classifies Department of Defense procurements as to their urgency. The DX–C2 designation means that the item is on the President's urgent master list of defense procurements. In practical terms, a DX rating means the contractor, its subcontractors and suppliers, are to perform the contract before any other non-rated or lower-rated contracts.

2. A PERT Chart is a tool of construction scheduling that uses a series of time lines to depict early start and late finish dates for activities. PERT is event, rather than activity, oriented, and is based on probable start and finish dates. Therefore, a PERT Chart is most likely to be used to plan projects in which the contractor has little historical information with which to base time estimates. *See* Anzelon, *CPM or PERT—What's the Difference*, the Constructor (May 1961); Moder and Phillips, *Project Management with CPM and PERT* (2d Ed.1970).

Another tool of construction scheduling related to PERT is critical path method analysis (CPM). The value of CPM is its power to determine the sequence of project activities which require the longest time to complete, and, therefore, be performed by a particular deadline so that the entire project may be completed on schedule. As was true in this case, there may be several critical path activities to a project, some running throughout the entire project and others becoming critical at different stages in the life of the project. CPM analysis uses certain dates to plan activities commonly performed in the construction industry. Pouring concrete and erecting structural steel are considered common activities; installing motor control centers for a chrome plating facility is not. *See,* J. Wickwire & R. Smith, *The Use of Critical Path Method Techniques in Contract Claims,* 7 Pub. Cont.L.J. 1, 1 (1974).

3. Mr. Valloze testified that he considered two factors in determining whether the chrome plating facility should be bid as a construction or supply contract: the Davis–Bacon Act, and bonding requirements. He stated that the administrative burden of complying with the Act and his desire to prevent organized labor from participating in the project were important factors in his decision to award a supply contract. He also stated that he "believed" the bonding requirements under a construction contract would have exceeded the $8 million contract price and have been far too burdensome on the many small subcontractors who would participate.

ately. The court declines to tinker with this well-settled principle.

Harold Caton is a civil engineer with approximately twenty years of industrial contracting experience. Mr. Caton employed Bruce Bromley as the principal subcontractor, and project leader, for the Arsenal contract. Mr. Bromley's background is in the plating industry and he assisted in the successful completion of the eight-millimeter barrel chrome-plating facility for the Arsenal in 1976. The record indicated that both men were highly qualified professionals who had worked well together in the past. Although Mr. Bromley was a subcontractor, and not in privity of contract with the government, the record makes amply clear that the contract was administered as if it were a joint venture between Messrs. Caton and Bromley.

At a pre-award survey conducted on March 24, 1987, the government was told that Messrs. Caton and Bromley had pledged their homes and assets to Marine Midland Bank to secure a $500,000 line of credit to provide cash during the normal twenty to thirty-day period between Sterling's billing of its incurred direct and overhead expenses and receipt of payment for those expenses from the Arsenal. As a small business the payment provisions of the contract permitted Sterling to bill the Arsenal for costs incurred, and required the Arsenal to pay 80 percent of the amount billed. Sterling was to pay its subcontractors 80 percent of their invoiced amounts until the end of the contract, at which time Sterling would receive its remaining 20 percent, and complete payments to its subcontractors. On May 21, 1987, the Defense Contract Audit Agency (DCAA) issued a pre-award audit report stating that the contractor's accounting system was adequate for accumulation and identification under a fixed-price contract. An August 26, 1987, post-award audit by DCAA concluded that Sterling's financial condition was considered sufficient to finance the necessary liabilities and that Sterling's line of credit was sufficient for it to perform the contract in one year.

The contract called for plaintiff to construct the 120-millimeter barrel chrome-plating facility in a pit that the firm of Sweet Associates, Inc. had constructed in a building at the Arsenal in 1980. The chrome-plating facility had been designed for the Arsenal by Walter Kidde Constructors, Inc. (WKC) in 1981, under a contract with the United States Army Corps of Engineers. Sterling was to pour and waterproof a concrete floor, erect a steel structure to house the vats of liquid chrome, and install sophisticated instrument control panels and complex electrical systems. In addition, the contract called for Sterling to remove the pit cover, waterproof the pit walls, and eventually reinstall a new cover over the pit in which it was to construct a new facility. Sterling, as the prime contractor, entered into a series of subcontracts to perform the work.

The DX-C2 status of the contract underscored the importance of completing the performance within the one-year contract period. Sterling's as-planned progress schedule projected a completion date of May 23, 1988, seventeen days short of one year. A significant factor to meeting the compressed completion date was the requirement of the Arsenal to review all shop drawings within five working days. As set forth in the contract, the Offeror's Statement of Compliance required Sterling to create a PERT Chart for the project shortly after award and provide the Arsenal with critical path updates monthly as construction progressed. The five-day shop drawing review requirement was first presented to the Arsenal in a PERT Chart on March 23, 1987, three months before award. The Arsenal never challenged or questioned the required five-day shop drawing review period until months after the award.

In accordance with government contract and industry practice the Arsenal provided Sterling with the WKC design of the chrome-plating facility for distribution to Sterling's various subcontractors. The steel subcontractor created several layers of design drawings of the steel structure needed for the frame of the chrome-plating facility and submitted them, through Ster-

ling, to the Arsenal for review. Sterling was several days late in submitting the first steel shop drawings for approval but it took the Arsenal several months to review the drawings. On December 11, 1987, plaintiff discovered slight, but very significant, bulges in the concrete walls of the pit. The bulges affected the size of the structural steel frame in the pit, as well as many technical shop drawings that subsequently had to be revised. A solution to the problem of the pit wall bulges did not crystallize for over two months. All the while, the working relationship between Sterling and the Arsenal deteriorated. In June 1988, the government refused to make two progress payments, citing the need to recoup allegedly excessive costs previously billed by Sterling. Even though substantial amounts of material had been delivered, plaintiff was forced to suspend work at the job site on June 17, 1988, for lack of funds.

Sterling argued that its failure to complete the project was excusable under the contract because of government-caused delay, and refusal to pay properly earned income. Sterling alleged that the principal cause of the government's delays was the Arsenal's failure to assemble the technical expertise necessary to manage a contract of this complexity, especially in the compressed period of performance. Moreover, the government was liable for defective design drawings which were based in part on as-built drawings of the pit that failed to show the bulges. As a result, the Arsenal's actions frustrated Sterling's performance and prevented Sterling from completing the project on time.

The government denied liability for delay but eventually admitted that it did not have the necessary expertise to review the shop drawings. The government denied any responsibility for the pit wall bulges, asserting that Sterling had a duty to survey the pit at the outset of the project and detect the bulges before any drawings were made. Defendant counterclaimed that Sterling billed the government for fictitious costs through a fraudulent scheme to accelerate profit by charging exorbitant rates for salaries, leases, and pre-award engineering costs in violation of the False Claims Act, 31 U.S.C. §§ 3729–3731 (1988); the Contract Disputes Act, 41 U.S.C. §§ 601–613 (1988); the Forfeiture Statute, 28 U.S.C. § 2514 (1988); and 18 U.S.C. 1001 (1988).

## I. Delay Claims

### A. *Steel Shop Drawing Delays*

Sterling subcontracted with the Albany Steel Company to fabricate the steel structure to house the chrome-plating facility in the pit. Based on WKC's design, Albany Steel was to craft the steel members necessary to construct the facility. Structural steel drawings, sometimes called "shop" or "technical" drawings, are of two types: erection drawings and detail drawings. The erection drawings are based on the owner's structural steel plans and drawings and show the layout, size and length of the structural steel members. Detail drawings depict essential minutiæ: information to be used in the manufacture of the structural steel members, including exact dimensions, configurations, bolt-hole patterns, and attachments for each member. Customarily, the steel subcontractor's erection drawings are submitted, with any questions, to the owner for review and comment. Anchor bolt drawings, a type of detail drawing, are normally prepared with the erection drawings because anchor bolts are sunk into concrete which must cure before the steel is erected atop it. According to government contract and industry custom, the steel subcontractor drafts and submits anchor bolt layout and major erection drawings, and submits both to the owner with "clouds" to flag areas that require clarification. A "cloud" is a term of art meaning an annotation on the drawing used to indicate to the designer that the steel shop requires clarification on a particular aspect of the shop drawing. It is identical to the manner in which conversation is depicted in a cartoon. Standard industry practice, even according to Mr. John Hockenbury, the Arsenal's senior technical representative on the chrome-plating project, permits the contractor to cloud the requested clarifications on the shop

drawings. The owner, or design contractor on behalf of the owner, then clarifies the question on the shop drawing, either written in or adjacent to the steel subcontractor's cloud so that the steel shop may create the detail drawings. The detail drawings are in turn sent to the designer for review.[4] When the detail drawings are approved and returned to the steel subcontractor, they become the basis for fabrication of the steel.

Mr. Peter J. Hess, president of Albany Steel, testified that if the steel subcontractor has a high degree of confidence in the accuracy of the plans and drawings, the steel subcontractor may create erection and detail drawings simultaneously, and submit both to the owner for approval at the same time. Normally, however, the steel subcontractor needs to seek clarification, and obtain approval of erection drawings, before proceeding to create detail drawings. Customarily, the owner's design engineer responds within three to five days to the steel subcontractor's questions by annotating clarifications in clouds on the drawings, or communicating by telephone. Naturally, it is imperative that the owner answer any and all questions as efficiently and completely as possible at this stage of production; attempting to install steel members that were fabricated on the basis of faulty detail drawings is obviously a waste of time and money.

On July 7, 1987, Albany Steel began its anchor-bolt layout and major erection drawings. Both parties agreed that Albany Steel had planned to fabricate steel from approved detail drawings during September and October 1987. The government's design drawings of the chrome-plating fa-

cility called for Albany Steel to create two anchor-bolt layout drawings, sixteen major erection drawings, and hundreds of detail drawings. On July 27, 1987, Sterling submitted Albany Steel's anchor-bolt layout drawings to the Arsenal, noting several matters, identified in clouds, that required clarification. On that same day, the Arsenal shutdown for its two-week annual vacation. On August 10, 1987, the day the Arsenal reopened, and having received no response to Albany Steel's anchor-bolt layout drawing submittals, Sterling again submitted Albany Steel's anchor-bolt layout drawings, marking them "Review Priority," along with Albany Steel's first set of major erection drawings. The latter drawings were submitted nine days later than scheduled. Sterling's as-planned PERT Chart showed that the first set of major erection drawings were to have been submitted on July 28, 1987.

On August 12, 1987, the Arsenal returned Albany Steel's July 27, 1987, first anchor-bolt layout drawings to Sterling, without responding to Albany Steel's requests for clarification. Specifically, the Arsenal did not clarify questions about column sizes, base-plate sizes, or spacing of anchor bolts to be imbedded in concrete piers. On August 13, 1987, the Arsenal returned the August 10, 1987, major erection/"Review Priority," submittal and the second anchor-bolt package to Sterling, again without review, and instructed Albany Steel to resubmit all requests for clarification of WKC's design drawings in a single large submittal in narrative form.[5] The court notes for the record that in spite of the government's insistence on departing from general government contract and in-

---

**4.** This standard industry practice was embodied in the contract in Special Provision 4, which stated in part:

SP–4. *Submittals*

a. *Shop Drawings.* The Contractor shall submit, to the Contracting Officer, seven (7) copies of all shop drawings requiring approval, as called for under the various technical sections of these specifications. The shop drawings shall incorporate all the changes approved in the Step 1 compliance sheets. Approved shop drawings are required before any work can proceed.

**5.** The American Institute of Steel Construction, Manual of Steel Construction (AISC Manual) indicates that drawings should be submitted for review in groups, rather than as one large submittal. This is so because it allows the steel contractor to begin a flow of drawings to the owner who can review and approve smaller batches of submittals more orderly and efficiently than a single large group of drawings. A logical flow of drawings also permits the steel subcontractor to receive approved drawings more quickly thus, allowing it to begin detailing and fabrication sooner.

dustry practice by using a single large submittal of narrative questions when dealing with Albany Steel, the Arsenal permitted the use of "clouds" to communicate with other subcontractors during this same period. On August 18, 1987, Sterling again submitted Albany Steel's anchor-bolt layout and erection drawings plus three additional erection drawings, and thirty-four narrative questions, in compliance with the Arsenal's instructions. Ms. Debbie Jones, the Arsenal's first contract administrator for the chrome-plating project, inexplicably returned the entire package to Sterling on August 19, 1987, stating it was a waste of the contracting officer's time. After this episode, Ms. Jones was removed from the Sterling contract and Mr. John Palmer assumed the role of contract administrator.

The contracting officer subsequently accepted the August 18, 1987, package submitted the narrative questions to WKC on August 21, 1987, even though the Arsenal had not as yet contracted with WKC to review shop drawings. On September 30, 1987, nearly four months after award, the Arsenal and WKC negotiated a modification to WKC's seven-year-old contract with the Army Corps of Engineers whereby WKC undertook to review shop drawings.

Sterling submitted additional Albany Steel erection drawings to the Arsenal for approval on August 21, 1987, and another set, with twelve additional narrative clarification questions on August 26, 1987. On September 10, 1987, the Arsenal forwarded to Sterling WKC's answers to thirty-two of the thirty-four questions that Albany Steel had asked in narrative form on August 18, 1987. WKC clarified the remaining two matters on September 15, 1987. In all, Albany Steel submitted a total of fourteen major erection drawings and forty-six narrative questions to the Arsenal.

In yet another major departure from government contract and industry custom, the Arsenal, on September 15, 1987, directed Sterling to *resubmit* all of Albany Steel's previously approved major erection and anchor-bolt layout drawings for review and approval as a "complete final submittal." On September 23, 1987, Albany Steel complied with the order to resubmit. On October 5, 1987, Mr. John Valloze, the Arsenal's senior contracting officer on the project and the Chief of the Arsenal's Purchasing and Contracting Division, informed Mr. Caton that the Arsenal might require another three weeks to review and approve what he characterized as the "complete final submittal." One month later, on November 2, 1987, the Arsenal returned the approved anchor-bolt and erection drawings. The Arsenal took seventy-seven days to review and approve the structural steel drawings submitted on August 10, 1987, taking into account the five-working-day review period.

### B. *Electrical Delays*

Sterling subcontracted with Gray Electric to install exterior substations, two motor control centers, all related conduit, a direct current buss bar, control wiring, and a fire-alarm system for the chrome-plating facility.

#### 1. PVC Conduit

In the uncontroverted testimony of Mr. Douglas Goard, vice-president of Gray Electric and Gray Electric's project manager for the Arsenal subcontract, Gray Electric was required to install the power feed wires in polyvinylchloride (commonly known as PVC) conduit as part of its substation work. Although contract specification 16B–8.1.1 called for 3½ inch schedule 80 PVC,[6] that size and grade of PVC was not produced by the industry. Defendant did not address the PVC issue in its briefs, and its cross-examination of Mr. Goard convinced the court of the veracity of his testimony and credibility as a witness.

On July 20, 1987, Gray Electric proposed to substitute 4–inch schedule 80 PVC *at no extra cost* to the Arsenal. According to Mr. Goard, the affect of the larger diameter PVC would require only several minor design adjustments. In addition, on

---

**6.** Schedule 80 refers to the thickness of the PVC wall; the higher the schedule number, the thick- er the wall of the PVC.

August 14, 1987, Gray Electric informed Sterling, which told the Arsenal on August 18, 1987, that Gray Electric had obtained a price-protected, reserved quantity of 4–inch schedule 80 PVC for the Arsenal project and that if the Arsenal did not want the 4–inch schedule 80 PVC, to notify Sterling immediately because Gray Electric had ordered the manufacturer to ship the 4–inch schedule 80 PVC. On August 26, 1987, after receiving no response from the Arsenal, and to underscore the importance of prompt action, Gray Electric sent the Arsenal an industry bulletin reporting an existing, worldwide shortage of resins necessary to manufacture PVC. Mr. Goard had ordered the manufacturer to ship the 4–inch schedule 80 PVC because he believed that the Arsenal would choose the contract-specified schedule 80 PVC, in the light of Gray Electric's price-protected reserved quantity with the manufacturer, and the worldwide shortage.

The Arsenal failed to respond to Gray Electric's obviously urgent letter of August 26, 1987, until October 1, 1987, six weeks later. At that time Gray Electric learned that, notwithstanding WKC's approval of the 4–inch schedule 80 PVC, Mr. Charlie Simon, an employee in the Arsenal's Engineering and Housing Directorate, ignored WKC's recommendation, without explanation, and instructed Sterling to use 3½–inch schedule 40 PVC, in spite of the contract specification for schedule 80 PVC. Schedule 80 PVC was required because it is more resilient to crushing and puncture than schedule 40 PVC, and, therefore, is safer. Gray Electric proceeded as directed but on October 5, 1987, noted its objection, in writing, to the Arsenal's decision, disclaiming any liability for personal injury or damage to property and reserving the right to claim damages for the additional costs of obtaining the now scarce 3½–inch schedule 40 conduit. Gray Electric scoured the country in search of 3½–inch schedule 40 PVC, and on October 13, 1987,

Mr. Goard ordered various manufacturers to ship quantities of 3½–inch schedule 40 PVC. However, by October 1987, the scarcity of PVC due to the shortage of resins had made it impossible to obtain the full quantity needed. Gray Electric, accordingly, ordered a combination of the two sizes and grades of PVC to meet the requirements of the contract.

On October 27, 1987, Gray Electric resubmitted its PVC proposal to Sterling for a combination of 3½–inch schedule 40 and 4–inch schedule 80 PVC. On that date, Sterling also filed a claim for Gray Electric's additional costs of restocking the materials on site and attempting to obtain the 3½–inch schedule 40 PVC. On October 30, 1987, the Arsenal approved Gray Electric's submittal. By October 13, 1987, Gray Electric managed to obtain sufficient quantity of 3½–inch schedule 40 and 4–inch schedule 80 PVC to perform its subcontract. Ninety-five days elapsed between the time Gray Electric first offered the 4–inch schedule 40 PVC and the Arsenal approved use of the combination of sizes, adjusted for a review period of five-working-days.[7]

### 2. Electrical Shutdown

Electrical power to Substation 2B2 in the Arsenal had to be shutdown for Gray Electric to perform work in an electrical cabinet containing wires charged with 13,200 volts. According to the unrefuted testimony of Mr. Goard, industry custom dictates that a minimum of forty-eight hours notice must be given to effect a shutdown, and more typically, several days notice is given. On July 29, 1987, Gray Electric requested an eight-hour shutdown of Substation 2B2 at any reasonable time during the Arsenal's two-week holiday, from July 29, 1987, through August 10, 1987, while the Arsenal's own maintenance staff performed work on the physical plant. The Arsenal did not respond to Gray Electric's request until after its personnel returned from

---

7. Those who condemn government procurement as inefficient, wasteful, and irrational would be hard pressed to find a better example to support their contention. In this case, the contractor had a technically sound, no-risk, no-cost, and improved alternative to the PVC con-

duit problem. Rather than seize the common sense solution when presented, the Arsenal balked for six weeks and then irrationally chose the least safe, most expensive alternative, all the while knowing that the PVC market was slipping rapidly away.

their two-week holiday. At that time the Arsenal informed Gray Electric that the shutdown would be on August 15, 1987, from 12:30 a.m. to 7:30 a.m., or, in case of rain, on August 22, 1987, during the same hours. Although Mr. Goard had performed similar jobs at night, he objected in this particular case because Gray Electric had arranged for a factory representative of the motor control center manufacturer to fly in for the day to assist with the work. The Arsenal then offered to shut down Substation 2B2 on September 5, 1987, during daylight hours. Gray Electric agreed.

The Arsenal never offered a sound reason to explain why the power shutdown and electrical work in the panel could not occur during the two-week vacation shutdown of the Arsenal at the end of July. The Arsenal took from July 29, 1987, and September 5, 1987, twenty-nine days, adjusted to provide the Arsenal with a generous one-week notification period, to allow the shutdown of electricity as Substation 2B2.

### 3. Substation As–Built Drawings

Gray Electric also subcontracted with Sterling to provide the Arsenal with an addition to an electrical substation. The parties stipulated that by "the end of June 1987," Sterling notified the Arsenal that as-built drawings of the existing substation were necessary for Gray Electric to prepare its shop drawings for the addition to the substation. At meetings with Arsenal personnel on July 29, 1987, September 22, 1987, and September 24, 1987, Sterling reiterated Gray Electric's need for the as-built drawings of the existing substation. On September 25, 1987, the Arsenal finally delivered the existing substation as-built drawings. Sterling submitted Gray Electric's shop drawings based on the as-built drawings on October 5, 1987, but the Arsenal did not return the approved drawings to Sterling until December 23, 1987.

Once Gray Electric submitted the shop drawings for the additional substation, the Arsenal took seventy-five days to review the drawings, adjusted for a five-day-review period. In addition, it took the Arsenal seventy-three days to provide the nec-

essary as-built drawings, calculating from July 1, 1987, even though the request was received "at the end of June 1987," until September 25, 1987, when the Arsenal finally produced the as-built drawings.

### 4. Motor Control Center Shop Drawings

Gray Electric also installed two motor control centers adjacent to the chrome-plating facility pit. Motor control centers are cabinets that house individual starters that control and protect electric motors from overload. In a meeting with Sterling and Arsenal personnel in July 1987, Mr. Simon, of the Arsenal's Engineering and Housing Directorate, instructed Gray Electric to submit the shop drawings for the motor control centers, and the substation addition discussed above, as a single package. Although not required by the contract to do so, Gray Electric agreed. While Gray Electric had the motor control center shop drawings ready for submittal almost immediately, the Arsenal failed to deliver the existing substation as-built drawings, as noted above. According to the testimony of Mr. Goard, Gray Electric submitted the motor control center shop drawings to the Arsenal on September 21, 1987, without the substation shop drawings because of the Arsenal's delay in delivering the existing substation as-built drawings to Sterling, and the lengthy lead time necessary to construct and install the motor control center. The Arsenal delayed returning the motor control center shop drawings to Gray Electric until November 20, 1987, sixty days later. At that time the Arsenal approved one motor control center drawing and disapproved another.

The disapproved motor control center shop drawing submittal was based on contract drawing 303, which showed a 1200 amp circuit breaker labeled 1(a) and underneath it an 800 amp branch breaker labeled 1(b). On Gray Electric's shop drawing the same 1200 amp breaker was labeled 1(g) and the 800 amp branch breaker was labeled 1(n). The Arsenal disapproved the entire shop drawing because it wanted a minor change in the location of the circuit breakers in the motor control center, placing them along side each other, horizontal-

ly, rather than vertically. This was the only reason given by the Arsenal for disapproving the second motor control center shop drawing. Rather than "clouding" the change and approving the drawing, as so noted, the Arsenal disapproved the entire drawing, requiring Gray Electric to send the shop drawing back to the factory to be redrawn. Had the Arsenal approved the drawing with the clouded change pursuant to normal government contract and industry custom, the factory would have constructed the motor control center with the change and noted the change on the motor control center's as-built drawings. In contrast to his demands for narrative clarifying questions from Albany Steel, Mr. Hockenbury, who reviewed the drawing in dispute, used clouds to communicate questions on the circuit breakers with Gray Electric, and to disapprove the submittal. Gray Electric resubmitted the drawing with the design change to the Arsenal on December 28, 1987, and the Arsenal approved it on January 21, 1988.

The Arsenal took fifty-five days, between November 20, 1987, and January 21, 1988, after allowance is made for the five-working-day review period, to review the motor control center shop drawings.

5. Fire–Alarm System Shop Drawings

Gray Electric also provided a fire-alarm system to the chrome-plating project. On August 18, 1987, Gray Electric submitted its fire-alarm system shop drawings, and on September 10, 1987, its smoke-detector drawings. The evidence showed that WKC received both the fire-alarm system and the smoke detectors from the Arsenal on September 28, 1987. Yet WKC inexplicably rejected both the fire-alarm system and the smoke-detector submittals, one month later, on October 29, 1987, because they were not submitted in a single package. Following WKC's rejection, the Arsenal, on November 6, 1987, rejected the entire fire-alarm submittal for the same reason and ordered Sterling to resubmit the entire package. In addition, WKC and the Arsenal rejected the fire-alarm shop drawing submittal because it allegedly lacked a "cut sheet," which described the materials in-

cluded in the submittal. However, the evidence of record showed that Gray Electric did include a "cut sheet," entitled "Bill of Materials," a standard, industry-wide method of listing the different components of the submittal. Sterling resubmitted Gray Electric's fire-alarm system as an entire package on December 15, 1987, and the Arsenal returned the submittal approved on January 21, 1988. The Arsenal took a total of 151 days, after adjusting for the five-working-day review period, to review the fire-alarm drawings.

6. Control Panel Drawings

Johnson Controls, Inc. subcontracted to install instrument panels to monitor and control the new chrome-plating facility. In the testimony of Mr. Dan Ebbert, Johnson Controls's project manager for the Arsenal subcontract, the Arsenal's project management had little understanding of the magnitude of the instrumentation aspect of the contract. The delays experienced by Johnson Controls were numerous and complex.

Johnson Controls was to install three panels: CP–201, CP–301, and an Automatic Control Monitoring System (ACMS). As was the case with Sterling's other subcontractors, Johnson Controls worked from a WKC design to create shop drawings of the three control panels. On August 21, 1987, Johnson Controls submitted shop drawings for CP–201, and the Arsenal approved the drawings three months later, on November 19, 1987. On September 2, 1987, Johnson Controls submitted shop drawings for CP–301, which were reviewed and approved on December 1, 1987. The ACMS panel was reviewed and approved in three stages: the elementary wiring was submitted on August 21, 1987, and approved on November 19, 1987; the panel arrangement was submitted on September 21, 1987, and approved on December 1, 1987; and the interconnect wiring was submitted on September 1, 1987, and approved on January 7, 1988. According to Mr. Ebbert, there were several omissions in WKC's design drawings and instrument lists, as well as additional components that, in Mr. Ebbert's testimony, "shouldn't have been there." Johnson Controls attempted to contact

WKC directly to remedy the design problems, but WKC refused to communicate with Johnson Controls. Johnson Controls used its own "Request for Engineering Review" (RER) forms to request clarification from WKC on the design drawings, but these requests went unanswered from WKC.

On July 27, 1987, Johnson Controls requested logic diagrams,[8] which were in the Arsenal's possession, for a control panel component known as an emergency-rectifier shutdown. On July 27, 1987, Johnson Controls also requested logic diagrams for push-button-light stations on CP–201 and CP–301 because components of the push-button-light stations appeared on the design drawings but not on the instrument list or the Piping and Instrumentation Detail drawing.[9] On August 13, 1987, the Arsenal wrote to Sterling stating that the information which Johnson Controls requested was already included in the design drawings and contract specifications. In fact, it was not. On March 30, 1988, WKC finally sent the Arsenal copies of the logic diagrams, which the Arsenal forwarded to Sterling on April 11, 1988. The Arsenal took 246 days to respond to Johnson Controls's request for the logic diagrams.

On September 4, 1987, Johnson Controls sent the Arsenal RER 001 for five signal generators not shown on the P & ID's or the logic diagrams. Johnson Controls received the Arsenal's response four months later, on February 8, 1988. On October 23, 1987, Johnson Controls sent RER 003 to the Arsenal to resolve a problem of cross-referencing between logic diagrams and P & ID's. Johnson Controls recommended a solution in RER 003 which was approved by a WKC on December 28, 1987, and sent to Sterling on January 6, 1988. On October 23, 1987, Johnson Controls submitted RER 004 in which it identified ten problems and attached its proposed solutions. In one of these problems, Johnson Controls cross-referenced WKC's instrument list with WKC's P & ID's and the contract specifications, and found that there were dozens of missing instruments from WKC's instrument list. On December 28, 1987, WKC gave its approval to RER 004 and corrected some of the errors that Johnson Controls had discovered. Johnson Controls received the response on January 6, 1988. Johnson Controls submitted RER 005 and 006 on October 23, 1987. RER 005 identified five items that required tag numbers,[10] and RER 006 queried whether electrical current indicators were required. Both were answered, initialed and approved months later, on January 19, 1988, by WKC but not transmitted to Sterling by the Arsenal until three weeks later on February 10, 1988.

Most revealing were the minutes of the November 5, 1987 meeting at which representatives from Johnson Controls, the Arsenal, and Sterling were present. Messrs. Valloze, Palmer, and Uppal, and Ms. Felock represented the Arsenal; Messrs. Caton and Bromley represented Sterling; and Mr. Ebbert, and his senior project engineer, Mr. Mallarkey, represented Johnson Controls. Johnson Controls complained about the prolonged review period on fourteen submittal documents and thirteen technical inquiries. The minutes showed that Mr. Valloze stated that, "[d]ue to a manpower shortage, [WKC] cannot respond to the large quantity of submittals in a timely manner. At present, they cannot even make a projection on response dates." Mr. Ebbert, then explained to Mr. Valloze that the submittals were essential to the completion of the job and were mandated by Special Provision 4 of the contract. According to Mr. Ebbert's recollection of the meeting, Mr. Valloze expressed surprise that the project

---

**8.** A logic diagram is a flow diagram showing how a system is supposed to operate as well as the events required to permit the system to operate.

**9.** Known in the trade as P & ID, these drawings show the relationship between the instrumentation and the equipment and piping.

**10.** It is industry practice to assign a tag number to each instrument on the instrument list or each piece of equipment supplied by a contractor. For example, a temperature switch would be labeled TS–125. The letters identify what the item is and the numerical designation refers to the loop number for that switch which is wired in conjunction with other components that also have the 125 designation.

had been generating so much "paper," presumably in the form of submittals, letters, and requests for clarification, and asked whether all the paper was necessary. Mr. Valloze also expressed his dissatisfaction with Sterling for continually reserving the right to file claims for alleged government-caused delay, as Sterling was required to do to protect its contract rights. Mr. Valloze felt that Sterling's practice of preserving its claims was unproductive.

The Arsenal took 153 days to return RER 001; seventy days to return both RER 003 and 004; and 105 days to return both RER 005 and 006. All calculations include an adjustment for the five-working-day review period.

### C. *Steel Tank Drawings*

Fey Steel subcontracted to provide the tanks in which the M256 120–millimeter gun barrels were to be plated. Sterling submitted Fey Steel's shop drawings on August 10, 1987. The Arsenal approved the drawings three months later, on November 2, 1987. The Arsenal took seventy-nine days, after adjusting for the five-working-day review period, to review the steel tank shop drawings. By letter dated September 9, 1987, Sterling submitted revisions to two of the tanks which the Arsenal approved and returned on November 18, 1987, sixty-five days later, after adjusting for the five-working-day review period.

### II. Defense Production Act Claim

Albany Steel received its approved steel shop drawings on November 3, 1987, but did not begin detailing until November 23, 1987. Albany Steel had reserved the months of September and October 1987, to work exclusively on the Arsenal's DX-rated contract; but when the Arsenal delayed review and approval of the shop drawings, it made detailing and fabrication impossible during these months. Therefore, Albany Steel accepted a non-rated job from Vicon Recovery in October 1987. At trial, Mr. Hess, president of Albany Steel, stated the following:

> During the two month period that we had anticipated doing [the Arsenal's] job,

we lost approximately $100,000 ... So what we did was, I talked to my other estimators and I said, I have no idea when these erection drawings are going to come back approved. [Sterling] gave us no definite date that we're going to have them. I told [Albany Steel's estimators] to go out and bid other work. If the other work required us to commit portions of our shop schedule, we would have to do that. We got another job with Vicon Recovery [in October 1987], and we were doing this job with Vicon Recovery when the [Arsenal's] erection drawings came back approved ... I think the Vicon Recovery job was about two-thirds to three-quarters done at that point ... I decided we have to finish the Vicon Recovery job first. As soon as we finish that job, we will put the Sterling Millwright's, [*sic*] Watervliet Arsenal job immediately following that.

Mr. Hess testified that he understood the DX rating of the Arsenal's contract to mean that it was to take priority over any other non-rated jobs in Albany Steel's schedule. Defendant contended that Albany Steel's acceptance of the Vicon Recovery project and failure to begin detail drawings on November 2, 1987, displaced the rated Arsenal contract from Albany Steel's production schedule and, therefore, Sterling was responsible for twenty days of delay. Sterling claimed that it was not responsible for the twenty-day delay because the Arsenal had unreasonably delayed progress under the contract, forcing to accept the Vicon Recovery project for economic reasons.

### III. Defective Design Claim

The pit walls in the instant case were constructed from concrete poured into wooden forms. As the concrete was poured, it exerted pressure on the wooden forms which bowed noticeably inward, towards the center of the pit at various spots along the pit wall. It was uncontested that the bulges were from 1- to 1½-inches along the fifty- and sixty-foot walls. Mr. Hess of Albany Steel, and others, including defendant, stated that after the forms were

removed the bulges were invisible to the naked eye.

The bulges were not identified in the contract drawings or plans even though WKC designed the steel structure to fit tightly within the walls, like a hand in a glove, as if no bulges existed. The steel members that form the skeleton of the chrome-plating facility rest on concrete pads located a precise distance from the pit walls. If the pit walls bulge, the steel members will not clear the walls. Naturally, the burden of detecting this problem, and the point at which it was detected, are crucial.

Sweet Associates, Inc. constructed the pit in 1980 based on a design of the architectural and engineering firm of Lev Zetlin Associates, Inc. Mr. Fortune, president of Sweet Associates at the time of Sterling's contract with the Arsenal, was Sweet Associates' project manager for the pit installation at the Arsenal. Mr. Fortune testified that he knew that a chrome-plating facility was to be built inside the pit, and that the pit walls did not conform either to Lev Zetlin's design or Sweet Associates' as-built drawings. Mr. Fortune stated that he did not inform Arsenal personnel about the bulges because he "knew the Arsenal was aware of [the bulges] and [the bulges] just didn't represent a problem to anyone associated with building that pit." Mr. Fortune also conceded that Sweet Associates' as-built drawings failed to identify the bulges because he did not believe they were significant enough to warrant a note to that effect. Sterling did not receive the pit as-built drawings until November 1987, but even then, the absence of notations made the bulges impossible to detect visually.

WKC designed the structure using Lev Zetlin's pit design drawings, and not Sweet Associates' as-built drawings. It is unclear to the court why WKC would undertake the design of the chrome-plating facility, which consisted almost wholly of work in the pit, without verifying the as-built dimensions. Mr. Caton testified that discovery of WKC's design files of the chrome-plating facility yielded no evidence of WKC conducting, or urging the Arsenal

to conduct, a survey. Sterling has no action against Sweet Associates because they were never in privity of contract. If defendant ever gave any thought to a claim against Sweet Associates for constructing defective pit walls or providing defective as-built drawings, or against WKC for its defective design of the facility, it is not revealed in the record.

On August 31, 1987, Mr. Paul Dougall, a Sterling employee, measured the pit. Using a tape measure, he and another person found the pit to be fifty by sixty linear feet, as shown in WKC's design. In an excess of caution, on December 11, 1987, Mr. Bromley employed Mr. Gary Wells, a surveyor with the firm of Smith and Mahoney, to verify the layout of the centers of concrete column pad locations on the floor of the pit, but not to survey the pit walls. Sterling, and its concrete subcontractor, had laid out the column pad locations previously and it was Mr. Bromley's intent to verify the accuracy of the locations. On a different project, Mr. Bromley had found that the location of several column pads shifted after erection of the steel had begun, and decided it would be prudent to survey the column pad locations before installing the anchor bolts and fabricating the steel. During the course of the column pad survey on December 11, 1987, Mr. Wells discovered the bulges in the pit walls. On that same day, Mr. Bromley telephoned Mr. John Palmer, the Arsenal's contract administrator, to inform him of the problem.

Note 14 on Drawing Sheet S–8 stated that "[c]ontractors [are] to verify all dimensions, elevations, sizes & field conditions before fabrication and to be responsible for fit and alignment of all work." Note 1 of Drawing Sheet S–2 stated in relevant part that, "[t]he contractor shall familiarize himself with the existing building and ... field verify all dimensions and elevations shown on the drawings before proceeding with the detail drawings ..." These "Notes" required plaintiff to verify dimensions of, for example, concrete blockouts, sewer pipes, utilities, and any new construction that was to connect to, or abut, existing conditions.

At trial, counsel for plaintiff and defendant stipulated that WKC designed the chrome-plating facility using Lev Zetlin's pit design drawings. As a result, WKC's, and therefore the Arsenal's, chrome-plating facility design represented that the dimensions of the pit were those stated on Lev Zetlin's design. This, of course, was not the case. On December 14, 1987, Mr. Caton sent a memorandum to Mr. Valloze, the senior contracting officer, confirming Mr. Bromley's earlier messages to Mr. Palmer that the pit did not conform to the contract drawings, and asking for "comments and directives" to solve the problem. Keeping in mind that Albany Steel was preparing detail drawings at this time, and having heard nothing from the Arsenal, Mr. Caton, on December 18, 1987, sent a second memorandum to Mr. Valloze, with a copy of the survey report, and reserved the right to make a claim for any delay resulting from the problem. On December 21, 1987, Mr. Bromley wrote another memorandum, this time to Mr. Palmer and Ms. Felock, informing them that Sterling would instruct Albany Steel not to fabricate any steel based on the erection drawings that had been approved on November 2, 1987, and detail drawings then under preparation. Mr. Bromley again requested a decision from the Arsenal to solve the problem so that the steel erection and detail drawings could be corrected and fabrication proceed.

On January 19 and 20, 1988, over five weeks after Sterling reported the bulges to the Arsenal, WKC representatives visited the job site to "observe" the pit. On January 21, 1988, Sterling informally received a WKC proposed solution that called for moving structural steel column center lines inward, toward the center of the pit, away from the pit wall bulges. Sterling poured the concrete column pads on January 23, 1988, based on the original WKC design drawings because it had not received a stop-work order from the Arsenal. It was subsequently discovered that the column lines depicted on WKC's January 21, 1988, solution were misplaced, and on January 28, 1988, WKC sent a corrected version, backdated to January 21, 1988, to the Arsenal. The same day that Sterling received the flawed WKC proposed solution, January 21, 1988, Mr. Palmer informally "recommended" that Sterling delay the pouring of the outer pit column pedestals until WKC made its design recommendations. Mr. Palmer, the contract administrator, was apparently unaware that WKC had given Mr. Valloze its (flawed) proposed solution. Mr. Bromley stated that without a formal order to stop work, Sterling was contractually obligated to "proceed in the pit." When Mr. Bromley inquired of Mr. Palmer whether the latter's recommendation constituted a directive, Mr. Bromley was told that it was a "recommendation or opinion only." On January 28, 1988, Ms. Felock, a contracting officer on Mr. Valloze's staff, forwarded the corrected, backdated WKC proposal to Sterling.

Albany Steel submitted the completed steel detail drawings on February 1, 1988, based on WKC's original design. As a result of pit wall bulges that Mr. Fortune testified were not worth noting on Sweet Associates' as-built drawings of the pit, Albany Steel was required to redraw approximately 100 beams, fifteen rails, and six columns.

On February 5, 1988, Sterling submitted WKC's January 28, 1988, redesign to its subcontractors for their analysis of the impact of WKC's proposed changes. Mr. Hess of Albany Steel wrote to Mr. Caton on February 18, 1988:

[The WKC solution] advises us that the structure must be reduced by:

1½″ on the north side
1″ on the south side
½″ on the east side

Walter Kidde's letter gives us the option of moving the columns on the west side ½″ to maintain symmetry in the east-west direction. Your letter of February 15 … directs us to make this ½″ west wall adjustment by offsetting bolt holes to allow for this shift.

These changes, in all four directions, will necessitate that almost all beams (approximately 100 beams and 15 rails) and six columns will need to be redesigned and redetailed. Most beams will need to be shortened and redrawn. Almost all of

our drawings will need to be redone and resubmitted.

Our estimate for the direct costs is $18,-862....

We must have a directive from the Arsenal no later than March 1, 1988, to avoid further delay....

On February 26, 1988, Sterling submitted a request for a modification of the contract for time and costs to reflect the change in the pit wall dimensions. On March 8, 1988, without waiting for a response from the Arsenal, Mr. Bromley ordered Albany Steel to redraw the structural steel on the basis of WKC's January 28, 1988, design changes. On March 10, 1988, the Arsenal finally issued a change order, but with no time allowance, informing Sterling that "Albany Steel is ... to proceed with any drawing changes required as a result of [WKC's design changes] this issue [*sic*] is a change order with negotiation of equitable adjustment pending receipt of suitable data." On the same day, the Arsenal also denied Sterling's monetary claim. On March 31, 1988, Sterling submitted Albany Steel's revised structural steel shop drawings and its revised erection drawings to the Arsenal. The Arsenal approved them five weeks later, on or about April 7, 1988, and Albany Steel began the detail drawings for a second time. As noted above, steel began arriving at the job site on July 5, 1988.

IV. Withholding of Progress Payments Claims

In its first three requests for progress payments, Sterling *pro rata* billed Mr. Caton's salary at an annual rate of $265,000, Mr. Bromley's salary at an annual rate of $232,000, Patricia Caton's salary at an annual rate of $70,000, and Sherry Bromley's salary at an annual rate of $74,000. In addition, Caton Real Estate billed for Sterling's use of storage and office space in York, Maine, at a rate of $10,700 per month, and Harold Caton's computer equipment lease at a rate of $3,200 per month. Also billed were incurred costs from Mr. Bromley's lease of storage space to Sterling at a monthly rate of $18,652.17 and

Bromley Equipment, Inc.'s technical and engineering personnel services subcontract with Sterling at a rate of $19,320 per month. Sterling also billed the Arsenal for pre-award engineering costs of $200,700.

Based on the August 26, 1987, DCAA audit of Sterling's second progress payment, Mr. Joe Breen, the Arsenal's senior price analyst recommended to Mr. Valloze, the senior contracting officer, that the Arsenal undertake a scheme to reduce the price of the fixed-price contract, unilaterally, and without consideration. In memoranda dated September 9 and 14, 1987, Mr. Breen urged Mr. Valloze to reduce Sterling's compensation, pre-award costs, and lease rates far below those incurred by Sterling in its first three requests for progress payments. Mr. Breen recommended that Messrs. Caton and Bromley receive compensation of $22.11 an hour, or about $45,000 a year, and that their wives (administrative assistant and purchasing manager, respectively) receive compensation of $10.70 an hour, approximately $22,-000 a year. Mr. Breen also recommended that Messrs. Caton and Bromley receive compensation for 1680 hours of pre-award engineering services at $22.11 an hour, for a total of $37,150. Mr. Breen did not recommend any amounts for the Bromley–Sterling storage space lease because DCAA failed to recommend rates for the lease. A month later, in a September 14, 1987, memorandum to Mr. Valloze, Mr. Breen recommended salaries of $75,000 each for Messrs. Caton and Bromley, $40,-000 for Mrs. Caton, and $35,000 for Mrs. Bromley, as counter-positions for possible negotiations with plaintiff. The record is devoid of any reference of any authority of defendant to unilaterally diminish the salaries of the Sterling principals, and other competitively derived prices in a fixed-price contract in the absence of consideration; nor, is the court aware of any such authority. FAR 16.202–1 describes that attributes of a fixed-price contract and the responsibilities of the parties:

A firm-fixed-price contract provides for a price that is not subject to any adjustment on the basis of the contractor's cost experience in performing the contract.

This contract type places upon the contractor maximum risk and full responsibility for all costs and resulting profit or loss. It provides maximum incentive for the contractor to control costs and perform effectively and imposes a minimum administrative burden upon the contracting parties.

On September 25, 1987, Mr. Valloze met with Messrs. Caton and Bromley to "negotiate" the compensation, lease, and pre-award engineering costs. At the meeting Mr. Valloze informed told Messrs. Caton and Bromley what he would allow Sterling to bill for salaries and leases. In a September 30, 1987, letter to Sterling Mr. Valloze memorialized the contract changes he made at the September 25, 1987, meeting. To Mr. Valloze's credit, the September 30, 1988, letter demonstrated that Mr. Valloze did ignore Mr. Breen's suggested rates. The letter stated that "[d]uring the Progress Payments negotiations on September 25, 1987, the following items were discussed, and either agreed to outright or at interim rates pending required further documentation." The parties agreed to pay pre-contract engineering costs at a rate of $168,000, or $84,000 each for Messrs. Caton and Bromley; a rate of $2,500 per month for the lease between Caton Real Estate and Sterling for the York, Maine storage areas; $208,000 each for Messrs. Caton and Bromley in annual salary; and $74,880 each in annual salary to compensate Mrs. Caton and Mrs. Bromley. In a December 15, 1987, letter to Mr. Caton, Mr. Valloze later agreed to increase the rate of the York, Maine lease agreement to the DCAA recommended amount of $2,700 per month. The Arsenal also agreed to pay Mr. Bromley $10,000 a month for Sterling's use of storage space in Springfield, Massachusetts, and $10,000 a month to Bromley Equipment, Inc. for its technical support services lease. At the close of the letter, Mr. Valloze stated, "it is recommended that the remaining unpaid items [from prior progress payments] be withdrawn ... and a new request encompassing costs incurred

to date at the above agreed to [*sic*] rates be submitted." Clearly, the letter evinced the intent of the Arsenal to bind Sterling to the "new" rates, as part of the contract in the complete absence of any consideration.

On March 21, 1988, two weeks before Sterling submitted its request for progress payment ten, the Defense Contract Audit Agency (DCAA) completed its audit of Sterling's December 16, 1987, shop-drawing delay claim. The audit questioned the reasonableness of the September 25, 1987 compensation and lease rates which Mr. Valloze had memorialized in his letter of September 30, 1987.[11] On April 11, 1988, Mr. Breen drafted another Memorandum For the Record based on the March 21, 1988, DCAA audit, in which he recommended several options for the Arsenal to recoup what he characterized as "accelerated profit" paid to Sterling. Mr. Valloze grasped the "accelerated profit" argument and, in a direct turn-about of the terms in his September 30, 1987, letter, adopted Mr. Breen's recommendation. Mr. Valloze directed the Arsenal's Comptroller to suspend payment of Sterling's monthly incurred salary and lease expenses until such time as recoupment of the "accelerated profit" was accomplished. The amount of the alleged "accelerated profit" was never established, and Sterling never received full payment of its incurred costs. The contract was silent on the payment of profit though profit is traditionally paid, pursuant to FAR 52.232–1 in this type of contract, upon completion of the contract. The profit is the difference between the sum of the progress payments made during the course of the contract and the total (adjusted) contract price.

On May 18, 1988, the Arsenal issued progress payment ten in an amount sufficient to compensate Sterling's subcontractors, but did not pay approximately $54,000 of Sterling's incurred salary and lease expenses. Mr. Valloze and Mr. Caton met on May 19, 1988, to discuss progress payment ten and Mr. Valloze agreed that the $54,-

---

**11.** A "question" in a DCAA audit is a term of art meaning that the cost item should either be

disallowed completely or reduced.

000 had been withheld in violation of his September 30, 1987, letter. In what appeared at first to be a bright spot in this sad tale, Mr. Valloze told Mr. Caton that the $54,000 would be paid immediately. On June 9, 1988, Mr. Valloze informed Mr. Palmer, the contract administrator, that the Arsenal would honor all reduced salary and lease rates as set forth in the letter of September 30, 1987.

It must be remembered that the contract was to be completed by June 8, 1988. On May 19, 1988, and June 10, 1988, Messrs. Valloze, Caton, and Bromley met to discuss an extension of Sterling's contract. Mr. Valloze offered a one-year extension and payment to Sterling of $635,000 for overhead costs, subject to a DCAA audit. However, as a condition of extension, Mr. Valloze demanded that Sterling accept, without question, whatever amounts DCAA found reasonable, *i.e.*, a waiver of Sterling's right to challenge the results of any audit requested by the Arsenal. Mr. Caton naturally refused to agree to the condition.

On May 6, 1988, the Arsenal received Sterling's request for progress payment eleven. Mr. Valloze approved progress payment eleven in the amount of $387,134 on June 15, 1988, which included the $54,000 which he told Mr. Caton would be restored. On June 16, 1988, after the one-year contract completion date of June 8, 1988, had passed, Mr. Valloze approved Sterling's twelfth request for progress payment in the amount of $422,776, but in yet another flip-flop, directed the Arsenal's Comptroller not to release progress payments eleven and twelve until advised to do so. In a June 16, 1988 memorandum to the Comptroller's Office, Mr. Valloze wrote:

1. I am currently conducting negotiations with the subject contractor. If the negotiations are positively concluded, *immediate payment* of the subject progress payments (attached) will be necessary.

2. To facilitate this, I request that these progress payments be processed for payment to the point of issuing checks. *It is imperative, however, that the checks not be issued until telephonically advised by the undersigned.*

(Emphasis in original.)

The checks for progress payments eleven and twelve were never issued, ostensibly because negotiations between Sterling and the Arsenal were not "positively concluded." Mr. Valloze held payment on admittedly earned progress payments eleven and twelve hostage as a tactic to force Sterling to agree to an extension of the contract on terms much more favorable to the government, but well-nigh impossible for Sterling to accept. The government offered no evidence to rebut the meaning or intent of the June 16, 1988 memorandum to the Comptroller.

On June 13, 1988, Marine Midland Bank wrote the following letter to Sterling:

The Bank's credit arrangement with you was set up specifically to fund short term cash flow needs pending receipt of progress payments. We are not comfortable with the fact that the contract has expired, that there is no executed document extending the contract, and, that there is an outstanding balance of $500,000. We must have a definitive repayment plan established to our satisfaction immediately.

The only way we may continue our credit line is if there is a contractual agreement to extend the contract.... We would also like assurances that progress payments would be made by the Arsenal in a more timely manner then [*sic*] what has been the case in the past few months. As you recall, we had anticipated that notes drawn under the line of credit would not be outstanding for longer than 30 days because of monthly requests for progress payments and subsequent receipt of monthly payments. This schedule has been very uneven resulting in longer term line outstandings [*sic*] in amounts that have been greater than most progress payments....

To re emphasize [*sic*] our position, we will continue your credit line should there be a satisfactory contractual agreement between the Arsenal and Sterling

Millwrights, Inc. to continue the project to completion.... Until that happens, we cannot extend your credit line and you must make a satisfactory repayment plan with the Bank for the current amount outstanding of $500,000 immediately.

On June 17, 1988, having lost all funding from both the Arsenal and the bank, Sterling was forced to suspend work on the job site for lack of sufficient cash to continue. The government terminated Sterling for default on August 12, 1988. By letter of October 31, 1988, Sterling submitted a termination for convenience claim pursuant to the Contract Disputes Act, 41 U.S.C. § 605 (1988). On January 30, 1989, the contracting officer issued a final decision denying Sterling's termination for convenience claim in its entirety. Sterling subsequently filed suit here.

## DISCUSSION OF PLAINTIFF'S CLAIMS

Sterling filed its complaint pursuant to the Contract Disputes Act, 41 U.S.C. §§ 601–613 (1988) (CDA), which provides, in pertinent part:

(1) [A] contractor may bring an action directly on the claim in the United States Claims Court, notwithstanding any contract provision, regulation, or rule of law to the contrary.

* * * * * *

(3) Any action under paragraph (1) ... shall be filed within twelve months from the date of the receipt by the contractor of the decision of the contracting officer concerning the claim, and shall proceed *de novo* in accordance with the rules of the appropriate court.

41 U.S.C. § 609 (1988). Sterling filed suit here within twelve months of its termination for default and the denial of its claims. In the proceedings before this court, "the facts, as well as the law, are decided *de novo* by the ... court." *Seaboard Lumber Co. v. United States*, 903 F.2d 1560, 1562 (Fed.Cir.1990); *accord Assurance Co. v. United States*, 813 F.2d 1202, 1206 (Fed.Cir.1987). "The court is not bound by either the findings of fact or the conclusions of law of the [contracting

officer]." *Lathan Co. v. United States*, 20 Cl.Ct. 122, 125 (1990). It is under this standard that the court evaluated the claims in the following discussion.

### I. Shop Drawing and Electrical Delays

On December 19, 1987, Sterling submitted a shop drawing delay claim to the Arsenal covering the structural steel, electrical, motor controls, and steel tank delays. Sterling claimed entitlement to an equitable adjustment to the contract of $1,497,237, and a time extension of 176 days. On April 12, 1988, Sterling adjusted that claim, increasing the total amount to $1,716,383. Mr. Valloze denied the claim in its entirety on May 13, 1988.

Although this is plaintiff's delay claim, it is the law that "the government should bear the burden of proof with respect to the issue of whether termination for default was justified, regardless of the forum and regardless of whose 'claim' is being asserted." *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed.Cir. 1987). Therefore, the government must convince this court, by a preponderance of the evidence, that the Arsenal was justified in its decision to terminate Sterling for default. The United States Court of Appeals for the Federal Circuit has made clear that "if the government created a situation that caused or contributed to [the contractor's] late delivery, it cannot be held as a matter of law that [the contractor] was required to exceed reasonable efforts in order to compensate for this unwarranted government action." *Connell Rice & Sugar Co. v. United States*, 837 F.2d 1068, 1071 (Fed.Cir.1988).

■ It is black letter law that every contract with the government contains an implied obligation that neither party will do anything to prevent, hinder, or delay performance. *Lewis–Nicholson, Inc. v. United States*, 213 Ct.Cl. 192, 550 F.2d 26, 32 (1977). The government breaches this implied obligation when delay occurs because of the government's foreseeable or excessive unpreparedness in the performance of its contractual obligations. *Roberts v. United States*, 174 Ct.Cl. 940, 357 F.2d 938

(1966). Therefore, when the government's actions delay performance and increase costs, its contractor has a viable claim for damages. *Lewis–Nicholson*, 550 F.2d at 26. However, as the Court of Claims has held, "no matter how unreasonable the Government's delay, there can be no recovery without proof that the delay caused material damage." *Commerce Int'l Co. v. United States*, 167 Ct.Cl. 529, 338 F.2d 81, 89 (1964).

■ "Where both parties contribute to the delay 'neither can recover damage, unless there is in the proof a clear apportionment of the delay and the expense attributable to each party.'" *Blinderman Constr. Co. v. United States*, 695 F.2d 552, 559 (Fed.Cir.1982), (quoting, *Coath & Goss, Inc. v. United States*, 101 Ct.Cl. 702, 714–15 (1944)). "Generally, courts will deny recovery where the delays are 'concurrent or intertwined' and the contractor has not met its burden of separating its delays from those chargeable to the Government." *Blinderman Constr. Co.*, 695 F.2d at 559. The evidence of Arsenal delays recited earlier makes clear to the court that Sterling has met its burden of demonstrating that the Arsenal's actions were the overwhelming source of delay in this contract. The government's delay is well documented for each of Sterling's subcontractors and totals well into the hundreds of days.

The record is replete with evidence that the Arsenal knew of its inability to review the large volume of highly complex technical shop drawings associated with this project. Nine months before award, a September 25, 1986, memorandum from the Arsenal's Director of the Engineering and Housing Directorate noted that "part time procurement [Directorate] involvement, overpowering control by [the Operations Directorate] and less than full time [Engineering and Housing Directorate] support,

will result in failure." [12] On March 11, 1987, three months before award, a memo from the Director of the Operations Directorate revealed that the Arsenal still had not solved the problem of which Directorate would lead the review of technical drawings. At an August 27, 1987 meeting with other Arsenal personnel, more than two months after award, Mr. Hockenbury, an employee of the Operations Directorate, finally and formally admitted the obvious; that without support from the Arsenal's Engineering and Housing Directorate, the Arsenal's personnel lacked the technical expertise and staffing to review the large volume of complex technical drawing submittals. Mr. Hockenbury was too optimistic. Even with the assistance of other Directorates, the Arsenal could not meet its burden, yet the Arsenal never informed Sterling of the problem. The uncontradicted testimony of Mr. Hockenbury revealed that he had never managed a project of comparable scope and complexity, and that neither he nor his assistant, Mr. Tempi Uppal, had any structural engineering training or experience in reviewing submittals of this nature and magnitude.

In a memorandum for the record dated November 30, 1987, more than six months after award, Ms. Kathy Felock, a contracting officer on Mr. Valloze's staff, admitted that, "[steel shop drawings] started coming in during July 87, however, the government did not have the expertise to review these submittals. As a result [WKC] was contracted with [*sic*] to perform the review in late September [1987]." As noted above, the Arsenal retained WKC nearly four months after the award of the contract for that purpose. Mr. Valloze also testified that the Arsenal had been surprised by, and unprepared to handle, the large volume of technical drawings that required expedited review. This was even though the Arsenal knew that Sterling's March 23, 1987,

---

12. Watervliet Arsenal is composed of three directorates: Engineering and Housing, Operations, and Procurement. The Engineering and Housing Directorate is responsible for maintenance of the Arsenal's physical plant and improvements to its real property. It provided construction inspectors and served as the Arsenal's liaison with the Army Corps of Engineers and WKC, the project designer. The Operations Directorate is responsible for the manufacture of weapons and provided the technical representative on the contract in question. The Procurement Directorate provided the contracting officers and contract administrator for the contract with Sterling.

as-planned PERT Chart set a five-working-day review period for all shop drawings. The Arsenal had ample notice prior to contract award that failure to have an experienced government team ready to review the technical sufficiency of the shop drawings would delay progress, if not be fatal to timely completion, of the contract. Only after Mr. Valloze's staff became utterly backlogged with steel shop drawing submittals between July and September 1987, compounded by their two-week vacation and insistence on a single large resubmittal, did the Arsenal retain WKC to perform the technical review. The Arsenal knew, or certainly should have known that WKC, as the project designer, and not the Arsenal, had the expertise to review the steel shop drawings, and that most electrical, mechanical, and instrumentation clarification requests would have to be submitted to WKC as well. Unfortunately, the tardy employment of WKC did not solve the Arsenal's problems. Because the Arsenal waited so long to contract with WKC, and the shop drawing backlog had built to unmanageable levels, WKC could not cope with the flow of documents in the required time period. It is clear from the record that the Arsenal was incompetent to review the steel shop drawings and it became apparent to the court, as trial progressed, that the real reason for the Arsenal's requirement for narrative clarification questions and resubmittals was to delay the time when it would have to respond.

Defendant argued that Albany Steel was wholly responsible for the shop-drawing delay because Albany Steel, to win the steel subcontract, purposely stated it would take 450 hours to prepare the drawings, all the while knowing that it would take no less than 850 to 880 hours. In fact, it took Albany Steel 1,541 hours to prepare the erection and detail drawings, including time spent meeting the additional burdens placed on it by the Arsenal staff. Defendant contended that Albany Steel engaged in several time-wasting tactics to cover its excessively low estimate, as for example, omitting sketches from submissions and submitting erection drawings without indicating the location of any connections. The Arsenal also contended that Sterling's resubmittal of the anchor bolt drawings with the major erection drawings on August 10, 1987, rather than awaiting the Arsenal's clarifications on August 12, 1987,—even though the Arsenal did not provide the clarifications—demonstrated that Albany Steel did not require clarification but merely was attempting to show that some critical path work was going forward. As proof, argued defendant, Albany Steel spent from July 21, 1987, to August 31, 1987, producing steel shop drawings, yet had nothing to send to the fabrication shop during the months of September and October. Moreover, defendant argued that Albany Steel must have known the answers to the thirty-four clarifying narrative questions because WKC answered "correct" or "satisfactory" to all but two of Albany Steel's suggested interpretations but two. Albany Steel's time sheets, alleged defendant, also supported its theory because Albany Steel required only eight man-hours to revise the major erection and anchor bolt layout drawings based on WKC's clarifications. The time to correct the more voluminous detail drawings was not in the record. Defendant argued that when Albany Steel discovered that its fabrication shop would be vacant, because it had underestimated the time required to create these drawings, Albany Steel postponed detail drawings, ostensibly because the design was flawed, and placed a job from another customer, Vicon Recovery, ahead of the Arsenal's work. In reality, argued defendant, Albany Steel merely "bought more time" to complete the steel shop drawings by criticizing the design and displacing the Arsenal's job. Defendant stated that

> the only logical reason for Albany [Steel] ... submitting erection drawings and no detail drawings although it knew the answers to its [requests for clarification], ... was that it *wanted* to slip the Arsenal work into a later production slot, so it could move the Vicon job into its fabrication shop ahead of [the Arsenal's project].

(Emphasis in original.)

Although highly creative, the government's case fails for want of proof. The

government's conclusion that Albany Steel knew the answers to thirty-two narrative requests for clarifications that Albany Steel posed to WKC because WKC answered "correct" or "satisfactory" to the questions is overreaching and unwarranted. Mr. William Dmyszewicz, Albany Steel's lead draftsman on the subcontract, testified that although the WKC drawings on which Albany Steel was to create anchor-bolt layout and major erection drawings, were quite detailed they lacked some important information. Column sizes were omitted from the column schedule set forth on the drawings on which the anchor-bolt layout drawings were based, and beam sizes were missing on the drawings used to create the major erection drawings. Anchor bolt patterns and column-plate dimensions were also missing.

Although Mr. Robert Fortune, now president of Sweet Associates, the contractor that succeeded Sterling on the reprocurement, disingenuously testified on direct examination that WKC's design drawings were of excellent quality, he admitted on cross-examination that his own project manager on the reprocurement informed the Arsenal that steel erection would be delayed because of "the excessive volume of clarifications needed to detail the structural steel." Given the lack of confidence in WKC's design drawings, Albany Steel's speedy resubmittal of anchor-bolt drawings—after no Arsenal response for ten days—and excessively cautious narrative questions are understandable; a minor change in a design or erection drawing would have altered dozens of detail drawings. Industry practice recommends that "[t]he preparation of erection plans should precede the detailing work in the drafting room. This helps to insure that all required information is available." American Institute of Steel Construction, *Detailing for Steel Construction*, 5. That Albany Steel suggested proper answers to thirty-two of the clarification questions it asked is not evidence of intent to delay but of its expertise. Regardless, it is clear from the circumstances that for Albany Steel to have relied on its expertise alone would have been foolhardy, and certainly was not required by the contract.

When the Arsenal returned the anchor-bolt preliminary drawings on August 12, 1987, it had not responded to the request for clarification of column sizes on the column schedule, missing base plates, and missing spacings for anchor bolts to be imbedded in concrete piers because Arsenal personnel were incompetent to answer the questions and, at that time, the Arsenal had not retained WKC to do so. Mr. Valloze testified that the Arsenal was reticent to retain WKC because management could not agree on a contract price for WKC's services for the chrome-plating project, and, in any, event believed that WKC might have been hesitant to point out any errors or omissions in its own design. The latter argument is without merit because that function is the very purpose of architect-engineer contracts and ignores the purpose of suggested contract language to minimize the problem of suspected organizational conflicts of interest. The government cannot escape liability for delay when it is abundantly clear from the record that it was technically incompetent to review anchor-bolt layout, erection, and detail drawings. Nor does it follow, *ipso facto*, from Mr. Dmyszewicz's testimony that Albany Steel's low bid of 450 hours proved that Albany had a motive to concoct a scheme to drag out the shop-drawing process. As the court noted after Mr. Dmyszewicz's highly credible testimony, had WKC's design been more accurate, and the Arsenal competent to administer the contract, Albany Steel more than likely would have completed its work in 450 hours. Given the testimony of Mr. Dmyszewicz and Mr. Fortune about the lack of some necessary details in the WKC design, and the utter lack of any cooperation with Albany Steel by the Arsenal staff, the court finds that Albany Steel acted reasonably in not proceeding to steel detailing until its erection drawings had been approved.

The evidence was overwhelming that the WKC design drawings required clarification and that the Arsenal was not prepared to provide that service. Albany Steel's de-

lay was rooted in the time required for clarification and review of anchor bolt, major erection, and detail drawings and not on the amount of time needed to redraw once the clarifications were received from WKC. The evidence clearly pointed to the fact that the Arsenal knew before and after award that it was incompetent to clarify and review timely-submitted drawings, especially within the five-working-day time frame. These Arsenal blunders, in addition to its failure to provide a solution to the pit wall problem discussed below, delayed delivery of steel to the job site from the original delivery date of December 14, 1987, until July 5, 1988, a period of 203 days.

The solicitation did not expressly establish the length of time within which the Arsenal would complete shop-drawing review, however, both Sterling's pre-award PERT Chart of March 23, 1987, and its post-award PERT Chart of September 3, 1987, (actually the same Charts) specified a five-working-day review period to meet the contract's highly-compressed performance deadline. The Arsenal reviewed those PERT Charts and did not question the review period. The court is of the opinion that the review period specified in the March 23, 1987, PERT Chart, coupled with the Arsenal's lack of response or reaction, became a condition of the contract. *Johns–Manville Corp. v. United States*, 12 Cl.Ct. 1, 33 (1987). However, in an August 20, 1987, letter to Sterling, another contracting officer on Mr. Valloze's staff, Mr. Terry Park, imposed a ten-day review period for shop drawings. The court observes that industry custom allows a maximum of fourteen calendar days turn-around time. American Institute of Steel Construction, *Manual of Steel Construction*, 5–177 (1980). The industry standard cannot be construed too strictly, however, because it is not reasonable in the demanding context of a highly compressed, contract such as Sterling's. Moreover, it is a maximum recommended period, not the average or typical turn-around time in the industry. Mr. Hess of Albany Steel testified that, in his experience, three or four days to review erection drawings is typical.

Mr. Scavello, proffered by the government as an expert witness on construction scheduling techniques, concocted a hypothetical, as-planned PERT Chart, long after the fact, and exclusively for use at trial, that set a review period of fourteen calendar days notwithstanding Mr. Park's contemporaneous change to ten days. The project completion date on Mr. Scavello's as-planned chart was July 5, 1988, a month beyond the one-year mark mandated by the contract. The court notes with special irony that WKC's contract with the Arsenal for review of shop drawings for the chrome-plating facility called for a review period of less than five-working-days and that WKC barely, if ever, met that schedule. Nevertheless, on the reprocurement, WKC boasted that "[o]ver one hundred shop drawings and vendor information sheets have been reviewed with an average turnaround time of three working days." Defendant attempted to belittle plaintiff's contention that a five-working-day review period was necessary for successful performance by pointing out that Sweet Associates, the reprocurement contractor, who did not insist upon a five-working-day review period, suffered just as significant delay as did Sterling. The court is not sure just what point defendant attempted to make by that argument but it does demonstrate to the court that many of the difficulties encountered by Sterling with the Arsenal were also encountered by the reprocurement contractor. No action was ever taken by the Arsenal against WKC for the latter's failure to meet its three-day review period. Mr. Valloze's only response was to tell Sterling that WKC could not keep up with the review process.

FAR 52.243–1, *Changes—Fixed Price*, states in relevant part:

(a) The Contracting Officer may at any time, by written order, ... make any changes within the general scope of this contract in any one or more of the following:

(1) Drawings, designs, or specifications when the supplies to be furnished are to be specially manufactured for the

Government in accordance with the drawings, designs, or specification.

\* \* \* \* \* \*

(b) If any such change causes an increase or decrease in the cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by the order, the Contracting Officer shall make an equitable adjustment in the contract price, the delivery schedule, or both, and shall modify the contract.

 A contractor may seek an equitable adjustment to compensate for increased costs of performance flowing from changes that alter the work to be performed under the contract. *Johns–Manville Corp. v. United States*, 12 Cl.Ct. 1, 32 (1987); *Bruce Construction Corp. v. United States*, 163 Ct.Cl. 97, 324 F.2d 516, 518 (1963). To prevail on its claim for equitable adjustment(s), plaintiff must demonstrate first that any increased costs arose from conditions differing materially from those indicated in the bid documents, and that such conditions were reasonably unforeseeable in the light of all the information available to the contractor. *Johns–Manville Corp.*, 12 Cl.Ct. at 33. Plaintiff must also show that its contract costs actually increased, and that the cost increases were the direct and necessary result of the change. *Id.; see Wieman v. United States*, 230 Ct.Cl. 563, 678 F.2d 207, 214 (1982); *Paul Hardeman, Inc. v. United States*, 186 Ct.Cl. 743, 406 F.2d 1357, 1369 (1969).

 It has been established that although the bid documents were silent, Sterling's pre-award PERT Chart established a review period of five-working days. Proof that the five-day review period was reasonable is to be found in the Arsenal's three-day review period negotiated with WKC. The fact that WKC could not meet the schedule to which it agreed does not detract from the proof of reasonableness of the Arsenal's five-day review commitment to Sterling. The Arsenal's August 20, 1987, letter doubled this period. The court has little trouble finding that this term of the contract is material in light of the con-

tract's DX rating, its complex nature, and its highly compressed performance period. Given the custom in the industry to review shop drawings in three to five-days, Sterling could not have reasonably foreseen a doubling of the review period by Mr. Park, especially in light of the contract's DX status and one-year performance period. As discussed in detail below, steel was a critical path activity during the first half of the contract. Therefore, any delay experienced in the review of anchor bolt, major erection, and detail drawings could have *ipso facto* caused delay to the project resulting in increased costs to Sterling. Had the Arsenal assembled a properly trained contract management and technical staff, contracted with WKC before award of Sterling's contract, and followed general government contracting and industry practice, it might have reviewed steel drawings more efficiently and not delayed a critical path activity. The Arsenal's ten-day review period for every shop-drawing submittal delayed the delivery schedule because it slowed the rate at which Albany Steel could begin preparing detail drawings and, eventually, steel fabrication. The court finds that the Arsenal was responsible for all delays associated with the review of technical drawings submitted by Albany Steel, Grey Electric, Johnson Controls, and Fey Steel. Sterling was responsible for the twenty day delay caused by Albany Steel's failure to resume work on the contract immediately upon receipt of the approved drawings on November 3, 1987. Sterling was not responsible for Albany Steel's initial nine day delay in submitting the first set of major erection drawings. Sterling delivered the erection drawings on August 10, 1987, nine days later than planned, but it is amply clear that the Arsenal would have taken no action on those drawings until it reopened on August 10, 1987, even if they had been delivered during the annual shutdown. The Arsenal significantly increased the time required to construct the chrome-plating facility thereby entitling Sterling to an equitable adjustment under the contract changes clause for additional time and money.

## II. The Defense Production Act

The court must decide whether Albany Steel violated the Defense Production Act (DPA), and its implementing regulations, by placing the Vicon Recovery job ahead of the Arsenal's stalled DX contract. The court must also resolve whether Albany Steel was entitled, under the DPA, to finish the Vicon Recovery job before recommencing the Arsenal's contract, given the government-caused delay.

The Defense Production Act of 1950, 50 U.S.C. app. §§ 2061–2169 (1988), states in relevant part:

> The President is hereby authorized ... to require that performance under contracts ... which he deems necessary or appropriate to promote the national defense shall take priority over performance under any other contract ... and, for the purpose of assuring such priority, to require acceptance and performance of such contracts ... in preference to other contracts ... by any person he finds to be capable of their performance
> ...

50 U.S.C. app. § 2071 (1988). The legislative history of the DPA reveals that Congress intended to give the President broad powers to procure items critical to the national defense. The House Report stated that, except for rationing at the retail level,

> the powers that would be granted [to the President under the DPA] are broad and flexible. They would include the power to issue orders stopping or reducing the production of any item; orders to prohibit the use of a material for a particular purpose; and orders to prohibit the accumulation of excessive inventories. They would authorize the President to require filling certain orders in preference to oth-

er orders, or requiring acceptance and performance of particular orders.

H.R.Rep. No. 2759, 81st Cong., 2d Sess. 4 (1950), *reprinted in* 1950 U.S.C.C.A.N. 3620, 3623–24.[13]

Pursuant to Title I of the DPA, the President delegated the enforcement of priorities and allocations under the Act to the Director of the Federal Emergency Management Agency, who redelegated the authority to procure and allocate industrial resources to the Secretary of Commerce. The Commerce Department, in turn, created the Defense Priorities and Allocations System (DPAS) to maintain national defense programs on schedule and provide an operating system that could be expanded rapidly in a national emergency. To this end, the Commerce Department's Office of Industrial Resource Administration issued a series of DPAS ratings to be assigned to certain government contracts:

> (a) *Levels of priority.* (1) There are two levels of priority established by [the DPAS] regulation, identified by the rating symbols "DO" and "DX".
> (2) All DO rated orders have equal priority with each other and take preference over unrated orders. All DX rated orders have equal priority with each other and take preference over DO rated orders and unrated orders ...
> (3) In addition, a Directive issued by Commerce takes preference over any DX rated order, DO rated order, or unrated order, as stipulated in the Directive.

15 C.F.R. § 700.11 (1991).

According to 15 C.F.R. § 700.13(a), *Mandatory acceptance,* "a person shall accept every rated order received and must fill such orders regardless of any other rated or unrated orders that have been accepted." Section 700.13(b)(1), *Mandatory re-*

---

13. Congress was not blind to the injustice that could result from the exercise of executive fiat in the economy. The House Report noted that the power to requisition found in Title II of the Act was a "drastic exercise of the sovereign power." The Banking and Currency Committee, to which the bill was referred from the whole House, inserted the following compensation terms in the DPA:

> Provisions have ... been inserted ... requiring the President to give the former owner the

opportunity to reacquire the property at its then fair value, when it is no longer needed for the national defense, and providing for payment of 75 percent (instead of 50 percent as provided in the bill as introduced) of the value as determined by the President, when the former owner does not accept the amount so determined and wishes to have the amount of compensation determined in court.

H.R.Rep. No. 2759, 81st Cong., 2d Sess. 4 (1950), *reprinted in* 1950 U.S.C.C.A.N. 3620, 3624.

*jection*, states that the contractor must reject a rated order if it is unable to fill the order by the date required, but scheduling conflicts between previously accepted lower-rated or unrated contracts is not an excuse to reject the higher rated contract. The heart of the regulations, 15 C.F.R. § 700.14, *Preferential scheduling*, states:

(a) A person must schedule operations, including the acquisition of all needed production items, in a timely manner to satisfy the delivery requirements of each rated order ...

(b) DO rated orders must be given production preference over unrated orders, if necessary to meet required delivery dates, even if this requires the diversion of items being processed or ready for delivery against unrated orders. Similarly, DX rated orders must be given preference over DO rated orders and unrated orders.

■ The facts demonstrated that Albany Steel did not violate the regulations solely by the act of displacing the Arsenal's contract with the Vicon Recovery job. Under § 700.13(d), *Customer notification requirements*, Albany Steel met its regulatory obligations. Section 700.13(d)(2) spells out the procedure for a contractor to follow when confronted with delay beyond the contractor's control:

If a person has accepted a rated order and later discovers that, due to circumstances beyond the person's control, deliveries will be delayed, the person must notify the customer immediately, give the reasons for the delay, and advise of a new shipment date. If notification is given verbally, written confirmation must be provided within five working days.

On October 2, 1987, Mr. Daniel McAlonie of Albany Steel wrote to Mr. Bromley indicating that the failure of the Arsenal to approve the major erection drawings, which Albany Steel had submitted on September 23, 1987, as the "final submittal," prevented Albany Steel from meeting the "original schedule." Mr. McAlonie informed Mr. Bromley that Albany Steel would require between eight to ten weeks to complete the detail drawings. On Octo-

ber 5, 1987, Mr. Paul Dougall, Sterling's Project Superintendent, wrote to inform Mr. McAlonie that, *inter alia*, the Arsenal had not reviewed Albany Steel's anchor-bolt or erection drawings, and that Mr. Valloze had indicated that the Arsenal would require at least another three weeks to do so. The facts of record show that Sterling met the procedures set forth in § 700.13(d)(2), and, therefore, was not in violation of the regulations governing the DPA merely because Albany Steel accepted the unrated Vicon Recovery project. The Arsenal's failure to review drawings was delay beyond Sterling's and Albany Steel's control, which in turn caused delay to the delivery of the steel. The Arsenal was notified that the reason for Albany Steel's delay in delivery was the Arsenal's failure to approve anchor-bolt drawings AB–1 and AB–2, as well as major erection drawings E–1 through E–14. Pursuant to § 700.-13(d)(2), Albany Steel gave Sterling its estimated "shipment" date of eight to ten weeks from receipt of the approved erection drawings. Albany Steel began detailing on November 23, 1987, and completed the steel detail drawings on February 1, 1988.

However, Albany Steel's failure to begin detail drawings immediately upon receipt of the approved drawings on November 3, 1987, was a violation of the DPA. Sections 700.13(a) and § 700.14(a)–(b) impose a continuing burden on a contractor to stop work immediately on any unrated work and resume previously accepted rated work without delay. Such an interpretation of the regulations is proper given the importance of defense production to national security in general, and the clear congressional intent behind the DPA to strengthen the President's hand in the production of critical defense related items in particular. Therefore, the court concludes that when Albany Steel received the approved erection drawings on November 3, 1987, it was incumbent upon Albany Steel to stop work on the Vicon Recovery job and resume work on the Arsenal's DX-rated job. Albany Steel, and thus Sterling, violated the DPA by permitting twenty days to elapse between receipt of the approved erection

drawings, and start of the steel detail drawings.

The court finds that the Arsenal consistently ignored its own responsibilities under the DX rating during performance of the contract but did not hesitate to call the rating forth to berate Sterling capriciously at trial. As the court noted at trial, it did not see how the government could challenge Sterling for not adhering to the tight construction schedule when the Arsenal did not adhere to the same schedule, thereby stalling and undermining Sterling's performance under the contract. Nevertheless, DX-rated orders have priority over unrated orders. In the absence of a convincing estoppel argument, which was not made, the court must conclude that the government's indolence in performing its contract obligations did not excuse Albany Steel and Sterling from performing in accordance with the DPA. However, Sterling's violation of the DPA, caused by Albany Steel's twenty day lapse in resuming work under its subcontract, does not necessarily dictate a finding of delay to the Arsenal's contract with Sterling, even though steel was on the critical path at the time. Neither party directly addressed the latter issue at trial. Defendant averred that because it had proved delay on the critical path, *a fortiori*, a contract delay occurred that would be traced to Albany Steel, and hence, Sterling's doorstep. Such is not necessarily the case in the absence of proof that the delay caused material damage. As discussed below, delay on the critical path may not result in a *per se* delay in completion.

III. Critical Path Analysis

The Court of Claims described CPM analysis as

an efficient way of organizing and scheduling a complex project which consists of numerous interrelated separate small projects. Each subproject is identified and classified as to the duration and precedence of the work. (E.g., one could not carpet an area until the flooring is down and the flooring cannot be completed until the underlying electrical and telephone conduits are installed.) The

data is then analyzed, usually by computer, to determine the most efficient schedule for the entire project. Many subprojects may be performed at any time within a given period without any effect on the completion of the entire project. However, some items of work are given no leeway and must be performed on schedule; otherwise, the entire project will be delayed. These latter items of work are on the "critical path." A delay, or acceleration, of work along the critical path will affect the entire project.

*Haney v. United States*, 230 Ct.Cl. 148, 676 F.2d 584, 595 (1982).

The Claims Court has also noted that determining the critical path is essential to determining damages.

The reason that the determination of the critical path is crucial to the calculation of delay damages is that only construction work on the critical path [has] an impact upon the time in which the project [is] completed. If work on the critical path [is] delayed, then the eventual completion date of the project [is] delayed. Delay involving work not on the critical path generally [has] no impact on the eventual completion date of the project.

*G.M. Shupe, Inc. v. United States*, 5 Cl.Ct. 662, 728 (1984). This does not, however, end the inquiry. There very well may be more than one critical path on a project, and the critical path may change during the life of a project, *i.e.*, activities that were not on the original critical path subsequently may be added. It is also true that delay of a critical path item may not result in a *per se* delay in completion because the critical path is only an educated estimate of the impact of delay; lost time in one phase may be made up in later phases.

Theoretically, if an activity on the critical path is delayed by one day, and no compensating change is made by rescheduling or some form of acceleration, the entire project will be delayed by one day. Running parallel to the construction events on the critical path, there will probably be other activities, which should easily keep pace with the critical construction events. Because these events

have more time available to them on the schedule than is actually necessary to complete these events, they are said to have "float time," i.e., an amount of time in excess of the minimum reasonable amount of time required to complete that item of work. While every construction event can eventually become "critical," by having its cushion or float time used up, this is not anticipated in the initial scheduling. If, [for example, the construction of a house] is delayed in foundation construction, we know that that is a critical event; arguably, a two-day delay in that construction will cause a two-day delay to project completion. At the same time, a two-day delay to the electrician which merely deprives the electrical work of two days of "float time" will not, by definition, directly cause any delay to the project as a whole.

Kenneth M. Cushman & Joyce K. Hackenbrach, *Delays and Disruptions in Advanced Construction Claims Workshop* (1989), (*PLI Real Estate Law and Practice Course Handbook Series, Advanced Construction Claims Workshop*, No. 11).

Steel activities were critical on Sterling's as-planned PERT Chart for the first half of the project, from June 9, 1987, to December 15, 1987. Defendant's contentions on the critical path are at best murky and confusing. Paragraph 128 of defendant's Amended Answer and Counterclaim states:

> Sterling manipulated its CPM and its CPM updates by stating that virtually every subcontractors' work fell on the critical path when *in truth and in fact* the steel subcontractor's work was the only activity on the critical path. Sterling made these false statements in order to create delay claims for those subcontractors. The subcontractor claims, in turn, allowed Sterling to include its grossly inflated and false overhead rates and a profit as a mark-up on each subcontractor claim.

(Emphasis added.) Yet, on page twenty-eight of its Contentions of Fact and Law, the government stated, *"In truth and in fact,* the critical path included the waterproofing (pit restoration) and the concrete pours, a fact that never appears on Ster-

ling's charts." (Emphasis added.) Not only did the government flip-flop from a "steel only" critical path to a "concrete and waterproofing" critical path, the government alleged in its Contentions of Fact and Law that the concrete and waterproofing work never appeared on Sterling's critical path. However, the government alleged in its Amended Answer and Counterclaim, that concrete and waterproofing did appear on Sterling's critical path. The government's inability to settle on a consistent position, or even one that was not blatantly contradictory, detracted fatally from the persuasiveness of its argument.

According to the so-called as-planned PERT Chart that Mr. Scavello created for this litigation, an exacting survey of the pit should have been conducted on June 10, 1987, but pit cover removal, also a critical path activity, was not to have been done until September 10, 1987, a full three months after award of the contract. Yet the government argued vociferously that Sterling should have removed the pit cover and had the pit surveyed before it engaged in any steel related activities, *i.e.*, at the outset of the project and well before any steel detail drawings were submitted. The government argued that all structural steel drawings should have been performed after removal of the pit cover, but Mr. Scavello's as-planned chart showed the structural steel drawings proceeding well before the pit cover was to be removed. No steel activity, whether shop drawing or fabrication, became critical on Mr. Scavello's as-planned chart until December 15, 1987, far too late to permit timely completion of the contract. As said above, Mr. Scavello's as-planned chart showed a contract completion date of July 5, 1988, a month after the contract's one-year completion date!

A second problem with Mr. Scavello's version of the as-planned schedule was addressed by another witness for the Arsenal, Mr. Gary Wells, the surveyor under contract to Sterling who discovered the bulges in the pit wall. His testimony, by deposition read into the record, was that surveying the pit with the cover in place, as Mr. Scavello's PERT Chart required, would

have been impractical and assuredly inaccurate. Mr. Wells testified that he surveyed the pit's column center lines while sitting in a chair suspended from a crane using instruments known as a T–1 Wild and a T–2 Wild. To perform this procedure, Sterling removed the pit cover between November 27, and December 4, 1987, one week before Mr. Wells' column center line survey. No government witness rebutted his testimony, and although the court was not able to observe Mr. Wells' demeanor on the witness stand, his answers to direct and cross-examination were straightforward, highly informative, and clear.

After extensive research of critical path analysis, and the facts of this record, the court gave no weight to Mr. Scavello's after-the-fact, as-planned PERT Chart, with its made-for-litigation critical path. In the absence of credible evidence to demonstrate the flaws in Sterling's as-planned chart or its critical path analysis, the court cannot second-guess Sterling's calculations, Mr. Bromley's formulae, or the intuitive estimates that he added to his analysis based on years of construction experience. It is also clear to the court from the evidence and testimony adduced at trial that PERT Charts, as-planned schedules, and critical path analysis are pliant principles of construction management and lend themselves easily to different interpretations. As demonstrated by the highly divergent testimony about the project's critical path, reasonable people may disagree as to whether an activity on an as-planned chart is critical or not. Reliance on the questionable charts and highly subjective testimony of the parties, would be nonproductive. The court finds from a careful analysis of the record that the critical path ran through structural steel during the first half of the project. Without a steel structure in the pit, the PVC, electric substations, motor control centers, fire-alarm systems, control panels, and steel tanks could neither have been installed nor connected. Had the structural steel been installed, the critical path then would have shifted to electric, control panels, and steel tank activities for the remainder of the contract. Therefore, any delay to the submittal and approval of steel shop drawings, and the fabrication, delivery, or installation of structural steel that caused material delay to the project is compensable. Material delay is delay that has not been offset by equal or greater timesaving in other critical activities. *Haney v. United States*, 230 Ct.Cl. 148, 676 F.2d 584, 595 (1982); Cushman & Hackenbrach, *Delays and Disruptions; Advanced Construction Claims Workshop* (1989).

■ Structural steel was delivered to the job site beginning on July 5, 1988, some three weeks after Sterling suspended work at the job site, and was not installed until after Sterling's default termination. Therefore, based on a full review of all the evidence of record, the court concludes that the Arsenal-caused delay in reviewing structural steel drawings delayed progress on the critical path and that such delay was not offset by timesaving in other critical path activities. These delays to the contract were responsible for Sterling's inability to complete the contract within the one-year performance period. Arsenal-caused delays to electric, control panel, and steel tank activities, though egregious and frustrating, cannot be found, at this time, to have constituted material delays to the contract primarily because the steel delays ran through the course of the entire contract until the day the contract was terminated for default, thereby preventing the critical path from ever running through the other activities. Had the steel been erected, and the contract properly extended by change order, it is possible that some of the other activities would have reached the point where they would have been on the critical path and not "floaters." *See* Cushman & Hackenbrach, *Delays and Disruptions; in Advanced Construction Claims Workshop.* However, it is possible that after defendant converts Sterling's termination for default to a termination for the convenience of the government that the other delays may become material and hence compensable. The court cannot tell at this time, but as these proceedings are bifurcated, the time to address that issue will be

during the determination of quantum by the parties, or the court.

## IV. The Pit Wall Bulge

■ The court must determine whether Sterling had a duty to order Albany Steel to (1) stop detail drawing upon discovering that the pit walls interfered with the structural steel design, and (2) begin redetailing based on WKC's solution to the pit wall problem before the Arsenal directed it to do so.

Defendant argued that it was not liable for any delay or wasted detailing resulting from the Arsenal's tardy change order. Rather, defendant contended, Sterling should have ordered Albany Steel to halt all detail drawing immediately upon Sterling's discovery of the pit wall bulges, and to redraw the structural steel affected by WKC's proposed solution much earlier than March 8, 1988. The government argued that Ms. Felock's January 28, 1988, "directive" obligated Sterling to order Albany Steel to begin redrawing, based on the WKC solution, no later than that date. In her cover letter Ms. Felock stated:

Attached is Walter Kidde Constructors, Inc. [back-dated] letter of January 21, 1988, which furnishes their solution to the pit wall interference problem. *The solution and comments stated in the letter reflect the Government's position on this matter.*

Request [sic] you review the referenced letter and advise whether or not you agree with the proposed solution. If you disagree, please furnish your rationale.

(Emphasis added.)

In another letter written February 13, 1988, Ms. Felock stated that

[a]t this point in time we have not been advised whether or not you agree with Walter Kidde's recommended column relocation [sic].... Until you confirm the WKC recommendations are acceptable or furnish viable alternate proposals we cannot proceed with review of the fabrication drawings.

It is clear to the court that Ms. Felock's "directive" was not a valid order of a con-

tracting officer to change the design of the contract. Her statement that WKC's solution reflected "the Government's position" was informational only because she characterized the solution as "proposed" and "recommended," and asked if Sterling agreed or disagreed with the solution. Mr. Valloze, the designated contracting officer on the Sterling contract and the person with the final authority to commit the government to a positive, firm solution, ignored Sterling's dilemma. Sound contract management required Mr. Valloze, at the very least, to have met with Sterling to discuss the problem and decide whether Sterling should proceed under the contract or stop work, with the obvious caveat that no matter what position Mr. Valloze took it would obligate the government to extend the time for performance and the costs incurred by Sterling for trying to comply with a defective design.

Defendant revealed that Mr. Bromley characterized Ms. Felock's correspondence as a valid directive in a pre-trial deposition in which he stated that he notified Sterling's subcontractors of the proposed WKC solution "[e]ither immediately, a day or two after the receipt of the pit arsenal's [sic] recommendations. Actually it was Kidde's recommendation. It was the Arsenal's directive." On cross-examination, Mr. Bromley also acknowledged that "we could have issued the directive earlier than [March 8, 1988]." The government cited a February 23, 1988, memo from Sterling to the Arsenal to prove that Sterling had accepted the WKC solution to the pit wall problem by that date. The memo stated, in relevant part:

[Sterling] agrees that Walter Kidde's solution was reasonable and practical. We have proceeded and poured the column pedestals approximately four (4) weeks ago. Since the pedestals and their respective column bolts are set firm in concrete it is now difficult for SMI to disagree with the solution. We consider this matter 'finished', 'complete', 'done' and wish to move on.

■ Defendant was perturbed that neither Sterling nor Albany Steel proffered an

alternative solution to the pit wall problem. As a result, WKC's proposed solution was the only solution available, and therefore, asserted defendant, Sterling should have embraced it as a "change" to the contract on January 28, 1988. Alternatively, defendant argued, Sterling "knew" by February 23, 1988, that the pending change order would include the WKC solution of January 28, 1988, and Sterling should have ordered Albany Steel to proceed with the redrawing by that date at the latest. Sterling failed to do so, and, therefore, was liable for the resulting delay. The government also asserted that Sterling had an obligation to suggest a solution to the pit wall problem under contract Special Provision Fourteen (SP–14), which is as follows:

*COORDINATION OF TRADES.* The contract drawings are in part diagrammatic and show the general arrangement of cuts, piping and other mechanical trades. The Contractor must have a competent engineer on the job site to coordinate all field work and shop drawings of the various trades prior to installation and/or submission of field or shop drawings for approval. He shall allot spaces to the various trades prior to the installation of the work. In spaces where all the various installations cannot be accommodated, the Contractor shall notify the Contracting officer and submit suggestions as to its solution.

Special Provision Fourteen speaks for itself, but it certainly did not require Sterling to suggest alternative solutions to pit design problems, or any other design problems. Nor, for that matter, did any other provision in the contract. Absent a contractual provision to the contrary, Sterling cannot be held liable for its failure to solve an extremely significant design error that was the fault of the Arsenal.

Sterling asserted that it was entirely proper for it not to direct Albany Steel to stop work even after Sterling discovered the pit wall bulges, and that if Sterling had ordered Albany Steel to suspend work before March 8, 1988, and WKC's proposed solution had been rejected, a critical path activity would have been delayed even further.[14] In fact, the WKC solution ultimately was not used. During the reprocurement, the Arsenal directed or permitted Sweet Associates to chisel troughs in the concrete pit wall to create sufficient space for the original structural steel dimensions. Sterling argued that it did not have the confidence in the Arsenal's management to consider Ms. Felock's January 28, 1988 letter, stating that the WKC solution "represents the position of the government," as a directive, much less a change order, in light of her equivocal statements, the Arsenal's mismanagement of the technical drawing review, refusal to cooperate with Sterling and its subcontractors, and months-long delay in obtaining a solution to the pit wall

14. FAR provisions 52.233–1, the *Disputes Clause,* and 52.243–7, *Notification of Changes,* provide in relevant part:

FAR 52.233–1

"Claim," as used in this clause, means a written demand or written assertion by one of the contracting parties seeking, as a matter of right, ... the adjustment or interpretation of the contract terms, or other relief arising under or relating to this contract.

\* \* \* \* \* \*

(h) *The Contractor shall proceed diligently with performance of this contract,* pending final resolution of any request for relief, claim, appeal, or action arising under the contract, and comply with any decision of the Contracting Officer. (Emphasis added.)

FAR 52.243–7

(b) *Notice* ... Except for changes identified as such in writing and signed by the Contracting Officer, the Contractor shall notify the Administrative Contracting Officer in writing, promptly, within ... (to be negotiated) calendar days from the date that the Contractor identifies any Government conduct (including actions, inactions, and written or oral communications) that the Contractor regards as a change to the contract terms and conditions....

\* \* \* \* \* \*

(c) *Continued Performance.* Following submission of the notice required by (b) above, *the Contractor shall diligently continue performance of this contract to the maximum extent possible in accordance with its terms and conditions as construed by the Contractor,* unless the notice reports a direction of the Contracting Officer or a communication from a SAR of the Contracting Officer, in either of which events the Contractor shall continue performance....

(Emphasis added.)

problem from WKC. Absent a clear and unequivocal change order from the senior contracting officer, Sterling felt bound to continue to work according to the terms of the contract which, until March 8, 1988, Sterling properly construed to include the original contract specifications and not WKC's proposed solution. The government took three months to execute the formal order adopting the WKC solution for this critical path activity but even then refused to give Sterling the equitable adjustment for time and money to which it was entitled.

Sterling did not just sit idly by on its hands while the Arsenal and WKC floundered about. By February 5, 1988, Sterling had submitted WKC's proposed redesign to its subcontractors for their analysis of the impact of the changes on their activities, anticipating the government by five days. On February 10, 1988, Ms. Felock asked Sterling to do just that:

> [I]t is uncertain as to what actions you are taking relative to the Government recommended re-location [sic] of certain columns. We realize that you cannot evaluate structural steel design considerations etc., that has [sic] been done by WKC. What you must do is verify that the re-locations [sic] will not have an adverse impact on installation of equipment/components in the system, if there are any to be identified.
>
> All effected [sic] subcontractors must be notified of the proposed re-location [sic] so they can make revisions as necessary and advise you of any potential problems caused by this condition.

The court finds that not only did Ms. Felock concede that evaluation of design specifications were not within Sterling's contract obligations, but also that she failed to include an explicit directive ordering Sterling to direct Albany Steel to begin the redrawing. All three of her letters on this subject support the finding that they were informational only. Sterling's submittal to its subcontractors for their review and the Arsenal's request for such review, though normally in reverse order, were standard procedure:

> [T]he changes procedure will generally call for an interchange of documentation. Only in rare cases will the Government issue a change without first coordinating with the contractor to obtain at least preliminary information as to the technical aspects of the change and its impact on the price and schedule of the contract.

John Cibinic, Jr. & Ralph C. Nash, Jr., *Administration of Government Contracts*, 297 (2d ed. 1985).

As admitted by defendant, the contract did not impose an obligation on Sterling to order Albany Steel to suspend steel detail drawing upon discovering the pit wall bulges on December 11, 1987, or upon receipt of the WKC proposed solution on January 28, 1988, from Ms. Felock. By January 28, 1988, the government, not Sterling, was in the only position to know if WKC's proposed solution would become part of the contract because only the government was in privity of contract with WKC and had the authority to approve such a decision. As is plainly evident from the FAR 52.243–1, *Changes–Fixed Price,* "[t]he Contracting Officer may at any time, by written order, ... make any changes within the general scope of this contract." Only the contracting officer had the power to issue the change order adopting WKC's redesign. The government knew that Sterling's critical path ran through steel and, therefore, that Albany Steel was rushing to meet its February 1, 1988, deadline for submission of detail drawings for approval. Had the Arsenal wished Albany Steel to stop creating what eventually became useless drawings, the Arsenal could have ordered Sterling to halt detail drawing any time after receiving notice of the pit wall bulges, and submit the WKC proposed solution to Sterling's subcontractors on January 28, 1988. The Arsenal could have ordered Sterling to commence re-drawing under the WKC solution as soon as the subcontractors had evaluated the WKC proposed solution and its attendant changes to WKC's original design. Better still, the Arsenal could have retained WKC to analyze and recommend a solution to the problem well before January 21, 1988, or, for

that matter, before award of the Sterling contract.

Because the steel detail drawings were a critical path activity, the progress of the entire contract had been delayed substantially by mid-January 1988. The one-year performance period had passed the six-month mark, and Sterling could not have reasonably known that the WKC proposed solution would ultimately be adopted by the Arsenal. The court finds that the government is liable for all extra time and costs attendant to its failure to order Sterling to halt Albany Steel's progress on detail drawings between December 17, 1987, and February 1, 1988, the date that Albany Steel completed the detail drawings based on the government's flawed design. The government is also liable for delay between February 1, 1988, and March 18, 1988, the day the Arsenal actually adopted the proposed WKC solution as a change to the contract. Clearly, if the Arsenal had acted promptly and decisively to resolve the issue, structural steel would have begun arriving at the job site months earlier than July 5, 1988, and may have changed the circumstances so completely as to have permitted Sterling to complete the contract. Again, as this phase of the case deals with liability only, damages will not be discussed.

V. The Pit Survey

██ Lev Zetlin designed the pit, Sweet Associates built it, and WKC designed the chrome-plating facility, all under the wavering eye of the Arsenal staff. The Arsenal's one-year contract with Sterling began the last phase of the project: building the facility within the pit. While not minimizing the complexity of this construction phase, it is clear that over seven years of faulty work and planning preceded the construction phase.

Defendant argued that the contract required Sterling to perform a highly technical "survey" of the pit at the outset of the contract, and that had Sterling done so it would have discovered the pit wall bulges long before they became a major issue. Sterling asserted that the duty of performing any such survey was on the Arsenal or WKC, otherwise WKC could not have designed the facility to fit the pit. The Arsenal's charge was nothing more than contrived nonsense, but the court will address the arguments of the parties in order to fully dispose of the issue.

In interpreting the duties imposed under the contract, the court is mindful that contract language should be given its plain meaning, without rewriting or varying the terms of the agreement. *George Hyman Constr. Co. v. United States*, 832 F.2d 574, 581 (Fed.Cir.1987); *Julius Goldman's Egg City, v. United States*, 697 F.2d 1051, 1057 (Fed.Cir.), *cert. denied*, 464 U.S. 814, 104 S.Ct. 68, 78 L.Ed.2d 83 (1983). Yet, the court has latitude to apply trade usage and custom to even unambiguous terms. *Ralph Larsen & Son, Inc. v. United States*, 17 Cl.Ct. 39, 46 (1989) (citing *Gholson, Byars & Holmes Constr. Co. v. United States*, 351 F.2d 987, 999 (Ct.Cl.1965)).

According to the uncontroverted testimony of Mr. Paul Butlak, Sterling's structural steel expert, field verification is a customary procedure which, in the context of this case, required the contractor to measure the inside of the pit walls with a tape measure. Field verification in the context of Note 1, Drawing Sheet S–2, referred only to the measurement of existing conditions. A survey, on the other hand, is an exacting procedure, based on geometric and trigonometric principles in which a surveyor, using either a transit or a laser, takes precise linear and angular measurements to obtain the length, width, grade, and elevation of a particular area. Mr. Scavello, the government's expert witness, agreed that field verification did not impose a duty on Sterling to conduct a survey. Both he and Mr. Fortune of Sweet Associates agreed, with hindsight, that for Sterling to have conducted a survey at the outset of the contract would have been a wise course, but neither suggested that the field verification requirement imposed an obligation to survey on Sterling. Mr. Butlak testified that the phrase "verify all dimensions" on Note 1 of Drawing Sheet S–2 indicated to the steel detailer that it was liable for any error in the dimensions

and elevations on its shop drawings. This clause signaled the need for an "in-house" verification of new work, not a field verification, because the work to be verified did not exist yet at the job site. To Mr. Butlak, the phrase "verify all ... field conditions" on Note 14 Drawing Sheet S–8 meant to determine, from a visit to the job site, whether there was, for example, sufficient headroom for a crane, or a long steel beam. Neither party argued that the term, "contractors [are] ... responsible for fit and alignment of all work," the only remaining contractual term where such a duty could be found, imposed a duty to survey on Sterling.

Conducting a thorough survey immediately after construction of the pit would obviously have been the surest method to provide for an accurate design. Expert testimony at trial confirmed that a survey at that stage (1980) was necessary to provide the designer with the exact dimensions of the pit before spending considerable resources to create a highly complex design that may be flawed or even useless. WKC's failure to survey the pit before designing the chrome-plating facility is something akin to Mr. Kidde building a large sailboat in a basement with no doors. Industry custom, according to Messrs. Hess and Butlak, required the Arsenal to arrange for a survey after the pit was constructed but before the chrome-plating facility was designed. The results of the survey certainly would have been given WKC for use in its design, and perhaps even Sterling and Albany Steel. The government did not rebut this contention.

For the court to infer a duty to survey from the phrase "contractors [are] ... responsible for fit and alignment of all work" would violate the plain meaning of the term. First, Sterling need not have fulfilled its responsibility for fit and alignment of all work by conducting a survey. Had Sterling not discovered the bulges, and the steel not fit properly when installed, Sterling could have chiseled a trough in the pit walls, just as Sweet Associates did on the reprocurement. Thus, Sterling would have assured fit and alignment without a survey. Second, the ultimate effect of stretching the meaning of this term so as to impose a duty to survey on Sterling would provide the government with an unintended and undeserved safe harbor from its warranty liability under *Spearin.* The court will not misread the contract to assist the Arsenal in shirking its clearly-stated liability for defective design specifications.

There is good reason to believe that the Arsenal knew of the bulges in the pit walls when Sweet Associates constructed the pit in 1980. If so, the Arsenal had a duty to pass this superior knowledge of its construction site to its contractor. The Federal Circuit has stated that a contractor is entitled to an equitable adjustment when:

(1) the contractor undert[ook] to perform without vital knowledge of a fact that affects performance costs or duration, (2) the government was aware the contractor had no knowledge of and had no reason to obtain such information, (3) any contract specification supplied misled the contractor, or did not put it on notice to inquire, and (4) the government failed to provide the relevant information.

*GAF Corp. v. U.S.,* 932 F.2d 947, 949 (Fed. Cir.1991) (quoting *Lopez v. A.C. & S. Inc.,* 858 F.2d 712, 717 (Fed.Cir.1988)); *American Ship Bldg. Co. v. United States,* 654 F.2d 75, 79 (Ct.Cl.1981). The court's analysis demonstrates that the facts of the instant case satisfy all four prongs of the Federal Circuit's test.

There is little doubt that Sterling undertook the performance of the contract without knowledge of the pit wall irregularities, as they were invisible to the naked eye and not noted in the as-built drawings. The question of whether the government knew that Sterling had no knowledge of the pit wall irregularities is no more complex. For the government to know whether Sterling was aware of the pit wall problem, the government first had to be aware of it. Mr. Fortune was the Sweet Associates project manager assigned to install the pit in 1980. He testified that the government's on-site representative "interacted" on a regular basis with Sweet's employees during the construction of the pit and knew

that the walls were irregular. Moreover, Mr. Fortune testified that "it was no secret" that the plywood frames had bowed visibly when the concrete settled, and that the shifting forms were common gossip at the job site. Mr. Fortune's testimony persuades the court that the government knew of the pit wall irregularities. Obviously, Sterling was not present at the job site in 1980 during the construction of the pit walls. *A fortiori*, the government knew that Sterling was unaware of the problem. Sterling's actions up to December 11, 1987, the date on which Sterling discovered the bulges, demonstrated to the court that the flawed as-built and design drawings on which Sterling relied caused it considerable delay in seeking review of useless steel drawings. Finally, the Arsenal failed to inform Sterling of the bulges. Only through fortuitous discovery did Sterling learn of the defects when it did.

The sole reference to any survey in the contract is contained in Section 2A of the Special Provisions, entitled, "DEMOLITION." Section 2A provided, in part:

### DEMOLITION

1. AVAILABILITY OF WORK AREAS: The contractor will coordinate with the Contracting Officer to schedule the availability of the areas.

2. SUBMITTALS: The procedures proposed for the accomplishment of salvage and demolition work shall be submitted for approval. The procedures shall provide for safe conduct of the work, careful removal and disposition of materials specified to be salvaged, *protection of property which is to remain undisturbed,* coordination with other work in progress, and timely disconnection of utility services. The procedures shall include a detailed description of the methods and equipment to be used for each operation, and the sequence of operations.

3. PROTECTION:

3.1 *Protection of Existing Work:* Before beginning any cutting or demolition work, the Contractor shall carefully *survey* the existing work and examine the drawings and specifications to determine the extent of the work. *The contractor shall take all necessary precautions to insure against damage to existing work to remain in place, to be reused, or to remain the property of the Government, and any damage to such work shall be repaired or replaced as approved by the Contracting Officer at no additional cost to the Government.* The Contractor shall carefully coordinate the work of this section with all other work and construct and maintain shoring, bracing and supports, as required. The Contractor shall insure that structural elements are not overlooked and be responsible for increasing structural supports or adding new supports as may be required to achieve original strength as a result of any cutting, removal, or demolition work performed under any part of this contract.

(Emphasis added.) Section 2A concludes with several admonitions to Sterling to protect the interior of buildings from the weather, control dust created by demolition activities, refrain from burning refuse at the site, and not to use explosives.

There is not a scintilla of evidence in Section 2A from which even the loosest inference could be drawn that Sterling was to conduct an exacting, mathematically precise "survey" of the pit, using a transit or laser and geometric and trigonometric principles. Sterling was to study or observe existing structures and review the plans and specifications to determine the extent of *demolition* required. The "survey" mentioned in paragraph 3.1 refers exclusively to the "protection of property" phrase in paragraph 2. Defendant's arguments are totally and absolutely without merit and border on the frivolous.

The court is satisfied that the contract placed absolutely no burden on Sterling to conduct a survey. If the Arsenal wanted Sterling to conduct a survey of the pit it could have stated the obligation in the contract. Defendant is liable for Sterling's costs in attempting to correct the faults in the Arsenal's design drawings.

## VI. Defective Specifications

██ The court must decide whether the government is liable for any work that Sterling performed in reliance on defective government drawings. Government liability for faulty design specifications is well-settled. "[I]f the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications." *United States v. Spearin*, 248 U.S. 132, 136, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918). Rather,

> [w]hen the Government contracts for supplies to be manufactured in accordance with Government specifications, there is an implied warranty that if the specifications are followed, a satisfactory product will result. [citations omitted] If the warranty is breached, i.e., the specifications are defective, the plaintiff is entitled to damages equal to the amount expended in trying to comply with the defective specifications.

*Hol–Gar Mfg. Corp. v. United States*, 175 Ct.Cl. 518, 360 F.2d 634, 638 (1966). (Citations omitted.)

It is equally well-settled that such liability attaches only if the contractor has relied on government design specifications and not merely performance specifications. Design specifications are those in which the government sets forth

> in precise detail the materials to be employed and the manner in which the work was to be performed, and plaintiff was not privileged to deviate therefrom, but was required to follow them as one would a road map. In contrast, typical "performance" type specifications set forth an objective or standard to be achieved, and the successful bidder is expected to exercise his ingenuity in achieving that objective or standard of performance, selecting the means and assuming a corresponding responsibility for that selection.

*J.L. Simmons Co. v. United States*, 188 Ct.Cl. 684, 412 F.2d 1360, 1362 (1969). In particular, this court has stated that the "implied warranty of adequacy of specifica-

tions applies only to design specifications such as detailed measurements, tolerances, materials, *i.e.*, elaborate instructions on how to perform the contract . . ." *Stuyvesant Dredging Co. v. United States*, 11 Cl.Ct. 853, 860, *aff'd*, 834 F.2d 1576 (Fed. Cir.1987).

██ This court examined the issue of design versus performance specifications recently in *Aleutian Constructors v. United States*, 24 Cl.Ct. 372 (1991). In that case Aleutian contracted with the United States to construct an airplane hangar at Shemya Air Force Base, Alaska. High winds ripped the rubber covering off the roof of the hangar and the plaintiff, after numerous repair attempts, unsuccessfully sought an equitable adjustment from the contracting officer. Aleutian argued that the government's specifications were design specifications and that the government impliedly warranted that if Aleutian followed the design specifications, the hangar roof could be built successfully. Conversely, if the government's design specifications were defective, the government would be liable. This court found that the government's drawings, although possessing traits of both design and performance specifications, were more like performance specifications. This court stated:

> Even though a contract may contain some design specifications, when a crucial element of a contract requires the contractor to use its own expertise and ingenuity, a *Spearin* warranty does not arise as to that element of the contract. . . . Aleutian was required to select a roofing manufacturer who would exercise skill and judgment in designing and providing instructors for attaching the [rubber] membrane [to the hangar roof] in a way that would achieve the wind uplift tolerance . . .
>
> \*　\*　\*　\*　\*　\*
>
> [I]n contrast to the lack of discretion given a contractor in a design specification, Aleutian had almost unfettered discretion to interpret the specifications to design and install the membrane system. The express terms of the contract made plaintiff responsible for certifying that

designs furnished by "the Contractor or any of his subcontractors or suppliers at any tier" were free from defects, as Aleutian did in both shop drawings, and that the work performed under the contract conformed to performance requirements. Here, as in [*Austin Co. v. United States*, 161 Ct.Cl. 76, 314 F.2d 518 (1963), *cert. denied*, 375 U.S. 830, 84 S.Ct. 75, 11 L.Ed.2d 62 (1963)], plaintiff was responsible for its design, and must assume the extra costs that resulted from its ill-conceived choice. Aleutian clearly was to design and install the membrane under a performance specification, and was responsible for providing details and engineering expertise. Because no "road map" existed, except for the one devised by itself, no recovery is possible for Aleutian under the *Spearin* doctrine of implied warranty of adequacy.

*Aleutian*, 24 Cl.Ct. at 379–81. Sterling's situation is distinguishable from Aleutian's. Aleutian was to design and build the roof of the airplane hangar using its own expertise and that of its subcontractors. Neither Sterling nor any of its subcontractors had any latitude to change or add to WKC's design. While Albany Steel was to provide shop drawings and fabricate the steel, the WKC design was supposedly complete and neither Albany Steel nor Sterling were at liberty to change the design. Sterling's situation was more like that faced by the contractor in *Neal & Co. v. United States*, 19 Cl.Ct. 463 (1990), *aff'd*, 945 F.2d 385 (Fed.Cir.1991), where the contractor built concrete and steel wall panels for the Navy based on government design specifications. The panels bowed and the contractor sought reimbursement for the remedial measures it took in conjunction with its subcontractor. Relying on the Federal Circuit's decision in *Stuyvesant Dredging Co. v. United States*, 834 F.2d 1576 (Fed.Cir.1987), and the Court of Claims decision in *J.L. Simmons*, 412 F.2d at 1362, *Neal* held that the highly detailed specifications for "Precast, Prestressed Concrete" were sufficient to pass muster as design specifications:

In particular, section 03420, entitled, "Precast, Prestressed Concrete," consisted of nine pages of mixed specifications, a sampling of which are as follows:

2.1.7. Sheathing: Shall be strong enough to retain its shape under the weight of concrete and resist unrepairable damage during construction.... Provide drain holes if the tendon is to be placed, stressed and grouted in freezing climate.

3.1.5. Placing Sheathing: Place sheathing to form ducts for post-tensioning tendons. Fasten sheathing securely at close enough intervals to avoid displacement during concreting.... After placing of sheathing, reinforcement and forming is complete, perform an inspection to located possible sheathing damage. Repair all holes or openings in the sheathing prior to concreting.

It should be noted that the above excerpts were randomly chosen to illustrate the nature of the specifications. Overall, they were highly detailed, notwithstanding references to tolerances and standards to which the product was required to comply. This is far more detailed and specific than the performance specification defined by the Federal Circuit in *Stuyvesant Dredging*, and is, in this court's opinion, clearly a design specification.

*Neal* at 468. Similarly, in *Ordnance Research, Inc. v. United States*, 221 Ct.Cl. 641, 609 F.2d 462 (1979), the government provided the contractor with highly detailed specifications for the production of igniters. The specifications told the contractor exactly how much of each ingredient was necessary to make the ignition compound, and exactly how to mix the ingredients. Included in the government's instructions were temperature, weight, time, and other technical requirements. The Court of Claims found that these were indeed design specifications which the contractor had to follow like a "road map" for the igniters to function properly.

Sterling's contract with the Arsenal contained close to 500 pages of detailed specifications affecting virtually every aspect of

the chrome-plating-facility. These specifications included twenty-two technical drawings known as "loop diagrams," prepared by WKC, which Sterling and its subcontractors were to follow precisely. In addition, there were more than forty pages of instrumentation specifications, which also contained technical drawings for Sterling and its instrumentation subcontractor. The following is a sample of these specifications:

[15–C.] 6.8 *Pipe hangers, inserts, and supports* shall conform to Federal Specification WW–H–171. Inserts shall be type 18 or 19 and shall be firmly secured to concrete forms in correct locations and installed before the concrete is poured. Beam clamps may be type 20, 21, 28, 29, 30, or 31. Miscellaneous steel required for the installation of pipe hangers, anchors, guides and supports shall be provided for and be the responsibility of the contractor.

6.8.1 *Horizontal piping*: The maximum spacing between pipe supports for straight runs shall be as follows:

| Nominal pipe size (inches) | Maximum span (feet) |
|---|---|
| 1½ | 9 |
| 2 | 10 |
| 2½ | 11 |
| 3 | 12 |
| 4 | 14 |
| 5 | 16 |
| 6 | 17 |

[15–D]11.2.10 *Valves*: All valves shall be constructed of cast iron, malleable iron, or carbon steel and shall be not less than 125 pound ANSI rating. Vales ½ inch to 2 inches shall have screwed end connections; 2½ inches and larger shall have flanged raised face end connections unless otherwise noted below. Ball and plug valves 4 inch size and larger shall be fitted with gear operators. Packing, where required, shall be graphite impregnated Teflon.

| | Size-inches | Type | Bonnet | Seat |
|---|---|---|---|---|
| Gate | ½ to 2 | ISRS | Union | Bronze |
| | 2½ & larger | OS & Y | Bolted Bronze | |
| Globe & Angle | ½ to 2 | ISRS | Union | See Note 1 Bronze, Renew. |
| | 2½ & larger | OS & Y | Bolted | Bronze, Renew. |
| Check | ½ to 2 | Swing | Union | See Note 1 Stainless Steel Cap |
| | 2 & larger | Swing | Bolted | Stainless Steel Cap |

---

Page 11–403C of the contract contained WKC specifications for a backpressure control valve. The following is a summary of the specifications:

| Tag No. | PCV–510 | PCV–511 |
|---|---|---|
| Service | Cool Glycol Distribution | Hot Glycol |
| Line # | CGS–2–6"–CS | HGS/1/6"/CS Body |
| Seat Mat'l | Ductile Iron, TFE coated | DI,TFE coated |
| Size | 4"–150# FLG | 3÷–150# FLG |
| Trim | St. Steel/Bronze; | St.Steel/Brz; |
| Diap. | Diaphragm | |
| Fluid | Glycol/Water | Glycol/Water |
| Flow Req'd | 650 GPM | 300 GPM |
| [Delta]P | 15 PSI | 10 PSI |
| Temperature | 90 F | 190 F |

| Set Point (Back Pressure) | 86 PSI | 54 PSI |
| Calculated CV | 168 | 95 |
| Valve CV | 200 | 115 |
| MFR or equal | Jordan | Jordan |
| Model | Mark 56 with model 12–3 Manual Loading Station (Regulator, 2–100 PSIG, Load Gage and Process Gage) | MK 50 HP |

Clearly, these were "road map" design specifications. If Sterling followed the specifications, the government warranted that the back pressure control valve would function as designed. The contract is replete with similar design specifications charting the map that Sterling was to follow. Most importantly, contract drawings S–8, S–9, and S–10 were detailed blueprints for Sterling to follow in constructing the structural steel frame of the chrome-plating facility. The drawings provided Albany Steel with the information necessary to create shop drawings and fabricate the steel for the project. The blueprints showed dimensions of the steel and specific instructions for notched flanges, welding dimensions, angle directions, and the location and size of duct, electric openings, and anchor bolts. The design drawings were inaccurate, as demonstrated above, yet were to be followed exactly, with the peril that any deviation would be unacceptable to the Arsenal.

Sterling's case may be distinguished from those decisions in which the government's specifications have been found to be performance specifications. In *Austin Co. v. United States*, 161 Ct.Cl. 76, 314 F.2d 518 (1963), *cert. denied*, 375 U.S. 830, 84 S.Ct. 75, 11 L.Ed.2d 62 (1963), Austin built an electronic navigation system for the Navy and claimed that the government's specifications were defective. Plaintiff persuaded the Navy to change its specifications based on the promise that, by following its specifications, plaintiff could even exceed defendant's specifications. After three years of trying, Austin failed to produce the navigation system and filed a claim for its costs, alleging it was unable to perform due to matters beyond its control.

The Court of Claims held that, because plaintiff suggested the means, plaintiff assumed the risk of impossibility. Therefore, no *Spearin* warranty of adequacy ran from the government to the contractor. *United States v. Spearin*, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918).

In *Stuyvesant*, plaintiff contracted to remove shoaling from the Corpus Cristi Ship Channel. After some of its equipment was damaged by non-shoal dredge, plaintiff alleged that the government's specifications were defective because they failed to warn of unexpected non-shoal material. This court determined that the contract in *Stuyvesant* contained performance specifications because the contract instructed plaintiff how much to dredge but never told plaintiff exactly how to do so. Stuyvesant was at liberty to use its own judgment, skill, and experience to achieve the contract's objective. The Federal Circuit affirmed this court's finding that "Stuyvesant had complete discretion to determine how it would perform that work. Its only obligation was to accomplish the designated result." *Stuyvesant*, 834 F.2d at 1582.

In contrast to the plaintiffs in *Aleutian*, *Austin* and *Stuyvesant*, Sterling was obligated under the contract to follow the government's design drawings exactly. When any of Sterling's subcontractors had questions about missing or conflicting information in the government's design, the contract neither bound nor authorized Sterling to provide that information. Nor would it have been prudent for Sterling to have done so in the circumstances of this case. As the contract and industry practice dictated, the Arsenal, and later WKC, were the parties in the only position to

adjust the design of the chrome-plating facility. Unlike the roofing manufacturer in *Aleutian,* which was required to "exercise skill and judgment in designing and providing instructions" to complete its tasks, Sterling, through Albany Steel, was required to adhere faithfully to the specifications in WKC's design.

Mr. Hess and Mr. Paul Butlak, Sterling's structural steel expert witness, both testified credibly that industry custom permitted the steel shop to proceed with erection and detail drawings before receiving approval on both. Mr. Hess testified that the Arsenal's ineptitude as well as ambiguous and conflicting information on WKC's detail drawings required informed review before he dared to proceed with the erection and detail drawings. The court is confident that discretion of this type did not vitiate the *Spearin* warranty. Albany Steel did not, and more importantly could not, except at its own risk, proceed until it obtained clarification of the WKC design from the Arsenal. Nor did Sterling or Albany Steel ever suggest an alternative to the government's pit wall or structural steel designs. In contrast to the plaintiff in *Utility Contractors, Inc. v. United States,* 8 Cl.Ct. 42 (1985), *aff'd,* 790 F.2d 90 (Fed.Cir.), *cert. denied,* 479 U.S. 827, 107 S.Ct. 104, 93 L.Ed.2d 53 (1986), Sterling was not required to provide engineering services or to contract with an engineering consultant to solve the pit wall bulge design problem. Unlike Aleutian Constructors, Inc., which "had almost unfettered discretion to interpret the specifications to design and install the membrane system," Sterling had no such discretion in the design of the structural steel. Moreover, Ms. Felock contemporaneously conceded that Sterling could not evaluate changes to the design of the chrome-plating facility in her letter of February 10, 1988. "[T]hat has been done by WKC."

The court finds that the specifications that the government included in its contract with Sterling were predominantly, if not completely, design specifications. Accordingly, the government warranted that its design drawings were adequate to the task of constructing the chrome-plating facility. The court finds that the government breached its implied warranty of adequacy.

Once convinced that the faulty specifications were indeed design specifications, the court's analysis must continue. The Federal Circuit has refined the *Spearin* test by requiring the court to inquire whether the contractor complied fully with the design specifications that it asserted were defective. *Al Johnson Constr. Co. v. United States,* 854 F.2d 467, 469 (Fed.Cir.1988). If the contractor failed to comply fully with the faulty design specifications, recovery on the implied warranty is precluded. Here, the record shows that Albany Steel completed all anchor bolt, erection, and detail drawings necessary to erect steel based on WKC's faulty design by February 1, 1988. Although the government alleged that Sterling was to blame for all delay associated with the shop drawing submittals, and that Sterling should have ordered Albany Steel to cease drawing on December 11, 1987, when Mr. Wells discovered the pit wall bulges, the government did not dispute that Albany Steel completed its detailing based on the Arsenal's defective design specifications. The court finds that Sterling attempted to comply fully with the faulty design specifications and is entitled to be paid for the extra expenses and time it incurred in trying to complete the project.

Nor should the court concern itself with the fact that Sterling's contract was a supply contract. In *Ordnance Research, Inc. v. United States,* 221 Ct.Cl. 641, 609 F.2d 462, 472 (1979), the United States Court of Claims extended the implied warranty found in *Spearin* to a supply contract. Under the facts of *Ordnance Research,* the contractor sought relief for damages sustained when igniters for fire bombs exploded during the production process due to faulty government design specifications. Although the contract in *Ordnance Research* was, as here, a fixed-price supply contract, the Court of Claims had little trouble extending the *Spearin* implied warranty of adequacy because of the detailed nature of the specifications. The Federal Circuit agreed with its predecessor court:

"When a construction contract is not involved, as in *Ordnance Research,* some other provision telling just how to do the job, takes the place of literal design. The contractor has a right to rely on an 'indicated method of manufacturing the end product.'" *Lopez v. A.C. & S., Inc.,* 858 F.2d 712, 716 (Fed.Cir.1988), *cert. denied sub nom., Eagle–Picher Indus. v. United States,* 491 U.S. 904, 109 S.Ct. 3185, 105 L.Ed.2d 694 (1989) (quoting *Natus Corp. v. United States,* 178 Ct.Cl. 1, 371 F.2d 450, 455 (1967)). Whether the abundant and detailed design specifications present in the instant case were a "literal design," which the court believes they were, or whether they were an "indicated method of manufacturing the end product," is an immaterial distinction because Sterling's contract satisfied both tests. There was a literal design present in the Arsenal's voluminous and highly detailed specifications and drawings which dictated the method by which Sterling was to construct the chrome-plating facility.

Most recently, in *GAF Corp. v. United States,* 932 F.2d 947 (Fed.Cir.1991), *reh'g denied,* 1991 WL 71975, 1991 U.S.App. LEXIS 12,235 (Fed.Cir. June 11, 1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 965, 117 L.Ed.2d 131 (1992), the Federal Circuit refined the *Lopez* analysis slightly to determine whether a warranty of specifications runs from buyer to seller. "In *Lopez,* this court did not detect any signs of extensive Government intrusion into the asbestos production process which might suggest that the Government intended to warrant the product's safety." *GAF Corp,* 932 F.2d at 950. In the instant case, the government provided its plans to Sterling, without which Sterling could not have constructed the chrome-plating facility. The government's defective design specifications constituted, not only an extensive, but an essential intrusion into construction of the chrome-plating facility. From this reasoning, the court concludes that the government specifications and drawings were predominantly, if not entirely, design specifications.

## VII. Withholding of Progress Payments

The court must decide whether the contracting officer, by withholding approved progress payments eleven and twelve, violated the payment provisions of the contract.

FAR 52.232–9, *Limitation on Withholding of Payments (APR 1984),* incorporated into Sterling's contract, states: If more than one clause or Schedule term of this contract authorizes the temporary withholding of amounts otherwise payable to the Contractor for supplies delivered or services performed, the total of the amounts withheld at any one time shall not exceed the greatest amount that may be withheld under any one clause or schedule term at that time; *provided,* that this limitation shall not apply to ...

\*　　\*　　\*　　\*　　\*　　\*

(b) Withholdings not specifically provided for by this contract....

██ No law, regulation, or clause in the contract permitted Mr. Valloze to withhold payment from Sterling as leverage for negotiations, which was Mr. Valloze's plain intent as evidenced by his conversations with Messrs. Caton and Bromley and admitted in his June 16, 1988 memorandum to the Comptroller.

FAR 32.503–6, *Suspension or Reduction of Payments,* also incorporated into Sterling's contract, states:

a. General. The Progress Payments clause provides a Government right to reduce or suspend progress payments, or to increase the liquidation rate, under specified conditions ...

(1) The contracting officer shall take these actions only in accordance with the contract terms *and never precipitately or arbitrarily.* These actions should be taken only after ...

(i) Notifying the contractor of the intended action and providing an opportunity for discussion;

(ii) Evaluating the effect of the action on the contractor's operations, based on the contractor's financial condition, projected cash requirements,

and the existing or available credit arrangements; and

(iii) Considering the general equities of the particular situation.

(2) The Contracting Officer shall take immediate unilateral action only if warranted by circumstances such as overpayments or unsatisfactory contract performance.

(3) In all cases, the contracting officer shall (i) act fairly and reasonably, (ii) base the decision on substantial evidence, and (iii) document the contract file.

(Emphasis added.)

The government offered no evidence to demonstrate that Mr. Valloze ever attempted to comply with FAR 32.503–6. Mr. Valloze never documented the file to support his decision, and did not discuss or communicate his decision to Sterling prior to withholding progress payments eleven and twelve. Most startling, Mr. Valloze testified that he was powerless to release progress payments eleven and twelve to Sterling after June 8, 1988, the last day of the contract period, because no contract existed to support the payments, even though the payments had been earned. Mr. Valloze's June 16, 1988 memorandum to the Comptroller, written after the contract completion date had passed, and stating that Mr. Valloze intended to make payment subject only to the completion of negotiations with Sterling, revealed that Mr. Valloze's testimony to the question of the court was nothing short of fiction.

■■■ The court finds that Mr. Valloze's actions were neither fair nor reasonable but were precipitate and arbitrary. *See* FAR 32.503–6. Mr. Valloze's professed

powerlessness to release earned payments after expiration of the contract completion period was specious. While not aware of it at the time of trial, the court, after analyzing the record discovered that Mr. Valloze had, in fact, actually issued a unilateral modification to the contract, after the contract had expired, to pay a small claim of Sterling's. This incident, and others, undercut Mr. Valloze's credibility as a witness. The court gave very little weight to his testimony. Because Mr. Valloze dallied with the progress payments and refused to grant Sterling time and costs for delay caused solely by the government, Sterling's cash flow evaporated and it was forced to suspend work.[15]

The United States Court of Appeals for the Federal Circuit has held that "when the financial incapacity of the contractor to perform is caused by the acts or omissions of the government, the default is excused and the contract is deemed to have been terminated for the convenience of the government." *TGC Contracting Corp. v. United States*, 736 F.2d 1512, 1515 (Fed. Cir.1984) (citing *National Eastern Corp. v. United States*, 201 Ct.Cl. 776, 477 F.2d 1347, 1356 (1973)); *Murdock Mach. & Eng'g Co. v. United States*, 873 F.2d 1410 (Fed.Cir.1989). However,

[w]hen ... the contractor claims that his financial inability to perform is due to the government's failure to make the required progress payments, the burden is on the contractor to establish that the progress payments were erroneously withheld and that the withholding of such progress payments was the primary or controlling cause of the contractor's default.

---

**15.** By refusing to pay incurred costs, defendant may have opened itself to additional penalties outside of the normal scope of the Contract Disputes Act. The Prompt Payment Act, 31 U.S.C. § 3901–3907 (1988), was enacted to "provide incentives for the Federal Government to pay its bills on time." H.R.Rep. No. 461, 97th Cong., 2d Sess. 1, *reprinted in* 1982 U.S.C.C.A.N. 111. Upon submission of a proper invoice, the government must pay the bill timely or incur liability for interest under the Act. 31 U.S.C. §§ 3902–3903. However, if the invoice is disputed, no Prompt Payment Act interest will be

paid but "interest for the period during which the dispute is being resolved is subject to [the interest provisions] of the Contract Disputes Act." 31 U.S.C. 3907(c). *See, CPT Corporation and Pacificorp Capital, Inc. v. United States*, 25 Cl.Ct. 451 (1992). Any dispute raised by defendant to defeat the purposes of the Prompt Payment Act would have to be based upon some reasonable basis. Merely alleging the existence of a dispute, or raising a frivolous dispute, is insufficient to deny the contractor its right to interest for late payments under the Prompt Payment Act.

*TGC Contracting Corp.*, 736 F.2d at 1515 (citing *R.C. Hudson & Associates, Inc.*, 76–2 BCA ¶ 12,201 (1976); *Guenther Mfg. Co.* 73–2 BCA ¶ 10,327 (1973).

The disputed progress payments totalled $809,910. Request for progress payment eleven, which the Arsenal received on May 6, 1988, covered activity from March 21, 1988, through April 20, 1988. Progress payment twelve covered activity from April 21, 1988, through May 20, 1988. The court has no difficulty finding, for the reasons discussed above, that Mr. Valloze improperly withheld progress payments eleven and twelve from Sterling in violation of FAR 52.232–9 and 32.503–6. In addition, had Mr. Valloze not improperly withheld those payments, Sterling could have continued work at the job site. Mr. Valloze's refusal to extend the period of performance unless Sterling waived its right to challenge any DCAA audit of its costs was totally unacceptable and improper. His refusal to extend the contract for government-caused delay, even in the presence of the outstanding but unpriced change order for the admitted government-caused delay in addressing the pit wall bulges, and to withhold progress payments, was the direct cause of Marine Midland Bank's refusal to extend Sterling's line of credit and demand for an immediate repayment plan. Marine Midland was justifiably concerned that Sterling had $500,000 outstanding on its line of credit yet had neither concluded an extension of the contract nor received payment for sixty days of activity. Had Mr. Valloze not wrongfully withheld the $809,910, Sterling could have satisfied Marine Midland's demand for an immediate repayment plan. Sterling could have paid its subcontractors, either from the progress payments or the line of credit. In short, Mr. Valloze's *improper withholding* of $809,910 made continued job site activity impossible, and his breach was the primary, if not the sole reason for Sterling's suspension of work at the job site.[16]

## DEFENDANT'S COUNTERCLAIM IN FRAUD

 Sterling's contract with the Arsenal was a competitively awarded, sealed-bid, fixed-price contract. As a small business Sterling was permitted to submit requests for progress payments based on costs incurred, rather than on actual payments to suppliers and subcontractors. The government counterclaimed that Sterling intentionally made false or fictitious claims for payment and manipulated its PERT Charts to receive accelerated payments of profit. The government alleged fraud under the False Claims Act, 31 U.S.C. §§ 3729–3731 (1988); the Forfeiture Statute, 28 U.S.C. § 2514 (1988); the Contract Disputes Act, 41 U.S.C. §§ 601–613 (1988); and 18 U.S.C. § 1001 (1988).

According to the bid sheets plaintiff used to calculate its Step 2 bid, the direct cost of performing the contract was $7,313,720. Sterling's bid of $8,310,000, therefore, contained approximately $997,000 in indirect costs, which included, among other items, salaries and profit. Sterling's first three requests for progress payments included incurred *pro rata* salaries for Harold Caton and Bruce Bromley billed at annual rates of $265,000 and $232,000, respectively, incurred *pro rata* annual salaries of $70,000 and $74,880 for Mrs. Caton and Mrs. Bromley, respectively, and $200,700 in incurred *pro rata* pre-award engineering costs shared by Messrs. Caton and Bromley. As the May 21, 1987, DCAA pre-award survey made clear, the contract also included leases by and between Messrs. Caton and Bromley, and Sterling. Caton Real Estate, a company wholly owned by Mr. Caton, leased administrative and storage space in York, Maine, to Sterling for performance of the Arsenal contract at a rate of $10,700 per month, and Mr. Caton leased computer hardware and software to

16. The record is unclear whether the $809,910 billed but withheld by the Arsenal was gross or net incurred costs. If the gross incurred costs equalled $809,910, the Arsenal, under the contract payment provisions, would have withheld twenty percent and paid $647,928. The exact figure is irrelevant, though, to the court's finding that the Arsenal had no legal right to refuse release of incurred costs. Had either amount been paid within the time required, Sterling could have continued performance at the jobsite.

Sterling at a monthly rate of $3,200. Bromley Equipment, Inc., a corporation wholly owned by Mr. Bromley, subcontracted with Sterling to provide administrative, engineering, and technical personnel services for the duration of the Arsenal contract at a cost of $19,320 per month. Mr. Bromley, individually, leased office and storage space in Springfield, Massachusetts, to Sterling Millwrights for use in the Arsenal contract at an interim rate of $18,652.17 per month.

In accordance with the terms of the contract, the Arsenal paid 80 percent of Sterling's first request for progress payment, $55,583, which covered the period from June 9, 1987, through June 20, 1987. The Arsenal withheld payment for all of Sterling's indirect costs in progress payments two and three because Mr. Valloze, like Mr. Breen, the Arsenal's senior price analyst, doubted the reasonableness and allocability of the salaries and lease costs. Mr. Breen requested a DCAA audit of Sterling's second request for progress payment on July 31, 1987, and on August 26, 1987, DCAA issued an audit report to the Arsenal that declined to question the reasonableness of labor costs, stating:

3. *Special Circumstances Affecting the Examination*

Since this contract is a Firm Fixed Price Competitive award, there is no basis to question the reasonableness of the contract price. The reasonableness of this bid should have been determined at the time of the original contract award through the competitive process. Therefore, we have not been able to specifically address the reasonableness of labor costs as part of our review of Progress Payment No. 2....

4. *Results of the Audit*

The review disclosed that certain proposed costs may not be allocable nor reasonable for the purpose of calculating progress payment request. [sic].... Due to the quantity of data involved and various assumptions to be made, we have not specifically questioned any of the costs on this progress payment....

\* \* \* \* \* \*

[Salaries paid to Harold and Patricia Caton, and Bruce and Sherry Bromley] are

allocable per the guidelines of FAR 31.-201–4; however, [they] may not be reasonable per FAR 31.201–3. The reasonableness guidelines are not specific as to amounts, but that [sic] they should not exceed that which would be incurred by a prudent person in the conduct of competitive business. As stated [above], we did not complete a compensation review to determine comparable costs.

According to DCAA, the Caton Real Estate storage space was either not in use at the time of the audit, or was used for purposes unrelated to the Arsenal contract, and, therefore, was a cost not allocable to the contract as of August 26, 1987. DCAA also found Mr. Caton's computer rental costs to be excessive because it believed Sterling could have purchased the hardware and software less expensively, and amortized the cost over the one-year life of the contract. DCAA declined to audit either the Bromley Equipment, Inc. or the Bromley subcontracts.

As noted above, Messrs. Caton and Bromley listened for two hours on September 25, 1987, while Mr. Valloze told them what he would permit them to bill the Arsenal for salaries, leases, and pre-award engineering costs. Mr. Valloze memorialized his statements in his September 30, 1987 letter to Sterling. The letter stated in relevant part:

c. Pre Contract–Engineering Costs— (Progress Payment No. 2)

Requested Amounts

| | |
|---|---|
| Harold Caton | $107,016.00 |
| Bruce Bromley | 93,727.20 |
| Total | $200,743.20 |

These will be paid on a monthly basis over the term of the contract at the $100/hour rates agreed to for Mr. Caton and Mr. Bromley. The pre contract [sic] engineering costs therefore, will be paid as follows:

| | | |
|---|---|---|
| Harold Caton | 840 hours @ $100/hour | $ 84,000.00 |
| Bruce Bromley | 840 hours @ $100/hour | 84,000.00 |
| | | $168,000.00 |
| Monthly payment will be ($168,000/12) | | $14,000.00 |

d. Computers, Software and Accessories—you are to furnish your rationale for leasing these items in lieu of outright purchase of some items which could have proven more economical. Subject to your satisfactory explanation, payments set forth in your September 25, 1987, letter will be allowed. Otherwise, only the recommended rates based on DCAA audit will be allowed.

e. Office/Storage Space (York, Maine)—I have agreed to accept the following monthly lease charges, all other requests will be withdrawn:

Office # 5 $150.00/month
Garage # 1 $500.00/month
 Exterior 1000 Sq Ft $417.00/month
 @ $5.00/sq ft/year

f. Compensation—based on data presented in the 1987, INC Executive Compensation guidance [*sic*]. I have allowed the high side of average study results for the positions held by Mr. Caton and Mr. Bromley. This equates to a salary of $100/hour for each at 2080 hours/year, or $208,000 per annum. ($17,333/month). Salaries for the administrative and purchasing manager at $74,880 per year are acceptable. The monthly billing for each will be $6240.00

g. Bromley Lease/Springfield, MA Office/Shop complex—agreed to a monthly interim rate of $10,000.

h. Bromley Lease for Administrative and Technical Support at the Springfield complex interim billing of $10,000/month is acceptable.

Mr. Valloze testified on cross-examination that he knew at the time of the September 25, 1987, meeting that the salary, pre-award engineering costs, and lease rates to which he agreed were well above the amounts recommended by DCAA and Mr. Breen. The compensation rates reflected in the agreement were to be final; he intended the lease rates to be interim, *i.e.*, subject to an audit and "renegotiation." Although Mr. Breen ordered an audit of the lease rates, no audit ever occurred. With one minor exception not relevant here, Sterling billed the *reduced* rates

in all remaining requests for progress payments.

I. The False Claims Act

It is axiomatic that this court has jurisdiction over counterclaims brought under the False Claims Act. Title 28 U.S.C. § 1503 (1988) gives this court jurisdiction to render judgment upon any set-off or demand by the United States against any plaintiff. Although the contracting officer rendered a final decision in the instant case, the Federal Circuit has stated that no such decision is necessary for this court's jurisdiction to attach under the False Claims Act. *Martin J. Simko Constr. Inc. v. United States*, 852 F.2d 540, 547–48 (Fed.Cir.1988). Under the exception stated in § 605(a) of the CDA, "[t]he authority of [the CDA] shall not extend to a claim or dispute for penalties or forfeitures prescribed by statute or regulation which another Federal agency is specifically authorized to administer, settle, or determine." 41 U.S.C. § 605(a) (1988). In *Simko*, the Federal Circuit found that the False Claims Act is a statute which the Attorney General, through the *qui tam* provisions of 31 U.S.C. § 3730, is specifically authorized to administer. *Simko* at 547–48. Thus, the False Claims Act falls within the exception language of § 605(a) of the CDA and, therefore, it is within the jurisdiction of the Claims Court to render judgment on any claim arising thereunder.

The False Claims Act states in relevant part:

(a) Any person who—
 (1) knowingly presents, or causes to be presented, to an officer or employee of the United States Government ... a false or fraudulent claim for payment or approval;
 (2) knowingly makes, uses, or causes to be made or used, a false record or statement to get a false or fraudulent claim paid or approved by the Government;
is liable to the United States Government for a civil penalty of not less than $5,000 and not more than $10,000, plus 3 times the amount of damages which the

Government sustains because of the act of that person ...

(b) [T]he terms "knowing" and "knowingly" mean that person with respect to information—

(1) has actual knowledge of the information;

(2) acts in deliberate ignorance of the truth or falsity of the information; or

(3) acts in reckless disregard of the truth or falsity of the information, and no proof of specific intent to defraud is required.

31 U.S.C. § 3729 (1988).

From its inception, the False Claims Act, sometimes known as the "Abraham Lincoln Law," has been the government's single most important litigation tool in the fight against government contractor fraud. 132 Cong.Rec. 22,335 (1986). The False Claims Act was enacted in 1863 when President Lincoln signed into law a bill that provided both civil and criminal penalties for Union Army contractors who knowingly presented false claims to the government. The original Act also contained a *qui tam* provision, which the current law retains, allowing a private citizen to bring an action on behalf of himself and the government against the alleged wrongdoer. The idea behind a *qui tam* provision was to have "10,000 lawyers in America ... assisting the Attorney General of the United States in digging up war frauds." 89 CONG.REC. 7,607 (1943) (statement of Sen. Langer), *reprinted in* 1986 U.S.C.C.A.N. 5266, 5276.

The False Claims Act has been amended only three times in its history. In 1943 Congress modified the *qui tam* provisions and in 1982 made technical changes to the Act while recodifying former Code section 231. The last change occurred in 1986, when Congress passed the False Claims Amendment Act, Pub.L. No. 99–562, 100 Stat. 3153 (codified as amended at 31 U.S.C. §§ 3729–3731 (1988)) (the Amendments). The Amendments, affected, among other things, the *qui tam* provision, the mental state required for a violation of the Act, and the fines imposed. 132 CONG. REC. 22,335 (1986).

The legislative history of the 1986 Amendment demonstrates that Congress intended to clarify the scope of the mental state required for a violation of the False Claims Act, but did not intend to create a new standard of liability. As the Senate Report on the Amendment states:

As a civil remedy designed to make the Government whole for fraud losses, the civil False Claims Act currently provides that the government need only prove that the defendant knowingly submitted a false claim. However, this standard has been construed by some courts to require that the government prove the defendant had actual knowledge of fraud, and even to establish that the defendant had specific intent to submit the false claim ... The Committee believes this standard is inappropriate in a civil remedy and presently prohibits the filing of many civil actions to recover taxpayer funds lost to fraud.

False Claims Amendments Act of 1986, S.REP. No. 345, 99th Cong., 2d Sess. 6–7, *reprinted in* 1986 U.S.C.C.A.N. 5266, 5271–72.

As noted in the legislative history, some courts required the government to prove actual knowledge on the part of the alleged defrauding party. *United States v. Ekelman & Assoc., Inc.* 532 F.2d 545 (6th Cir. 1976); *United States v. Cooperative Grain and Supply Co.,* 476 F.2d 47 (8th Cir.1973). Some courts also required specific intent to defraud the government. *United States v. Davis,* 809 F.2d 1509 (11th Cir.1987); *United States v. Thomas,* 709 F.2d 968 (5th Cir.1983); *United States v. Mead,* 426 F.2d 118 (9th Cir.1970). Other courts, including our predecessor court, did not require a showing of intent. *Miller v. United States,* 213 Ct.Cl. 59, 550 F.2d 17, 22 (1977); *United States v. Hughes,* 585 F.2d 284 (7th Cir.1978). The United States Court of Appeals for the Federal Circuit has never ruled on the issues of actual knowledge and intent under the False Claims Act. In the 1986 Amendment, Congress sought to eliminate this confusion by inserting 31 U.S.C. § 3729(b) to define the terms "knowing" and "knowingly" as used in § 3729(a). Section 3729(b)(1) defines "knowing" and

"knowingly" as actual knowledge of fraudulent information in a claim upon the government; § 3729(b)(2) defines "knowing" and "knowingly" as acting in deliberate ignorance of the truth or falsity of the information contained in a claim upon the government; and § 3729(b)(3) defines "knowing" and "knowingly" as acting in reckless disregard of the truth or falsity of the information in such a claim, and that, "no proof of specific intent to defraud is required."

Prior to the 1986 Amendment, the False Claims Act did not address the issue of the government's standard of proof under the Act. The courts of the various circuits reached inconsistent conclusions on the standard of proof required to prove a cause of action under the False Claims Act. One court required a clear and convincing standard of proof, *United States v. Ueber*, 299 F.2d 310 (6th Cir.1962), while other courts required a mere preponderance of the evidence. *United States v. Thomas*, 709 F.2d 968 (5th Cir.1983); *Federal Crop Ins. Corp. v. Hester*, 765 F.2d 723 (8th Cir. 1985). The United States Court of Claims followed the rule enunciated in *Hageny v. United States*, 215 Ct.Cl. 412, 570 F.2d 924 (1978). There, the court held that defendant had the burden of proving by clear and convincing evidence that plaintiff's conduct constituted fraud within the purview of the Act. By General Order No. 1 of the United States Claims Court, the decisions of the United States Court of Claims are binding precedent upon this court unless modified by the United States Court of Appeals for the Federal Circuit or the United States Supreme Court.

The 1986 Amendments to the Act, however, changed the very law to be applied by altering the standard of proof which the government must bear. Title 31 U.S.C. § 3731(c) states that, "[i]n any action brought under [the False Claims Act], the United States shall be required to prove all essential elements of the cause of action, including damages, by a preponderance of the evidence." 31 U.S.C. § 3731(c) (1988). The legislative history reveals that Congress clearly intended to harmonize the discordant opinions of the various courts by explicitly reducing the government's burden of proof to a "preponderance of the evidence" standard. The Senate Report accompanying the 1986 Amendments notes that, in *United States ex rel. Marcus v. Hess*, 317 U.S. 537, 63 S.Ct. 379, 87 L.Ed. 443 *reh'g denied*, 318 U.S. 799, 63 S.Ct. 756, 87 L.Ed. 1163 (1943), the Supreme Court explicitly rejected the penal nature of the False Claims Act, and implicitly the "beyond a reasonable doubt standard" associated with penal statutes. S.Rep. No. 345, 30–31, *reprinted in* 1986, U.S.C.C.A.N. 5266, 5295–96. Concurring with the Supreme Court's reasoning in *Hess*, Congress concluded that the False Claims Act was a civil, remedial statute in light of the absence of both a "fraudulent intent" requirement and punitive damages. The preponderance standard was applied traditionally in civil and administrative proceedings. *Id.* Given the clear language of the amended Act and the unequivocal intent of Congress to lower the measure of proof, this court holds that the "preponderance of the evidence" standard is appropriate in civil suits under the False Claims Act.

The Supreme Court as well as the Federal Circuit have addressed the quantum of evidence required to meet the burden under the preponderance standard. Justice Harlan wrote that the preponderance standard "requires the trier of fact 'to believe that the existence of a fact is more probable than its nonexistence before [the trier of fact] may find in favor of the party who has the burden to persuade the [judge] of the fact's existence.'" *In re Winship*, 397 U.S. 358, 371–72, 90 S.Ct. 1068, 1076, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring) (quoting F. James, *Civil Procedure* 250–51 (1965)). The Federal Circuit has stated:

Proving a prima facie case compels the conclusion sought to be proven unless evidence sufficient to rebut the conclusion is produced.... While the burden of proving the charges by a preponderance of the evidence remains upon the agency, an unrebutted prima facie case necessarily amounts to proof by a preponderance of the evidence.

Preponderance of the evidence with respect to the burden of proof in civil or administrative actions ... means the greater weight of evidence, evidence which is more convincing than evidence which is offered in opposition to it.

*Hale v. Department of Transp., Federal Aviation Admin.,* 772 F.2d 882, 885 (Fed. Cir.1985).

■ If the Arsenal is to prevail on its fraud counterclaims under the False Claims Act, it must prove by a preponderance of the evidence that Sterling acted with actual knowledge of false information contained in the first three requests for progress payments, or in deliberate ignorance of the truth or falsity of such information, or in reckless disregard of the truth or falsity of such information. The government need not prove that Messrs. Caton and Bromley intended to defraud the Arsenal, and its evidence must be sufficient to withstand plaintiff's rebuttal.

Although Step I of the bidding process showed Mr. Bromley as a subcontractor who was retained as senior engineer, the government argued that, in reality, Mr. Bromley was a joint venturer with Mr. Caton. The government characterized the joint venturers as two men who sought to maximize profit as quickly as possible and cared little about completing the project. After Mr. Caton failed to convince the Arsenal to pay Sterling on the basis of a milestone system, as would have been proper under a construction contract, defendant alleged that Messrs. Caton and Bromley engaged in a series of fraudulent activities to accelerate Sterling's profit. The government contended that Messrs. Caton and Bromley created false records to support fictitious lease costs, salaries, and pre-award engineering costs; disregarded the September 30, 1987, rate letter by continuing to bill the government at rates that far exceeded the agreement; and failed to pay subcontractors for work performed even though the Arsenal had paid Sterling for those incurred costs.

The government alleged in its post-trial briefing that Sterling continued to bill the Arsenal at rates far in excess of Mr. Valloze's September 30, 1987 letter but was unable to prove the allegation. Under cross-examination, DCAA auditor Susan Teser testified that according to her investigatory audit, with one minor exception not relevant to the government's fraud counterclaim, Sterling consistently billed according to the rates dictated by Mr. Valloze on September 25, 1987, memorialized in his letter of September 30, 1987. The court need not address this allegation further.

According to the government, Messrs. Caton and Bromley,

> [t]hrough self-dealing created leases and salaries that permitted them to disguise profit as fictitious incurred overhead 'costs' and increased their portion of the contract revenues to $1.44 million without regard to whether the contract was completed. At the end of twelve months, without completing the contract, Caton and Bromley still walked away with $1.46 million in money paid by the Arsenal and Marine Midland Bank.

\* \* \* \* \* \*

> Through the creation of these false records, Caton and Bromley billed Sterling [and, through Sterling, the Arsenal] for nearly $770,000 in advance payment of profit in the first four progress payments presented to the Arsenal.

In its post-trial brief, the government contended that,

> [e]ven after the Arsenal withheld 80% of its billings and paid only the first ten progress payments, Sterling took in $1,467,708, including the Arsenal progress payments ($827,954), two contract modifications ($22,585), amounts approved and paid by the Arsenal on behalf of Sterling's subcontractors, but withheld from those subcontractors by Sterling ($117,189), and the $500,000 line of credit.[17]

17. The court can only speculate as to why defendant had any interest, in this proceeding, in monies received by Sterling from Marine Midland Bank, except perhaps to paint a darker picture of Sterling's principals.

Defendant argued that Sterling's indirect costs in its first three requests for progress payment were so high that they "exceeded that which would be incurred by a prudent person in the conduct of competitive business." See FAR 31.201–3.

A. *Alleged Fraud in Billing of Salaries*

Defendant alleged that Sterling committed fraud upon the government by billing for unreasonably high salaries for Messrs. and Mmes. Caton and Bromley.

1. Salaries of Harold Caton and Bruce Bromley

According to the government, Messrs. Caton and Bromley sought to accelerate Sterling's profit by paying themselves unreasonably high salaries. Mr. Caton's salary of $265,000, argued the government, contained nearly $90,000 in advance payment of profit over the life of the contract. In making this allegation, the government relied on a DCAA salary estimate based on figures taken from the Executive Compensation Service, a business consulting firm that publishes annual surveys of executive compensation rates. DCAA identified a salary for a senior engineer, Mr. Caton's title, at a comparable level of experience and responsibility, and added 25 percent to that figure to arrive at $175,356 as a reasonable annual salary. The court does not know if the $175,356 figure was for a senior engineer without taking into consideration Mr. Caton's other responsibilities as president of Sterling Millwrights, Inc. Merely adding 25 percent to the base senior engineer average salary is certainly not an acceptable methodology to determine the proper compensation for his other duties and responsibilities. Rather, it appears to be nothing more than a way to raise his salary above the average. Subtracting $175,356 from $265,000 yielded approximately $90,000 in allegedly accelerated profit, though the court would not be surprised to learn that the $90,000 represented compensation for Mr. Caton's other responsibilities as president of Sterling.

Similarly, the government alleged that Mr. Bromley's employment contract, which included an annual salary of $232,000, was merely a vehicle for Mr. Bromley to accelerate approximately $170,000 in profit to Sterling. As in Mr. Caton's case, the government relied on a DCAA salary estimate based on figures taken from the Executive Compensation Service. DCAA identified a salary for a project engineer at a comparable level of experience and responsibility, added 25 percent to that figure, and arrived at a "proper" salary of $59,676. The court has the same concerns about the methodology of determining Mr. Bromley's salary as it had for Mr. Caton's. In addition to his duties as project engineer Mr. Bromley was the principal officer of two other businesses and it appears naive to assume that he would agree to bring his managerial and other skills to Sterling for less than $60,000. Subtracting $59,676 from $232,000 yielded approximately $170,000 in allegedly accelerated profit.

The government also alleged that Sterling misrepresented Messrs. Caton's and Bromley's salaries to the government in the so-called Sterling pre-award budget of March 23, 1987. That document contained a line item showing Mr. Caton earning $78,000 annually as the senior engineer and Mr. Bromley earning $78,000 annually as the project engineer.

FAR 31.201–3, *Determining Reasonableness*, states in relevant part:

(a) A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person in the conduct of competitive business. Reasonableness of specific costs must be examined with particular care in connection with firms or their separate divisions that may not be subject to effective competitive restraints. No presumption of reasonableness shall be attached to the incurrence of costs by a contractor. If an initial review of the facts results in a challenge of a specific cost by the contracting officer or the contracting officer's representative, the burden of proof shall be upon the contractor to establish that such cost is reasonable.

(b) What is reasonable depends upon a variety of considerations and circumstances, including—

(1) Whether it is the type of cost generally recognized as ordinary and necessary for the conduct of the contractor's business or the contract performance;

(2) Generally accepted sound business practices, arm's length bargaining, and Federal and State laws and regulations;

(3) The contractor's responsibilities to the Government, other customers, the owners of the business, employees, and the public at large; and

(4) Any significant deviations from the contractor's established practices.

48 CFR 31.201–3.

The court is not convinced that the salaries violated the FAR provision. Subsection (b), above, is not an exhaustive list, and the language contained therein affords the court substantial discretion to examine the facts of each case. Indeed, the reasonableness of compensation is a question of fact that is determined in light of all the relevant facts of a particular case. *Charles McCandless Tile Serv. v. United States*, 191 Ct.Cl. 108, 422 F.2d 1336, 1338 (1970); *Boyd Constr. Co. v. United States*, 168 Ct.Cl. 579, 339 F.2d 620, 624 (1964); *Bringwald, Inc. v. United States*, 167 Ct. Cl. 341, 334 F.2d 639, 643 (1964); *Baltimore Dairy Lunch, Inc. v. United States*, 231 F.2d 870, 872 (8th Cir.1956). While it may have been true that Messrs. Caton and Bromley billed their salaries at a rate of more than three times the average salaries earned by, respectively, senior engineers and project managers, it is also true that the Arsenal selected Messrs. Caton and Bromley from a field of seventy-seven competitors precisely because these men were uniquely qualified to manage this extremely complex construction project, and, more particularly, because Sterling was the lowest bidder. Moreover, Mr. Bromley had participated in the eight-millimeter chrome-plating facility construction project at Watervliet Arsenal in the mid–1970's and, his performance, according to Arsenal management, had been stellar. On August 25, 1983, in a letter to Etna Carrier Company, involving this very project, Mr. Thomas F. Mahar, Chief, Metal Processing Branch, Watervliet Arsenal wrote:

Bruce Bromley, now president of Bromley Equipment, Inc., is very proficient in process facility installation. Part of his experience stems from his Production Engineering duties in the building of our 8 M/M gun tube facility. This was a major installation project costing many millions of dollars. During the time that Bruce was involved with this project we at the Arsenal found him to be totally competent and cooperative. If Bruce Bromley's company were fortunate enough to be low bid [*sic*] on the contract to build the 120 M/M facility in question, we at the Arsenal would have no qualms about giving him the contract.

Messrs. Caton and Bromley were in high demand by the Arsenal because of their expertise and reputations.

Though the government cried fraud when Sterling billed $265,000 for Mr. Caton's annual salary and $232,000 for Mr. Bromley's, Mr. Valloze, the senior contracting officer, set both men's annual salaries at $208,000, slightly less than three times the average comparable salary that the government alleged at trial was typical of senior engineers and project managers in similar positions. During the September 25, 1987 meeting, Mr. Valloze "noted" that $100.00 an hour compensation for Messrs. Caton and Bromley would "raise some eyebrows," but that he (Valloze) would approve it nevertheless. Mr. Valloze then testified before this court that after many years of procurement experience, he understood fraud against the government in a practical sense and that he had detected no fraud in Sterling's billings. Mr. Valloze also stated that he "felt that in the fixed-price environment we were operating within, knowing that it wasn't going to cost the taxpayers any more ultimately, I agreed to those levels of compensation," and that, the court concludes, was exactly the case. In a more enlightened moment, albeit, years after the fact, Mr. Valloze testified as to his understanding of the price protection afforded by Sterling's fixed-price contract:

I seized the opportunity in [the September 25, 1987, meeting] to see that they got more money to work for cash flow. I, of course, kept in mind that we were dealing with a firm, fixed price contract and the bottom line didn't change. The only risk I was incurring on the part of the taxpayer was simply that the cost of money would become involved because, ... taxpayer dollars were being given to the contractor earlier than they should have been, and the interest the Government pays on money, of course, would come to bear. I did a quick calculation at that time. I saw—in the amount of something like $5,000. Looking at it against the importance of the job, there were no other [suitable reprocurement contractors waiting] in the wings, and all the other things I had to consider, I felt that was not an undue burden on the taxpayer.

Yet, sadly, Mr. Valloze's actions at the September 25, 1987 meeting belied this testimony. Had Mr. Valloze genuinely recognized the firm fixed-price environment in which he was operating, he would not have reduced Messrs. Caton's and Bromley's salaries, or the various lease rates, or for that matter withhold payment of all incurred costs in progress payments ten and eleven. Based on this evidence, the court cannot find that Messrs. Caton and Bromley recklessly inflated their compensation rates in the first three requests for progress payments so as to secure "accelerated" profits.

Neither is the court persuaded that Messrs. Caton and Bromley sought to defraud the government by intentionally understating their salaries in pre-award budgets. The March 23, 1987 budget to which defendant alluded was an equipment price list, not a complete or final statement of Sterling's labor costs. The worksheet was titled "Jobsite Expenses" and did not reflect all the line items in which Messrs. Caton and Bromley billed their time. Both men received compensation through Bromley Equipment, Inc. and through indirect costs charged to other line items that were either absent from, or not broken out as separate cost items, on the worksheet. Most importantly, the May 21, 1987, DCAA

pre-award survey review of Sterling Millwrights Inc. specifically informed the Arsenal that Mr. Caton's salary would exceed $250,000. Mr. Caton's salary was known to the government more than two weeks prior to award of the fixed-price contract. Based on this evidence, the court concludes that Messrs. Caton and Bromley did not attempt to hide the magnitude of their salaries from the Arsenal. The portion of Messrs. Caton and Bromley's salaries not stated in the March 23, 1987, pre-award budget is irrelevant to a finding of fraud under the False Claims Act, and the Arsenal's contention that Sterling misrepresented Mr. Caton's salary was devoid of merit in light of DCAA's May 21, 1987, pre-award survey. Although Mr. Bromley's salary was not mentioned in the May 21, 1987, DCAA report, the court finds that the government's argument is unpersuasive because of its reliance on the same pre-award budget worksheet, and its inability to persuade the court that either man's salary was unreasonable in the circumstances. Defendant has failed by a wide margin to prove by a preponderance of the evidence that Sterling knowingly presented a false or fraudulent claim to the government. 31 U.S.C. § 3729. Defendant's counterclaim in fraud as to the salaries paid to Messrs. Caton and Bromley is dismissed, with prejudice.

### 2. Salaries Paid to Patricia Caton and Sherry Bromley

The government claimed that Mrs. Caton's annual salary of $70,000 and Mrs. Bromley's annual salary of $74,880, were based on false records and were nothing more than another vehicle for Sterling to accelerate profit of approximately $50,000 per spouse. Mrs. Caton had worked in a clerical capacity for her husband on a volunteer basis for over ten years. Mrs. Bromley worked for her husband under similar circumstances for about three years. Neither woman had formal training in office management or purchasing. According to the Arsenal, Sterling represented in its March 23, 1987 price list that the Administrative Manager and Purchasing Manager would earn annual salaries of

$20,000 each. Therefore, argued defendant, Sterling fraudulently billed $100,000 in accelerated profit. Moreover, $70,000 per year for an office manager and $74,880 for a purchasing manager were unreasonable because the salaries exceeded the amount that a prudent person would incur in the conduct of competitive business. The Arsenal contended, based on comparable Maine labor statistics, that Mrs. Caton should have received no more than $21,984 annually, and Mrs. Bromley should have received no more than $25,680 annually. As noted above, in a September 14, 1987 memorandum to Mr. Valloze, Mr. Breen, the Arsenal's senior price analyst, recommended salaries of $40,000 for Sterling's purchasing manager, and $35,000 for its contract administrator as a counter-position for possible negotiations with plaintiff.

Mr. Valloze disregarded both the lower figures and the counter-position figures in his September 30, 1987 letter to Sterling. Rather than lower the rates at which Sterling billed for Mrs. Caton and Mrs. Bromley, Mr. Valloze authorized Sterling to continue to bill the government at the annual rate of $74,880, for Mrs. Bromley, and to *increase* Mrs. Caton's annual salary from $70,000 to $74,880. At trial, Mr. Valloze asserted that he believed he was acting reasonably in establishing their disputed salary rates. The Arsenal's senior contracting officer agreed to those salaries, in spite of hesitation on the part of both his price analyst and DCAA, precisely because he knew that a sealed-bid fixed-price contract protects the treasury from the dangers of excessive costs associated with cost reimbursements contracts. Obviously, the system is not infallible, but Sterling was, after all, the low responsive, responsible bidder. This court cannot find Sterling in violation of the False Claims Act when the Arsenal's senior contracting officer contemporaneously determined that the rates were acceptable and specifically incorporated them into the contract. Mr. Valloze's uncontroverted pre-trial deposition clearly demonstrated that he knew exactly what he was proposing: "I looked at what purchasing managers are getting in my own publications, the Federal Purchasing Di-

gest, and all the others, and I knew what a purchasing manager should get ... Nonetheless I said, well I'll extend [the disputed rates] out as far as I reasonably can." Thus, Mr. Valloze believed he acted reasonably in authorizing Sterling to bill these compensation rates. If the Arsenal's senior contracting officer did not balk at these rates, and even increased Mrs. Caton's, the court is loathe to find that the government can penalize Sterling for billing salaries that were acceptable to the contracting officer. In light of all the evidence, the government's *prima facie* case of fraud in Mmes. Caton's and Mrs. Bromley's compensation rates must fail. Defendant has failed to prove by a preponderance of the evidence that Sterling knowingly presented a false or fraudulent claim to the government. 31 U.S.C. § 3729. The government's counterclaim in fraud as to the salaries paid to Mmes. Caton and Bromley is dismissed with prejudice.

### B. *Alleged Fraud in Billing for Leases*

Defendant alleged that Sterling committed fraud upon the government by billing unreasonably high rates for leases between Sterling, Mr. Caton, Mr. Bromley, and Bromley Equipment, Inc. Defendant also alleged that two of the leases for which it was billed were for the use of property that was not allocable to the contract.

#### 1. Leases Between Sterling and Caton Real Estate

The government contended that Sterling entered into fraudulent and fictitious leases with Caton Real Estate for office and storage space in York, Maine at a rate of $10,700 per month. The storage space was leased at $26.59 per square foot while the office space was leased for $15.41 per square foot. DCAA inspected these spaces while conducting its August 26, 1987, audit of Sterling's second request for progress payments. DCAA concluded that Sterling was billed "the Government for a basement office in York Maine, that is not being used; therefore was not allocable to the contract." Sterling also billed the government for a small storage area and two garages. DCAA found that at the time of

its investigation the areas were either unused or used to store a mix of personal and Sterling property. The audit concluded that there were questions of allocability because of the unused space, but the audit did not find that the rates charged for the space were unreasonable or that the leases were fraudulent or fictitious. Similarly, Sterling charged the government for interior and exterior storage space which DCAA noted remained empty following the auditor's initial visit to Sterling's offices in York, Maine in May 1987. Sterling argued that the questioned space was destined for use in the Arsenal contract but due to Arsenal delay during the first three months of the contract, Sterling had not found it necessary, nor able, to purchase equipment or material to store.

The court questions DCAA's finding. If Sterling reserved the property for use on the contract, which was not disputed, rent would have been incurred, in a fixed-price contract on a *pro rata* basis each month. Defendant knew that Sterling intended to use the space on the contract from the outset, and presented no evidence that the space was not intended for legitimate storage use. Pursuant to the September 25, 1987 rate meeting, Sterling billed the Arsenal in October and November 1987, at a rate of $2,500 per month for the York, Maine office and storage space. In his December 15, 1987 letter to Mr. Caton, Mr. Valloze permitted Sterling to increase the price of the lease to the DCAA recommended amount of $2,700 per month.

Mr. Caton, individually, leased computer equipment to Sterling at a monthly rate of $3,200, which, according to the DCAA audit of August 26, 1987, may not have been reasonable under FAR 31–201.3, in that it could have been purchased by Sterling at less cost. In a September 14, 1987 memo to Mr. Valloze discussing the DCAA audit, Mr. Breen calculated that the extra cost to the government totalled $2,000 per month. The government did not allege that Sterling did not receive computer equipment from Mr. Caton, but merely that it paid too much. As noted above, the mere fact that an activity may be accomplished less expensively in a fixed-price contract falls measurably short of fraud under the False Claims Act.

In sum, Mr. Valloze paid Sterling for incurred lease costs that were less than the rates billed in Sterling's first three requests for progress payments. Neither the initially higher rates, nor the DCAA audit that questioned the allocability of the lease costs, supported a *prima facie* case of fraud. Sterling was an aggressive biller; in a commercial, profit-seeking arrangement, that is to be expected. The government, on the other hand, is expected to be aggressive in its protection of the public fisc, which includes using the type of contract, and meeting its contractual responsibilities to ensure judicious completion of the project and scrupulous protection of the taxpayer's money. Mr. Valloze and his staff failed in their tasks. While the court is cognizant that some of Sterling's transactions in question were not at arms-length, Congress did not intend good faith disputes over allocability or reasonableness of cost items in fixed-price contracts to trigger the False Claims Act. Defendant has failed to prove by a preponderance of the evidence that Sterling knowingly presented a false or fraudulent claim to the government. 31 U.S.C. § 3729. The government's counterclaim in fraud as to the leases between Sterling, Caton Real Estate, and Mr. Caton is dismissed with prejudice.

2. Leases Between Sterling and Bromley Equipment, Inc.

Bruce Bromley is the sole proprietor of Bromley Equipment, Inc., which executed a contract with Sterling to provide administrative, engineering, and technical personnel services for the duration of the Arsenal contract at a cost of $19,320 per month. The government claimed that the lease was fraudulent because the cost was excessive. The government also claimed that, although the Arsenal paid Sterling approximately $66,000 on Bromley Equipment, Inc.'s subcontract, Sterling paid Bromley Equipment, Inc. only $23,383.36. Furthermore, defendant alleged that the personnel named in the technical lease were not, in fact, available to Bromley Equipment, Inc.

Of the twelve individuals identified, six were not Bromley Equipment, Inc. employees. For example, when the services of Robert Hall, a professional engineer, were actually used on the contract, Sterling submitted a separate claim for his services. The Bromley Equipment, Inc. contract clearly stated that there would be "other outside consultants as required," and did not represent that the individuals listed were Bromley Equipment, Inc. employees. Furthermore, plaintiff contended that the charge for Mr. Hall was incurred because the government required an engineering analysis of the concrete oversawing by Sterling's demolition subcontractor. Ms. Felock allowed the $1,000 claim in a February 17, 1988, letter to Sterling, because the engineering analysis provided by Mr. Hall was beyond the scope of Sterling's lease with Bromley Equipment, Inc. and, therefore, it was entirely proper for the government to pay for the additional services demanded by the change order. Indeed, the Arsenal did not question whether Mr. Hall's services were beyond the scope of the Bromley Equipment, Inc. lease.

As already noted, at the September 25, 1987 rate meeting, Mr. Valloze reduced the rate of Bromley Equipment, Inc.'s technical support contract with Sterling to $10,000 per month. Mr. Bromley, on behalf of Bromley Equipment, Inc., executed a revised lease with Sterling to reflect the change. Finally, Mr. Caton testified at trial that Sterling wired $30,000 to Bromley Equipment, Inc. following the termination for default to cover the cost of Bromley Equipment, Inc.'s contract with Sterling.

The court finds that neither Mr. Caton's nor Mr. Bromley's actions in the Bromley Equipment, Inc. subcontract rise to the level of fraud under the False Claims Act. The record reflected that Bromley Equipment, Inc. provided the services it promised under the technical lease. The government's allegation of advanced profit rests on the theory that charging high rates for technical support services is *ipso facto* fraud. As stated above, this theory is insufficient. Defendant has failed to prove by a preponderance of the evidence that Sterling knowingly presented a false or fraudulent claim to the government. 31 U.S.C. § 3729. The government's counterclaim in fraud as to the lease between Sterling and Bromley Equipment, Inc. is dismissed with prejudice.

### 3. Lease Between Sterling and Bruce Bromley

Bruce Bromley, individually, leased office and storage space in Springfield, Massachusetts to Sterling Millwrights at an interim rate of $18,652.17 per month for use in the Arsenal contract. In March 1988, DCAA conducted a comparability study of rental rates for storage space in Springfield, obtaining quotes from area real estate firms and the Chamber of Commerce and concluded that the rate for comparable rental space would be $5,912 per month. The government cited this discrepancy between the two rates as evidence of fraud, yet Mr. Valloze agreed to pay Sterling for the Bromley lease at a rate of $10,000 per month. The government alleged fraud when the contractor billed three times the DCAA figure, but did not object when the Arsenal's senior contracting officer approved a rate of nearly twice the DCAA figure. Even if the government had the right to reduce a cost factor in a fixed-price contract without consideration it certainly cannot sustain a *prima facie* case of fraud with a discrepancy of one magnitude in the amount of plaintiff's billings. If the Arsenal wished to challenge the lease rate, the time to do so was before award, not long after the fact. Clearly, this is insufficient to satisfy the False Claims Act. Defendant has failed to prove by a preponderance of the evidence that Sterling knowingly presented a false or fraudulent claim to the government. 31 U.S.C. § 3729. The government's counterclaim in fraud as to the lease between Sterling and Bruce Bromley is dismissed, with prejudice.

### C. *Alleged Fraud in Billing of Pre-Award Engineering Expenses*

Defendant contended that Messrs. Caton and Bromley billed the Arsenal for pre-award engineering costs simply to accelerate profit. The first three billings included

pro rata incurred costs of approximately $8,900 for Mr. Caton and $7,800 for Mr. Bromley. The total amount claimed was $200,743. Defendant argued that the expenses were fictitious because they did not appear on the March 23, 1987, equipment price list. The pre-award budget prepared by Claire Collins, Sterling's accountant, also failed to reveal any trace of these expenses. There were no pre-award agreements, time records, or other documents indicating Sterling's intent to bill for pre-award engineering expenses.

The pre-award engineering expenses did not appear on the equipment price list because neither Mr. Caton nor Mr. Bromley were aware that they were entitled to pre-award engineering expenses until after award. It is clear from the record that Messrs. Caton and Bromley expended substantial time, effort, and money over a period of years to prepare for the contract. At the September 25, 1987, meeting Mr. Valloze told Messrs. Caton and Bromley he had determined that each man spent 840 hours, at $100 an hour, preparing for the contract and were, therefore, entitled to *pro rata* monthly payments based on a total compensation of $84,000 each. As a result he permitted Sterling to bill $7,000, each, monthly, for pre-award engineering services. Mr. Valloze's determination contradicted the government's argument that these expenses were false and fictitious.

The DCAA audit reported that Mr. Valloze had acted within his discretion when he approved the pre-award engineering payments and did not question the reasonableness or allocability of the costs. DCAA also indicated that pre-award engineering costs "should [be] amortized over the length of the contract, or be subject to a percentage of satisfactory physical completion, to minimize the impact on progress payment reimbursements." The court notes here that the pre-award engineering costs were billed on a *pro rata* basis as suggested by DCAA, but that the suggestion the payments be pegged to a percentage of physical completion was ludicrous. Such a payment scheme would be a violation of the contract, is a construction contract payment procedure, and, because the

costs had been incurred before award of the contract, could not have been measured by milestone completion during performance of the contract even if the contract were a construction contract. From a review of the record the court can find no evidence whatsoever that Sterling used its payments for pre-award engineering costs to accelerate profit. Mr. Valloze obviously did not agree with the amount billed and in the absence of any credible evidence of the expenses actually incurred the court cannot say that he acted improperly in reducing the amount. The pre-award engineering expenses were not cost factors in the fixed-price contract as were the other costs he unilaterally reduced. Defendant's counterclaim in fraud against the pre-award engineering costs is as totally and absolutely devoid of merit as its position on the pit survey requirement, and likewise borders on the frivolous. Defendant has failed to prove by a preponderance of the evidence that Sterling knowingly presented a false or fraudulent claim to the government. 31 U.S.C. § 3729. The government's counterclaim in fraud against the pre-award engineering costs paid to Messrs. Caton and Bromley is dismissed, with prejudice.

### D. *Alleged Fraud in Sterling's Critical Path Analysis*

The Arsenal argued that Mr. Bromley, who was responsible for the critical path analysis, knowingly and fraudulently manipulated Sterling's critical path to mask Sterling's failure to progress with pit preparation and erection of structural steel. To avoid detection by the Arsenal's technical staff defendant asserted that Mr. Bromley, who prepared the critical path analysis, fraudulently extended the completion times of certain activities, thereby creating false incurred costs and increasing Sterling's billings to the Arsenal.

The DX–C2 status of the contract underscored the importance of completing the project within the one-year contract period. Pursuant to the requirements of the Offeror's Statement of Compliance set forth in the contract, Sterling was to submit an as-planned PERT Chart shortly after award,

and provide monthly critical path progress updates to the Arsenal. The contract did not specify in what format the *updates* were to be. Mr. Bromley created Sterling's pre-award as-planned PERT Chart on March 23, 1987, by obtaining estimated beginning and ending dates of subcontractors' activities. He adjusted these dates to fit into the overall project and, as more information became available, entered the data on a regular basis into a computer software package designed specifically to create PERT Charts. Mr. Bromley provided the PERT Chart to subcontractors and suppliers on June 4, 1987, prior to award, none of whom indicated disagreement or displeasure at the chart's estimated beginning and ending dates for their respective activities.

Defendant charged that Sterling did not have its PERT Chart ready until September 3, 1987. Yet, the evidence of record plainly revealed that the Arsenal evaluated and approved Sterling's March 23, 1987, pre-award as-planned PERT Chart on June 9, 1987, the day the contract was awarded to Sterling, in accordance with the Offeror's Statement of Compliance.

The facts surrounding the issue of the progress update format is another example of rampant confusion by the Arsenal staff. Mr. Hockenbury, the Arsenal's lead technical representative on the project, told Mr. Bromley, in pre-award discussions, that updates to Sterling's as-planned PERT Chart should be submitted in the form of Gantt Charts on the twentieth of each month.[18] Mr. Hockenbury stated that Sterling's update charts were to be used by the Arsenal's accounting department for progress payment review, and that updates in Gantt Chart format were most appropriate, notwithstanding that payments were based on incurred costs and not actual completion dates, as depicted on a Gantt Chart. Mr. Hockenbury was but one other Arsenal employee who believed Sterling had been awarded a construction contract, or, more than likely, did not understand the difference between a construction and supply contract. Accordingly, Sterling submitted Gantt Chart updates to the Arsenal's accounting department beginning on July 20, 1987, and on or around the twentieth of every month, through June 1988. Once again, Arsenal management struck a raw chord. Mr. Hockenbury, as lead technical representative, had no business interpreting the contract, much less any authority, to instruct Sterling to submit Gantt Charts as an acceptable form of compliance, even though the contract was silent as to the form of the critical path updates.

On September 2 or 3, 1987, either Ms. Felock or Mr. Valloze informed Sterling that progress updates were to be in the form of PERT, not Gantt, Charts, and that the updates were to be submitted to the contracting officer. In an attempt to comply immediately, Mr. Bromley submitted an identified copy of Sterling's original as-planned PERT Chart to the Arsenal the next day. Mr. Bromley then undertook to update the original as-planned chart as quickly as possible. Three weeks later, on September 28, 1987, Mr. Bromley furnished the Arsenal with the first "thirty day update." Sterling then submitted PERT Chart updates monthly until May 25, 1988, all the while continuing to submit updates in Gantt Chart form to the Arsenal's accounting department to satisfy Mr. Hockenbury's demands.

In a letter to Sterling on October 1, 1987, the Arsenal indicated that Sterling's PERT Chart was acceptable but that the one-year completion date was "questionable" because the actual completion dates of activities that had been performed were later than depicted in Sterling's *pre-award* as-planned chart. Mr. Bromley told the Arsenal that the pre-award PERT Chart was based purely on estimates and had been calculated as accurately as possible at the time. This correspondence was the only communication between the parties about PERT Charts, updates, actual dates and "as-planned" dates. There is no evidence that the Arsenal challenged any of Ster-

---

**18.** A Gantt chart is a bar chart that shows actual completion dates and can be used to compare the as-planned with actual performance.

ling's PERT Chart estimates, scheduling logic, or the critical path during the performance period.

Defendant's assertions of fraud in Sterling's PERT Chart and critical path analysis bear repeating. First, the government took several illogical and wholly unpersuasive positions as to Sterling's alleged misdeeds. Paragraph 128 of defendant's Amended Answer and Counterclaim stated

Sterling manipulated its CPM and its CPM updates by stating that virtually every subcontractors' work fell on the critical path when in truth and in fact the steel subcontractor's work was the only activity on the critical path. Sterling made these false statements in order to create delay claims for those subcontractors. The subcontractor claims, in turn, allowed Sterling to include its grossly inflated and false overhead rates and a profit as a mark-up on each subcontractor claim.

Yet, on page twenty-eight of the its Contentions of Fact and Contentions of Law, the government stated, "In truth and in fact, the critical path included the waterproofing (pit restoration) and the concrete pours, a fact that never appears on Sterling's charts." Not only did the government flip-flop from a "steel only" critical path to a "concrete and waterproofing" critical path, the government alleged in its Contentions of Fact and Law that the concrete and waterproofing work never appeared on Sterling's critical path. Yet, the government alleged in its Amended Answer and Counterclaim that concrete and waterproofing did appear on Sterling's critical path as fraudulent entries to accelerate or increase payments.

The government's final position, at trial, was that Sterling committed fraud because it intentionally misrepresented activities on the critical path of its as-planned PERT Chart given the Arsenal on September 3, 1987. It must be remembered that the PERT Chart the Arsenal could not understand was the original pre-award as-planned PERT Chart prepared on March 23, 1987, and approved by the Arsenal on June 9, 1987, without question or challenge. The updated version, submitted September 28, 1987, was not challenged here. The government pointed to an absence of logic lines in the March 23, 1987 chart to link the pit restoration and concrete activities and contended years after the fact that Sterling's as-planned schedule did not depict a critical path running through the activities that Sterling actually performed to prepare for erection of the steel in the pit. The government concluded:

Sterling knew when it submitted [the June 9, 1987, chart on September 3, 1987,] to the Arsenal that its logic did not link the critical path activities it would have to perform to ready the pit for the structural steel. For this reason, the September 3, 1987, As-planned [sic] does not accurately reflect Sterling's actual plan and was knowingly false.

The court finds it tedious to repeatedly address the same dubious arguments but is constrained to do so to fully address the issues pleaded by the government. Sterling delivered the June 9, 1987, pre-award as-planned PERT Chart originally created on March 23, 1987, to the Arsenal on September 3, 1987, under circumstances of the Arsenal's own making. The contract did not state the form for the critical path analysis updates. The lack of any other direction, and Mr. Hockenbury's demands and assurances of compliance lulled Sterling into believing it was in compliance with the contract. Mr. Bromley freely admitted that the September 3, 1987 chart was the June 9, 1987 chart. He had not created updates in PERT Chart form, only Gantt Chart form. As a result, the quality of the information on the September 3, 1987 PERT Chart could not be expected to be as accurate, for example, as the information on the first PERT Chart update of September 28, 1987. Actual dates of completion of portions of the project should not be used in hindsight to criticize a pre-award PERT Chart that was based on reasonably anticipated dates. The Arsenal's allegations of fraud ring hollow given Mr. Hockenbury's misplaced instructions and the contracting officer's demand for an immediate update in PERT Chart form which Mr. Valloze

received three weeks later only to ignore in favor of an out-of-date analysis. The Arsenal knew, or should have known from its records, that the analysis it received on September 3, 1987, was the original as-planned chart of March 23, 1987, it had approved on June 9, 1987. Moreover, given the Arsenal imposed time constraints facing Mr. Bromley, he could not have been expected to execute every complex scheduling detail to perfection. Genuine mistakes and oversights are normal parts of every project, great and small. In the administration of this contract, the Arsenal should be last in line to make any allegations against Sterling based on mistake, much less allegations of fraud.

The government's argument is flawed for another reason. As noted above, Mr. Scavello, the Arsenal's expert on construction scheduling techniques, developed his own PERT Chart for trial purposes. On cross-examination, plaintiff's attorney elicited the fact that Mr. Scavello had not shown a logic line connecting concrete pours for piers in the pit with the approval of anchor bolt lay-out drawings and the receipt of the anchor bolts. Plaintiff suggested that Mr. Scavello was not guilty of committing a fraud on the court merely because he would have performed activities not shown by logic lines on the chart. Without much much more, evidence of activities undertaken in the absence of logic lines on Sterling's PERT Chart is simply not evidence of fraud under the False Claims Act.

The government also contended that, because Mr. Bromley used his critical path analysis computer software thirty-nine times, there must exist thirty-nine different versions of the PERT Chart and the critical path. That thirty-nine different entries into, and exits from, a computer program created thirty-nine different versions of Sterling's critical path chart is a flimsy basis for any complaint or allegation, much less for fraud. At trial, the government conceded that the difference between one "version" and another might be a mere symbol. Mr. Bromley, who created the charts in question, stated on cross-examination that he made many attempts to complete the program before doing so to his satisfaction. Common sense and personal experience tells us that a software user may begin a project, stop in the middle before it is completed, only to begin again when necessary or convenient, and that such behavior is typical of computer operations and business projects in general. Clearly, this is not evidence of a reckless disregard of the statements in Sterling's Chart of September 3, 1987, much less evidence of any fraud against the government. Finally, what did it matter even if Mr. Bromley had created thirty-nine complete PERT Charts updates? Of what possible relevance were defendant's allegations that there could have been thirty-nine versions?

The government also alleged that Mr. Bromley selectively pre-dated PERT Chart activities for the purpose of manipulating the critical path despite his promise to the Arsenal to show actual dates. The Arsenal contended, and Sterling conceded, that on the 330–day update, Mr. Bromley had not inserted actual dates for the concrete pours. On the 150–day update, the government alleged that Mr. Bromley showed the concrete pours starting before they, in fact, occurred, and the pit restoration yet to start when it already had been completed. Sterling knowingly manipulated these updates, so argued the government, to add subcontractors to the construction process, thereby creating false incurred costs and increasing Sterling's billings to the Arsenal. Logic alone tells us this could not be the case for pit restoration. The opposite would be the case. If Sterling manipulated the charts to create false billings it would have shown the pit restoration completed before it was actually completed, not after. Moreover, Sterling's failure to insert actual completion dates for the concrete pours did not constitute reckless disregard of the truth of the September 3, 1987, chart. The notation "@@@" was used on the chart to indicate actual work occurring. On the 150–day update, no such notation appeared on the chart for concrete work, i.e., concrete work had not yet occurred even though the date on the as-

planned chart had already passed. Defendant's argument is without merit. The court does not believe that Sterling could have created accelerated incurred costs simply by inserting false dates on its PERT Chart updates if, in fact, the work had not occurred. It was not Arsenal practice to issue progress payments solely on the basis of PERT Chart entries, in the absence of incurred cost progress payment requests, site visits, or other forms of verification by Arsenal staff.

It bears repeating that critical path analysis is not without its limitations. If the contractor calculates performance time with inaccurate "best estimates," the resulting critical path will be faulty. A contractor may innocently omit an activity that is critical to another, or depict an activity as critical that is not. The resulting critical path analysis will be misleading. PERT Charts and critical path method analyses are flexible concepts that vary with the inputs used in their formulation. The planning of a project of this complexity draws upon both science and art, *i.e.*, the planning depends on both the precision of the design and the judgments of many people on both sides of the contract. That the as-planned schedule on Mr. Scavello's PERT Chart yielded different start and finish dates than Mr. Bromley's is of little surprise and no consequence. That Mr. Bromley's PERT Chart used some logic lines and not others, without some evidence that he knew that he failed to insert such lines in reckless disregard of the truth, fails to support the government's counterclaim. That Sterling followed a sequence of work that was different from its logic lines on the Chart does not prove the government's counterclaim. The government failed to prove that Sterling misrepresented activities on it critical path in reckless disregard of the truth of the critical path and PERT Charts in an effort to increase or accelerate payments for incurred costs.

The court finds that the government's allegations of fraud in Sterling's PERT Chart and updates do not satisfy the government's preponderance of the evidence burden under the Act. The government failed to adduce any evidence of conversations, memoranda, or actions on the part of Messrs. Caton and Bromley to prove that they recklessly submitted PERT Charts and PERT Chart updates containing false data or that they were in reckless disregard of the truth of the information contained in their PERT Charts. Simply alleging a motive, without more, especially such a weak motive, does not meet the government's evidentiary burden. There was no evidence that Sterling conspired with subcontractors to overload the critical path, or that it acted to conceal information or activities from the Arsenal. Although the government no longer has the burden of proving specific intent under the amended False Claims Act, it may not dodge the burden of proving its case. Defendant has failed by a wide margin to prove by a preponderance of the evidence that Sterling knowingly presented a false or fraudulent claim to the government. 31 U.S.C. § 3729. Defendant's counterclaim in fraud as to Sterling's critical path analysis is dismissed with prejudice.

### E. Alleged Fraud in Sterling's Estimated Date of Completion

The government charged that Sterling committed an intentional misrepresentation by promising the government a May 23, 1988, completion date, allegedly knowing that subcontractors Johnson Controls and Gray Electric required at least until June 8, 1988, to finish their subcontracts. Sterling argued that, as prime contractor, it was not bound by the dates given by its subcontractors, especially at the outset of the contract. The evidence revealed that when Sterling gave its PERT Charts with the May 23, 1988, completion dates to Johnson Controls and Gray Electric, neither objected. For all we know, had the Arsenal not caused so much delay, confusion, and cash flow problems, the subcontractors' work would have been completed by May 23, 1988, even if the work had to be accelerated. But, even if it took the two subcontractors until June 8, 1988, to finish their tasks the contract would still have been completed within the one year time period for performance. Is a sixteen-day delay a

serious concern when the contract still would have been finished on time? The court cannot not find that Sterling knowingly misrepresented the contract completion date to the government. The court quite honestly cannot understand why defendant raised this issue except, perhaps, in a feeble attempt to obfuscate other issues. Defendant has failed to prove by a preponderance of the evidence that Sterling knowingly presented a false or fraudulent claim to the government. 31 U.S.C. § 3729. The government's counterclaim in fraud against Sterling's estimated completion date is dismissed with prejudice.

### F. Alleged Fraud in Withholding of Payments to Subcontractors

On April 1, 1988, Sterling submitted its tenth request for progress payment for costs incurred from February 21, 1988, to March 20, 1988. The request included direct costs for E.P. Technology, ($10,000), Johnson Controls ($25,740), New England Lead Burning Co. ($52,292), and Tougher Industries ($108,750).[19] On May 18, 1988, forty-five days later, the Arsenal paid Sterling for the incurred direct costs.[20] Of $145,680 in total direct costs paid to Sterling, Sterling failed to pay $117,189 to its subcontractors. Sterling submitted its eleventh request for progress payments on May 6, 1988.

The government charged in its Post Trial Brief that:

> Sterling's decision not to pay its subcontractors was made well before May 6, 1988. Sterling's tenth request covered work performed between February 21, 1988, and March 29, [sic] 1988.... Sterling claimed to have withheld payment because of deficiencies in the subcontractors' work.... [t]hus it is likely that Sterling knew whether this work was

deficient and had decided to withhold $117,189 in payments well in advance of May 6, 1988, when its eleventh request was submitted to the Arsenal; thus Sterling's eleventh request for payment was false.

At trial, however, the government was unable to prove these allegations. Mr. Caton's direct examination yielded the following on the subject of the disputed withholding of subcontractor payments:

Q: Now for all progress payments prior to progress payment number 10, had Sterling paid the amounts it received from the Arsenal on behalf of subcontractors to subcontractors?

A: Yes.

Q: And in progress payment number 10, did Sterling pay every amount received on behalf of subcontractors to subcontractors?

A: No.

Q: Why not?

A: The Arsenal had improperly withheld amounts of money from progress payment number 10 for Sterling's overhead cost per the agreement with John Valloze and myself, and that was back in September. And progress payment number 10 was for work done from February 21, 1988, to March 20, and was submitted on about April 1, which was when we received the payment from the government was [sic] 45 days after the billing date and even longer since the work was done.

By the Arsenal withholding those payments and the untimely payment, it created a cash flow problem. Coupled with that fact, during the time from when the work was originally done February—March of '88, to when we

---

**19.** These figures were taken from Defendant's Post Trial Brief, at 36, and were used by the government at trial. However, Plaintiff's Post Trial Brief at 61 cited the following amounts: E.P. Technology ($8,000); Johnson Controls ($19,305); New England Lead Burning Co. ($31,375); and Tougher Industries ($87,000). Neither party attempted to reconcile these discordant amounts. As this is defendant's counterclaim, the court shall use the figures from Defendant's Post Trial Brief. That the amounts

differed does not go to the merits of the fraud claim.

**20.** It should be remembered that Mr. Valloze failed to honor his rate agreement of September 30, 1987, in Sterling's tenth request for progress payment by withholding $54,000 in indirect costs, although Sterling had been billing at the rates approved by Mr. Valloze.

had received payment at the end of May, we had received various correspondence on subcontractors' and suppliers' work which the Arsenal felt was deficient or needed explanations.

And in addition, one of the subcontractors, Tougher Industries, appeared to be dragging their feet for some reason in the performance of their work.

So with all those reasons, I made a business decision that I would not pay those subcontractors until things get straightened out.

Q: Did you pay other subcontractors amounts received on their behalf?

A: Yes.

Q: Why did you pay those [subcontractors]?

A: I felt that they were performing.

At trial, Mr. Caton testified that Tougher Industries billed Sterling $87,000 for a piece of equipment known as a Baltimore Aircoil. Sterling included the incurred cost of the item in its tenth request for progress payments. The Arsenal issued progress payment ten, including the $87,000, to Sterling on May 18, 1987. The Baltimore Aircoil unit, however, was delivered covered in salt, and had been manufactured contrary to the approved shop drawings. For these reasons, the unit failed to conform to the requirements of the contract and was not acceptable. Sterling never paid Tougher for the Baltimore Aircoil.

On cross-examination, the government asked Mr. Caton why Sterling billed the government for the Baltimore Aircoil if it was defective. Mr. Caton answered that "the Army made payment [to Sterling for the Aircoil], and ... at the same time ... gave us notice[,] after we had submitted the [eleventh] bill[,] of these various deficiencies on the Baltimore Aircoil unit." Defendant inquired why Mr. Caton did not execute a revised progress payment request that would have acknowledged the defective Baltimore Aircoil and reduced the request by $87,000. Mr. Caton responded that request for progress payment eleven had been submitted two weeks before Sterling received notice from the Arsenal that the Baltimore Aircoil was defective.

The government then asked whether paying Tougher Industries for the defective unit would have been a wiser course of action. Mr. Caton responded that in his business judgment, withholding payment "might make them a little more eager to work with Sterling in performing the contract." The court concludes from this testimony that Sterling did not know of the defective nature of the Baltimore Aircoil at the time it billed the Arsenal for the unit and honestly believed the cost had been incurred legitimately. Therefore, Mr. Caton could not knowingly have violated the False Claims Act, or the certification on the reverse of progress payment ten. The certification required the prime contractor to promise it would pay subcontractor costs "when due, in the ordinary course of business, [and] that the work reflected [in the request for progress payment] has been performed, [and] that the quantity and amount involved are consistent with the requirements of the contract." FAR 53.-301–1443. Mr. Caton's testimony made it abundantly clear that as of May 6, 1988, when it submitted the eleventh request for progress payments, Sterling did not know that the Baltimore Aircoil was defective. Moreover, the phrase in the certification, "when due, in the ordinary course of business" meant for the contractor to do exactly what Mr. Caton did. Once the defects in the Baltimore Aircoil were brought to his attention, he did not pay Tougher Industries because a responsible business person would not pay for defective goods in the ordinary course of business. By then, Sterling was deeply enmeshed in the dispute over progress payments eleven and twelve, and the project came to a grinding halt before further action could be taken with Tougher Industries by either party.

Defendant failed to prove by a preponderance of the evidence that Sterling knowingly presented a false or fraudulent claim to the government. 31 U.S.C. § 3729. Defendant's counterclaim in fraud against Sterling's payments to subcontractors and the certification on its request for progress payment forms is dismissed with prejudice.

## G. *Alleged Fraud in Sterling's Cost to Complete*

Defendant alleged that Sterling intentionally misrepresented its cost to complete the contract beginning with its eighth request for progress payments. According to the Defendant's Post–Trial Brief,

[i]n each request for progress payment the contractor must state on line 12(b) its estimated cost to complete. This estimate must [be] an actual estimate and it must be updated at least every six months. The contractor cannot simply fill in the difference between the amount spent and the remaining contract price.

FAR 53.301–1443, line 12(b) (October 1982).

The government charged that Sterling stated that it would complete the contract at a profit. In reality, argued defendant, beginning with request for progress payment eight, Sterling understated its cost to complete by $110,000 to $630,000 as calculated by Ms. Susan Teser, the DCAA auditor who audited Sterling's contract. According to defendant Sterling knew that if it projected a loss under the contract the government would have reduced its payments pursuant to FAR 32.503–6(g), and for this reason Sterling concealed a loss of nearly $257,000 from the Arsenal as early as November 1987. The loss stemmed from Sterling's alleged increase in overhead which the government argued was caused by Sterling's false and fictitious billings.

Sterling freely admitted that it mechanically subtracted each billing from the contract price, rather than calculate a new estimate. Such a mechanical calculation is not forbidden by line 12(b); nor did it contain the admonition for prohibition, as defendant falsely stated, that "[t]he contractor cannot simply fill in the difference between the amount spent and the remaining contract price." The fact that Sterling's calculations for line 12(b) were simple subtractions does not equate to fraud in the absence of further proof. Significant latitude is given the contractor in that it is only required to update the estimated time to complete the contract every six months.

The counterclaim fails for another reason. Ms. Teser admitted on cross-examination that when Sterling submitted its delay claim on December 16, 1987, it represented to the government that Sterling was in a potential loss situation if the contract lasted more than one year and the government did not grant Sterling's claim. This was well before the alleged misrepresentation on the eighth request for progress payments which Sterling submitted to the Arsenal on January 20, 1988. Ms. Teser also stated that she had projected the September 30, 1987 salary, lease, and pre-award rates over twelve months to arrive at a figure of what it would cost the government to extend the contract. Yet, she conceded that she did not use those same figures when she performed her audit of Sterling's costs. Ms. Teser also testified that by July 1988, Sterling had paid $381,-594 more to Messrs. Caton and Bromley in pre-award engineering costs, and in salaries, than the government had paid to Sterling. Ms. Teser's testimony was misleading and nonsensical. Nonsensical because it was known by the Arsenal that Sterling used funds from the Marine Midland Bank line of credit to make up the shortfalls caused by the Arsenal's slow payment policy and Mr. Valloze's refusal to pay all properly incurred costs. Misleading, because Ms. Teser, in arriving at her figure of $381,594, admitted that she had not calculated the $809,910 in checks for approved progress payments eleven and twelve that were due Sterling, plus the $54,000 improperly deleted from progress payment ten that she knew was to be paid in progress payment eleven. In short, Sterling's certified costs to complete may, or may not, have been totally recalculated in each payment request, but there is no evidence that the figures presented were incorrect. If there were errors they were clearly not part of a nefarious scheme to defraud the United States. There was no other evidence elicited from Ms. Teser or any other witness to rebut the conclusions the court drew from Ms. Teser's cross-examination. The court finds that defendant failed to prove by a preponderance of the evidence that Sterling knowingly presented a false

or fraudulent claim to the government. 31 U.S.C. § 3729. The government's counterclaim in fraud against Sterling's estimated cost to complete is dismissed, with prejudice.

II. The Forfeiture Statute and 18 U.S.C. § 1001

The Court of Claims held that the government must prove fraud by a clear and convincing standard to prevail under the Forfeiture Statute, 28 U.S.C. § 2514. *McCarthy v. United States,* 229 Ct.Cl. 361, 670 F.2d 996, 1003 (1982); *O'Brien Gear & Mach. Co. v. United States,* 219 Ct.Cl. 187, 591 F.2d 666, 672 (1979); *Miller v. United States,* 213 Ct.Cl. 59, 550 F.2d 17, 22 (1977) (citing *Chelsea Factors, Inc. v. United States,* 212, 149 Ct.Cl. 202, 181 F.Supp. 685, 691 (1960)).

If the government was unable to prevail on its fraud counterclaims with the benefit of the lower standard of "preponderance of the evidence," it could not possibly prevail under the more arduous, "clear and convincing standard." Therefore, there is no need to further expend the court's resources by performing an exacting analysis of the facts under the Forfeiture Statute.

Similarly, violation of 18 U.S.C. § 1001 is a felony, carrying with it the possibility of a five-year prison term. Here, the government must prove guilt "beyond a reasonable doubt." *United States v. Weiler,* 385 F.2d 63, 65 (3d Cir.1967); *Walker v. United States,* 192 F.2d 47, 49 (10th Cir.1951). Assuming the court had jurisdiction, analysis would be pointless because the government's counterclaim failed even under the lower "preponderance of the evidence" standard.

III. The Contract Disputes Act Fraud Provisions

While the burdens of proof under the False Claims Act, Forfeiture Statute, and 18 U.S.C. § 1001, are clear, Congress, the Supreme Court, the Federal Circuit, the Court of Claims, and this court are silent as to the government's burden of proof under the CDA, 41 U.S.C. §§ 601–13, the Supreme Court appears to be edging toward a preponderance of the evidence standard in a widening variety of civil fraud cases. In *Grogan v. Garner,* —— U.S. ——, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991), the Court established the preponderance standard in bankruptcy fraud cases. *Herman & MacLean v. Huddleston,* 459 U.S. 375, 387–89, 103 S.Ct. 683, 690–91, 74 L.Ed.2d 548 (1982), established the preponderance standard in SEC fraud cases. This court need not fabricate new law out of whole cloth. Common sense and judicial economy permits the court to dispense with an analysis of the facts based on the CDA. Regardless of whether the standard of proof is "clear and convincing" evidence, or the lesser "preponderance of the evidence," the counterclaim would fail for the reasons given in the court's discussion of the False Claims Act. Defendant met neither standard.

CONCLUSIONS

■ Default termination is a drastic sanction, and should be imposed only on the basis of solid evidence. *Sun Cal, Inc. v. United States,* 21 Cl.Ct. 31, 39 (1990) (citing *Lisbon Contractors, Inc. v. United States,* 828 F.2d 759 (Fed.Cir.1987) and *J.D. Hedin Constr. Co. v. United States,* 187 Ct.Cl. 45, 408 F.2d 424, 431 (1969)). It is a type of forfeiture. *De Vito v. United States,* 188 Ct.Cl. 979, 413 F.2d 1147, 1153 (1969). For these reasons, it is the government that bears the burden of proof, by a preponderance of the evidence, to establish that the default termination was justified. *Lisbon Contractors, Inc.,* 828 F.2d at 765.

FAR Clause 52.249–8, *Termination for Default,* in the contract between Sterling and the government stated in relevant part:

(a)(1) The Government may ... terminate this contract ... if the Contractor fails to—

(i) Deliver the supplies or to perform the services within the time specified in this contract or any extension;

(ii) Make progress, so as to endanger performance of this contract ...

\* \* \* \* \* \*

(c) Except for defaults of subcontractors at any tier, the Contractor shall not be liable for any excess costs if the failure to perform the contract arises from causes beyond the control and without the fault or negligence of the Contractor. Examples of such causes include ... (2) acts of the Government in either its sovereign or contractual capacity ...

\* \* \* \* \* \*

(d) If the failure to perform is caused by the default of a subcontractor at any tier, and if the cause of the default is beyond the control of both the Contractor and subcontractor, and without the fault or negligence of either, the Contractor shall not be liable for any excess costs for failure to perform, unless the subcontracted supplies or services were obtainable from other sources in sufficient time for the Contractor to meet the required delivery date.

\* \* \* \* \* \*

(g) If, after termination, it is determined that the Contractor was not in default, or that the default was excusable, the rights and obligations of the parties shall be the same as if the termination had been issued for the convenience of the Government.

Sterling's failure to deliver the chrome-plating facility within the time originally specified in the contract cannot be attributed to Sterling because the causes were beyond its fault or negligence. As discussed at length above, the Arsenal egregiously failed to meet its contractual obligations, and Sterling's inability to complete the contract within the time specified was caused principally by that failure. Based on all the evidence of record, and its determination of the veracity of the witnesses observed at the lengthy trial, the court holds that the government has not borne its burden under *Lisbon*. The evidence clearly demonstrated severe and unjustifiable delay on the part of the Arsenal to review critical path shop drawings, failure to allow timely equitable adjustments for time and money to compensate for significant delay caused by the Arsenal, and failure to issue progress payments rightfully earned by Sterling. *TGC Contracting Corp. v. United States*, 736 F.2d 1512 (Fed. Cir.1984); *National Eastern Corp. v. United States*, 201 Ct.Cl. 776, 477 F.2d 1347 (1973); *Murdock Mach. & Eng'g Co. v. United States*, 873 F.2d 1410 (Fed.Cir. 1989); *Sun Cal, Inc. v. United States*, 21 Cl.Ct. 31 (1990); *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759 (Fed.Cir. 1987); *J.D. Hedin Constr. Co. v. United States*, 187 Ct.Cl. 45, 408 F.2d 424 (1969). Accordingly, under paragraph (g) of FAR 52.249–8, the *Termination for Default* clause, Sterling's termination for default is converted to a termination for convenience of the government. Pursuant to FAR 52.-249–2, *Termination for Convenience of the Government (Fixed Price)*, the contractor may recover costs incurred in the performance of the work terminated including a reasonable profit. Sterling is entitled to equitable adjustments to its contract for time and money, and interest pursuant to 41 U.S.C. § 611.

For the reasons discussed the court holds:

1. The government improperly terminated Sterling Millwrights, Inc. for default and the termination shall be converted to a termination for the convenience of the government.

2. The government caused months of delay by its failure to review anchor bolt, erection, and detail drawings, and other drawings within the five-working-day period, and to provide as-built drawings needed by Sterling.

3. The government caused delay by ordering an extension of the review process for shop drawings from five-working days to ten-working days.

4. The government caused delay by providing flawed design drawings, failing to issue a change to the contract incorporating WKC's solution to the pit wall bulges for three months after discovery of the pit wall irregularities, and all non-overlapping delays as discussed above.

5. The government is liable for unilaterally reducing the salaries and lease rates in

the fixed-price contract without consideration.

6. The government caused the contractor to suspend work at the job site by improperly withholding payments for incurred and approved progress payments.

7. As an incident to damages defendant may be liable for the tardy issuance of any progress payments that plaintiff requested in a timely and proper manner under the provisions of the Prompt Payment Act, 31 U.S.C. §§ 3901–3907. *See also* FAR Subpart 32.9.

8. Plaintiff is responsible for twenty days of delay for Albany Steel's tardiness in recommencing steel detail drawings.

Judgment will be deferred until the parties stipulate to, or the court rules, on damages.